**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TYLER DIVISION**

| | | |
|---|---|---|
| **j2 GLOBAL** | § | |
| **COMMUNICATIONS, INC.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| | § | |
| **vs.** | § | **NO.  6:08-cv-262 (LED)** |
| | § | |
| **CAPTARIS, INC.,** | § | **JURY DEMANDED** |
| | § | |
| **Defendant.** | § | |

**CAPTARIS' FIRST AMENDED ANSWER,**
**AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS**

In response to the allegations of the Complaint, defendant Captaris, Inc. ("Captaris") states as follows:

**AMENDED ANSWER**

1.      Regarding the allegations in Paragraph No. 1 of the Complaint, Captaris is without sufficient information to form an opinion as to the truth of the allegations and, on that basis, denies them.

2.      Regarding the allegations in Paragraph No. 2 of the Complaint, Captaris admits that it is a Washington corporation with a principal place of business in Bellevue, Washington. Captaris admits that its business includes the services described in Paragraph 2 of the Complaint and that it may have customers in this district.

3.      Regarding the allegations in Paragraph No. 3 of the Complaint, Captaris admits that the Complaint purports to state an action for patent infringement, and that the Court has subject matter jurisdiction over plaintiff's alleged claims.

4.      Regarding the allegations in Paragraph No. 4 of the Complaint, Captaris admits that the Court has personal jurisdiction over it in this case.  Captaris denies the remainder of the allegations in Paragraph No. 4 of the Complaint.

5.      Regarding the allegations in Paragraph No. 5 of the Complaint, Captaris admits that venue may be proper in this district pursuant to 28 U.S.C. §§ 1391(b) and (c), and 1400(d), but Captaris asserts that venue in this Court is not convenient and does not comport with the interests of justice.  Captaris denies the remaining allegations contained in Paragraph No. 5 of the Complaint.

6.      Regarding the allegations in Paragraph No. 6 of the Complaint, Captaris restates and incorporates herein the answers of Paragraph Nos. 1 through 5 above as if fully set forth herein.

7.      Regarding the allegations in Paragraph No. 7 of the Complaint, Captaris admits that U.S. Patent No. 6,597,688 ("the '688 patent") is entitled "Scalable Architecture for Transmission of Messages over a Network," that the '688 patent issued on July 22, 2003 to Anand Narasimhan, Yaacov Shemesh and Amit Kumar, and that a copy of the '688 patent appears to be attached as Exhibit A to the Complaint.  Captaris denies that the '688 patent was duly and legally issued.

8.      Regarding the allegations in Paragraph No. 8 of the Complaint, Captaris is without sufficient information to form an opinion as to the truth of the allegation that j2 owns by assignment the entire right, title and interest in and to the '688 patent, including the right to sue for past, present, and future infringements thereof, and, on that basis, denies the allegation.  Captaris denies the remainder of the allegations in Paragraph No. 8 of the Complaint.

9.      Regarding the allegations in Paragraph No. 9 of the Complaint, Captaris denies the allegations.

10.     Regarding the allegations in Paragraph No. 10 of the Complaint, Captaris admits that its activities have been without express or implied license by plaintiff but denies that its activities require express or implied license by plaintiff.

11.     Regarding the allegations in Paragraph No. 11 of the Complaint, Captaris denies the allegations.  Captaris further denies that plaintiff is entitled to any relief.

12.     Regarding the allegations in Paragraph No. 12 of the Complaint, Captaris denies the allegations.  Captaris further denies that plaintiff is entitled to any relief.

13.     Regarding the allegations in Paragraph No. 13 of the Complaint, Captaris denies the allegations.  Captaris further denies that plaintiff is entitled to any relief.

14.     Regarding the allegations in Paragraph No. 14 of the Complaint, Captaris restates and incorporates herein the answers of Paragraph Nos. 1 through 13 above as if fully set forth herein.

15.     Regarding the allegations in Paragraph No. 15 of the Complaint, Captaris admits that U.S. Patent No. 7,020,132 ("the '132 patent") is entitled "Scalable Architecture for Transmission of Messages over a Network," that the '132 Patent issued on March 28, 2006 to Anand Narasimhan, Yaacov Shemesh and Amit Kumar, and that a copy of the '132 patent appears to be attached as Exhibit B to the Complaint.  Captaris denies that the '132 patent was duly and legally issued.

16.     Regarding the allegations in Paragraph No. 16 of the Complaint, Captaris is without sufficient information to form an opinion as to the truth of the allegation that j2 owns by assignment the entire right, title and interest in and to the '132 patent, including the right to sue

for past, present, and future infringements thereof, and, on that basis, denies the allegation. Captaris denies the remainder of the allegations in Paragraph No. 16 of the Complaint.

17.     Regarding the allegations in Paragraph No. 17 of the Complaint, Captaris denies the allegations.

18.     Regarding the allegations in Paragraph No. 18 of the Complaint, Captaris admits that its activities have been without express or implied license by plaintiff but denies that its activities require express or implied license by j2.

19.     Regarding the allegations in Paragraph No. 19 of the Complaint, Captaris denies the allegations.  Captaris further denies that plaintiff is entitled to any relief.

20.     Regarding the allegations in Paragraph No. 20 of the Complaint, Captaris denies the allegations.  Captaris further denies that plaintiff is entitled to any relief.

21.     Regarding the allegations in Paragraph No. 21 of the Complaint, Captaris denies the allegations.  Captaris further denies that plaintiff is entitled to any relief.

22.     To the extent any allegations of the Complaint are not addressed above, they are denied.

23.     Captaris denies that plaintiff is entitled to any relief.

## AMENDED AFFIRMATIVE DEFENSES

Without assuming any burden that it would not otherwise have, and without waiving j2's obligation to prove each and every element of its claims, Captaris asserts the following defenses:

24.     Captaris hereby incorporates Paragraph Nos. 1-127 as if fully asserted herein.

## First Affirmative Defense

25.     Captaris has not infringed, has not contributorily infringed, has not induced infringement of, and is not infringing any claim of U.S. Patent 6,597,688 No. ("the '688 patent"),

and Captaris is not liable for any act that would be construed as any form of infringement of the '688 patent.

## Second Affirmative Defense

26.     Captaris has not infringed, has not contributorily infringed, has not induced infringement of, and is not infringing any claim of U.S. Patent No. 7,020,132 ("the '132 patent"), and Captaris is not liable for any act that would be construed as any form of infringement of the '132 patent.

## Third Affirmative Defense

27.     The statements, representations, and admissions made by the inventors or their representatives to the U.S. Patent and Trademark Office ("PTO") during prosecution of the application that matured into the '688 Patent and '132 Patent estop Plaintiff from asserting that the claims of the patent encompass or are infringed by Captaris.

## Fourth Affirmative Defense

28.     Plaintiff is not entitled to the relief it seeks in the Complaint due to its own unclean hands.

## Fifth Affirmative Defense

29.     Plaintiff's claims are barred, in whole or in part, by the doctrine of estoppel, based on, *inter alia*, statements, representations and admissions made during the prosecution of the patents-in-suit and/or other positions taken in this and other litigation.

## Sixth Affirmative Defense

30.     On information and belief, a reasonable opportunity for discovery will establish that any purported damages claimed by plaintiff should be limited by the doctrine of laches.

## Seventh Affirmative Defense

31.     The '688 patent and the '132 patent are invalid and/or no damages may be received by plaintiff pursuant to one or more provisions of 35 U.S.C. § 101, *et. seq.*, including, but not limited to §§ 102, 103, 112, 286 and/or 287.  Among other things, Captaris' Rightfax product was used, sold and offered for sale more than one year before the filing dates for the applications leading to the '688 and '132 patents and constitutes prior art that anticipates or renders obvious the '688 and '132 patents.

## Eighth Affirmative Defense

32.     On information and belief, j2's claims for damages and prayer for relief are limited, in whole or in part, by the failure to mark, by itself or by one or more parties licensed to practice the '688 and/or '132 patents, as required by 35 U.S.C. § 287.

## Ninth Affirmative Defense

33.     The '688 patent and '132 patent are unenforceable because the inventors failed to disclose all non-cumulative, material prior art of which they were aware to the PTO, during the prosecution of the '688 and '132 patents, as well as the re-examination of the '688 patent.

## Tenth Affirmative Defense

34.     Plaintiff's claims and prayer for relief for inducement and/or contributory infringement are barred prior to service of the instant Complaint as such alleged infringement predates Captaris' actual knowledge '688 patent or the '132 patent.

## Eleventh Affirmative Defense

35.     Plaintiff's claims for damages and prayer for relief are limited, in whole or in part, by its failure to mitigate its damages.

**Twelfth Affirmative Defense**

36.     Plaintiff is misusing the '688 patent and '132 patent.  Each of the asserted claims in the '688 patent, and claims 1, 2, 3, 4, 6, 11, 14, 15 and 16 of the '132 patent (collectively "the Customer Claims"), require a request message received from a customer of the message delivery service over an external packet-switched data network.

37.     During the prosecution of the '688 patent, the applicants specified that since the request message is received from a customer over the external packet-switched network, the customer does not reside in the internal network:

> Note that the request messages are received from a customer over the external packet-switched network, in other words outside of the internal network that contains the elements of the claimed system. Thus, the customer of the service in effect "resides" outside of the internal network.  This, of course is desirable because of the improved security that can be guaranteed for the internal network elements.

June 13, 2002 Preliminary Amendment at 11.  The applicant made this argument in order to distinguish the invention from the cited reference.

38.     Each of the Customer Claims also requires a router-filter either to validate the customer associated with the request message, or to verify that the request message is from the customer.  Thus, for the Customer Claims, the identification of the email sender from the external network must be verified in order to forward the request message to the ultimate destination.

39.     Contrary to the claimed invention, Captaris' Rightfax system processes inbound faxes by identifying the intended recipient of the fax, verifying the intended recipient as a "user" of the Rightfax system and routing the fax according to the appropriate user preference.  Thus, Rightfax verifies the fax recipient within the internal network when it receives an inbound fax

-7-

rather than verifying the fax sender from the external network, as required by the Customer Claims.

40.     In order to read the Rightfax system onto the Customer Claims, j2 has impermissibly attempted to broaden the scope of its claims to cover the Rightfax users, i.e., those residing inside of the internal network.  Because j2 has attempted to impermissibly broaden the scope of the '688 and '132 Patents, j2 has committed patent misuse.

### CAPTARIS' AMENDED COUNTERCLAIMS

Defendant and Counter-Claimant Captaris, Inc. ("Captaris") for its Amended Counterclaims against Plaintiff and Counter-Defendant j2 Global Communications, Inc. ("j2"), states as follows:

### INTRODUCTION

1.     These Counterclaims include claims for civil antitrust and anticompetitive behavior, brought in order to seek relief from j2's sham litigation against Captaris, which is part of j2's overall scheme to stifle and exclude competition in the relevant market for internet facsimile services to home and small offices.  Carrying out a plan hatched by its senior management and others, j2 has embarked on a scheme to purposefully and improperly maintain a monopoly in the relevant market.  The scheme begins with j2 acquiring patents, such as the '688 Patent and the continuation '132 Patent (the "patents-in-suit"), through acquisition or fraud and/or inequitable conduct upon the United States Patent and Trademark Office (the "PTO").  Once the patents have been mistakenly granted, j2, either directly or though a cadre of patent litigation vehicles, systematically threatens its competitors by demanding that they pay licensing fees, without regard as to whether those competitors actually infringe the patent rights of j2 or its litigation subsidiaries.  Any competitors that refuse to capitulate to j2 and its litigation subsidiaries' extortion are sued in patent infringement proceedings, despite the fact that the

lawsuits are objectively baseless such that no reasonable litigant would expect success on the merits.

2.       Once named in costly patent infringement proceedings, j2's competitors are offered settlements by j2 and its litigation subsidiaries that are carefully calculated to be far less than the cost of defending patent litigation.  Many of j2's competitors have opted to settle and pay j2 or its litigation subsidiaries' licensing fees, despite their belief that j2's claims were baseless, deeming it preferable to incurring legal fees that well exceed the cost of the proposed license.  j2 and its litigation subsidiaries then highlight these extorted settlements as litigation "successes," attempting to mislead the public and the courts that its infringement claims have validity on the merits.   Tellingly, j2 has never prevailed on the merits in these patent infringement claims, j2 recently lost a dispositive ruling on infringement on summary judgment.

3.       j2's competitors have begun to take notice of this predatory campaign to extort competitors by asserting and threatening costly sham litigation.  Within the last four years, at least four different entities in four different federal jurisdictions in the United States and in Canada have brought claims against j2 for antitrust violations and a pattern of anticompetitive behavior based on this very conduct.  Captaris does the same here.

4.       As a result of these and other illegal acts, j2 has: (i) unreasonably restrained, suppressed and eliminated competition in the market for internet facsimile services to home offices and businesses; (ii) illegally maintained its monopoly in the market for internet facsimile services to home offices and businesses; and (iii) damaged consumers by unlawfully depriving the public of the benefits of competition.   This wrongful conduct has injured Captaris, other fellow competitors of j2, and end-user consumers.

5.      Captaris incorporates its admissions, denials and responses above as if fully set forth herein, and further seeks a declaration that the '688 Patent and the '132 Patent are invalid, cannot be enforced, were obtained through inequitable conduct and/or that Captaris does not infringe the patents-in-suit.

## JURISDICTION AND VENUE

6.      These Counterclaims arise under the laws of the United States, being a civil action brought by Captaris pursuant to Section 7 of the Clayton Act, Sections 1 and 2 of the Sherman Antitrust Act, and Sections 16720 and 17200 of the California Business and Professions Code. The Court has subject matter jurisdiction over this Counterclaim under the provisions of 28 U.S.C. §§ 1331, 1337(a), 1338(a), and 1367(a).

7.      j2 transacts business in this judicial district and has filed suit in this district. Venue is therefore proper in accordance with 15 U.S.C. §§ 15 and 22 and 28 U.S.C. §§ 1391(b) and (c).   Venue is also proper pursuant to 28 U.S.C. § 1400(b), in that this is a patent infringement action arising under the patent laws of the United States, and pursuant to 28 U.S.C. § 1391(b) and (c), in that j2 is subject to the personal jurisdiction of this Court by commencing and continuing to prosecute this action.

8.      There is also a justiciable controversy between Captaris and plaintiff as to whether Captaris has infringed any patent rights owned by plaintiff, including any valid claims of U.S. Patent No. 6,597,688 ("the '688 patent") or U.S. Patent No. 7,020,132 ("the '132 patent"), and whether the patents-in-suit are valid or enforceable.

## PARTIES

9.      Captaris, Inc. is a Washington corporation with a principal place of business at 301 116th Street SE, Bellevue, WA 98004.

10.     As described by j2 in numerous press releases, j2 was founded in 1995 and provides messaging and communications services to individuals and businesses around the world.  The company's network "spans more then 1,300 cities in 20 countries on five continents." j2 provides faxing and voicemail services, document management services, conference calling, "unified-messaging" and communications services under the brand names eFax®, jai®, jConnect®, JFAX®, eFax Corporate®, Electric Mail®, jBlast®, eFax Broadcast®, PaperMaster®, Consensus®, M4 Internet® and Protfax®.   j2 recorded gross revenues of approximately $220 million in 2007.  On information and belief, j2 is a Delaware corporation with its principal place of business located at 6922 Hollywood Boulevard, Suite 500, Los Angeles, California 90028.

11.     j2 is the largest provider of services in the relevant market, and it is currently believed to control as much as 80% of the relevant market.  j2 attempts to maintain and protect this market share through its aggressive campaign of predatory litigation, which is designed to eliminate competition by imposing substantial litigation costs, licensing costs and/or business uncertainty on its competitors.   This prevents competitors, including Captaris, from either entering the market or being able to compete fairly in the market.

## j2's PATENT LITIGATION SUBSIDIARIES

12.     j2 operates a number of patent litigation subsidiaries, that are either wholly-owned by j2 or through another j2-owned entity such that they are effectively wholly-owned by j2. Through these entities, as well as directly, j2 has engaged in a regular campaign of sham litigation against its competitors in order to extort licensing revenue from them or raise their costs by having to defend costly patent litigation.  These litigation subsidiaries, which have no business purpose and offer no goods or services, participate in carrying out j2's unlawful scheme.

13.     j2 carries out its anticompetitive scheme through patent litigation subsidiaries, such as Dynamic Depth, Inc. ("Dynamic Depth") and Catch Curve, Inc. ("Catch Curve"), which do not conduct any business activity other than to extort licensing fees from and initiate legal proceedings against j2's competitors.  Catch Curve is organized under the laws of the State of Delaware with its principal place of business at The Biltmore, Suite 205, 817 West Peachtree Street, NW, Atlanta, Georgia, 30308.   Dynamic Depth is, upon information and belief, a Delaware corporation that is based out of the same headquarters as j2 in Los Angeles, California. Upon information and belief, the patents held by Catch Curve and Dynamic Depth were actually acquired by j2.

14.     Catch Curve and Dynamic Depth sell no products or services and have not created any additional patents that represent innovation or new inventions.  Rather, Catch Curve and Dynamic Depth exist solely to extract money from j2's competitors in the Relevant Market and to harm their efforts to compete and innovate.

15.     Upon information and belief, Catch Curve and Dynamic Depth are wholly-owned subsidiaries of j2, they take direction from j2's senior management, they commingle licensing revenues with j2, the patents in their respective portfolios were in fact acquired by j2, and, for all legal purposes, serve as alter-egos of j2.

16.     Upon information and belief, j2 has attempted to keep its connection with Catch Curve and Dynamic Depth hidden from the general public.  j2 created Catch Curve and Dynamic Depth without disclosing their creation to its shareholders or to the SEC in its public filings, nor did it disclose its connection to these entities on their websites or on public press releases announcing their creation.  These entities function solely as patent litigation subsidiaries, filing

lawsuits against providers of internet facsimile services that compete with j2 but refuse to purchase a license from j2 or the litigation subsidiaries.

## THE RELEVANT MARKETS

17.     The Relevant Product Market is internet facsimile services to home offices and businesses.  Companies competing in this market provide individuals and businesses, for a fee, with facsimile numbers and server functions that allow users to send facsimile messages directly from their computers (typically through email systems), and to receive the messages in the form of attachments to emails.

18.     The Relevant Geographic Market is the United States.  j2 offers the Relevant Product Market to customers throughout the United States (collectively the "Relevant Market"). j2 is believed to control as much as 80% of the Relevant Market, such that j2 possesses monopolistic market power.  j2's anticompetitive conduct has hindered Captaris' ability to enter and compete against j2 in the Relevant Market.

19.     j2's actions as part of, and in furtherance of, the illegal monopolization alleged herein, were authorized, ordered, or done by j2's officers, agents, employees, representatives and wholly-owned subsidiaries while actively engaged in the management of j2's affairs.

20.     j2's illegal acts to prevent fair and lawful competition in the United States marketplace for internet facsimile services to home and small offices has also resulted in injury to j2's rivals other than Captaris, as well as end-user consumers.

## j2's FAILURE TO DISCLOSE MATERIAL INFORMATION TO THE PTO

21.     In the instant lawsuit, and in other sham litigation asserted by one of j2's patent litigation subsidiaries against Captaris, j2 asserts rights under several patents – U.S. Patent No. 5,461,488 ("the '488 patent"), the '688 patent and the '132 patent, with designs to foreclose or hinder competition with it in the Relevant Market.  The patents-in-suit were acquired by virtue

of j2's knowing failure to reveal to the PTO clear material information that was known by j2 at the time of prosecution and/or re-examination.  Upon information and belief, this inequitable conduct was committed with deceptive intent, and such misconduct renders the patents-in-suit invalid and unenforceable.

22.     In particular, j2 asserted infringement under the '688 Patent against Venali, Inc. in *J2 Global Communications, Inc. v. Venali, Inc.*, Case No. CV04-01172 (C.D. Cal.).  During that litigation, Venali filed a request for ex parte re-examination of the '688 patent with the PTO, which the PTO granted on May 12, 2005.

23.     Applicable regulations require that "[e]ach individual associated with the patent owner in a reexamination proceeding has a duty of candor and good faith in dealing with the Office, which includes a duty to disclose to the Office all information known to that individual to be material to patentability in a reexamination proceeding."  37 C.F.R. § 1.555.

24.     Applicable regulations also require that "Any information disclosure statement . . . should be filed [with the PTO] within two months of the date of the order for reexamination, or as soon thereafter as possible."  37 C.F.R. § 1.555.

25.     Accordingly, while the PTO was performing its ex parte reexamination of j2's '688 patent, j2 had an obligation to disclose all material information of which it was aware.

26.     j2 acquired the '488 patent on March 22, 2006.  On June 25, 2007, one of j2's wholly-owned patent litigation subsidiaries, Dynamic Depth, filed a lawsuit against Captaris in the United States District Court for the Northern District of Georgia, styled *Dynamic Depth v. Captaris,* Case No. 1:07-CV-1488 (the "Dynamic Depth case").

27.     The Dynamic Depth case was initiated while the reexamination of the '688 patent was still underway by the PTO.  In the Dynamic Depth case, j2, through its patent litigation

vehicle Dynamic Depth, asserted the '488 patent against Captaris based upon Captaris' Rightfax product.  This is also the very same product that j2 alleges infringes the patents-in-suit in the instant litigation.

28.     Because j2, in sworn court filings, has plead that Captaris' RightFax product infringes both the '488 patent and the '688 patent, the '488 patent is material prior art to the '688 patent.  In fact, the '488 patent, in combination with the Rightfax documentation already before the PTO, renders the '688 patent obvious and invalid.  Therefore, j2 was under an affirmative duty to disclose the '488 patent to the PTO during the reexamination of the '688 patent.  But for j2's intentional withholding of this material reference, the '688 patent would not have survived reexamination.

29.     Additionally, in November 2001, j2 settled a lawsuit with AudioFAX in which AudioFAX asserted at least U.S. Patent No. 4,994,926 ("the '926 patent.") against j2 (the AudioFAX settlement").  Accordingly, as of at least 2001, j2 was aware and on notice that the '926 patent, at minimum, potentially read onto its system and was relevant to the proposed claims of the '688 Patent.

30.     The AudioFAX settlement occurred during the pendency of the '688 patent application, prior to the continuation filing of the '132 patent, and prior to the reexamination of the '688 patent.  Notwithstanding j2's awareness that the '926 patent may read onto its system, j2 failed to disclose this patent, or any related continuation patents, to the PTO during the prosecution of the '688 patent or at any subsequent time.   j2's failure to disclose material information with intent to deceive the PTO on three separate occasions - during prosecution of the '688 patent, the prosecution of the '132 patent, and the reexamination of the '688 patent - constitutes inequitable conduct.

31.     The '926 patent was also one of a series of patents owned by AudioFAX.  The other AudioFAX patents include, but are not limited to, U.S. Patent Nos. 5,291,302; 5,459,584; 6,643,034; and 6,785,021 (collectively with the '926 patent, "the AudioFAX patents").  Following a negotiation and acquisition by j2, on February 17, 2005, AudioFAX assigned the AudioFAX patents to Catch Curve, one of j2's wholly-owned litigation subsidiaries that was created specifically to hold the AudioFAX patents.

32.     j2's acquisition of the AudioFAX patents occurred while the '132 patent application was still pending and prior to the reexamination of the '688 patent.  Because j2 was already aware that the AudioFAX patents potentially read onto and were related to its system, at minimum, j2 should have disclosed the AudioFAX patents to the PTO after it purchased these patents, i.e., during the prosecution of the '132 patent and during the prosecution of the '688 patent reexamination.  j2's failure to disclose this material information with intent to deceive the PTO constitutes inequitable conduct.

33.     j2 is the also the assignee for, was aware of, and had in its possession, a number of other patents that disclose various aspects of the '688 and the '132 claims.  For example, j2 acquired U.S. Patent Nos. 5,870,549; 6,549,612; 6,693,729; and 6,707,580 all before the '688 reexamination certificate issued.  These references relate to that which is embodied in the statement of grant by the examiner, as well as the examiner's articulation of the novelty of the '688 patent.  The references were thus material to the reexamination and patentability of the '688 patent, yet j2 purposely and knowingly failed to disclose this material information with intent to deceive the PTO.

## j2's SHAM LITIGATION AGAINST CAPTARIS

34.     Captaris, through its Rightfax product, was among the first entities to sell a commercial product to the general public that utilized fax over network technology.  In fact, it

was well-known within the industry that Rightfax was being sold to large commercial entities long before the '688 patent application was filed, and had been sold to customers in the United States and abroad in precisely the same configuration that j2 now claims is its "invention" as early as 1993.

35.     j2 was aware that the functionality j2 now claims infringes the patents-in-suit had already been incorporated into Captaris' Rightfax *several years* in advance of the application date of the '688 patent or the '132 patent.  In addition, Captaris' user guides and manuals associated with its Rightfax product were available to the public and disclosed the functionality j2 now claims infringes the patents-in-suit.

36.     Captaris' Rightfax product, which had been widely sold in the United States and throughout the world for years before the '688 patent or the '132 patent, clearly anticipates and/or renders obvious the claims in the '688 patent and the '132 patent as they've been asserted by j2 in this litigation.

37.     Prior to April 4, 2004, Motorola owned the rights to U.S. Patent No. 5,461,488 ("the '488 patent") which is entitled a "Computerized Facsimile (FAX) System and Method of Operation."

38.     On or about October 8, 2003, Motorola contacted Captaris to allege that Captaris' Rightfax product was infringing the '488 patent, and requested that Captaris take a license with Motorola.  In response, Captaris, through its counsel, notified Motorola that its Rightfax product already contained the exact functionality being asserted under the '488 patent as an "invention" in its commercial version of Rightfax being sold more than one year prior to the September 12, 1994 application date of the '488 patent.  Captaris also made citations to a number of references,

including the user guides and manuals associated with Rightfax, which documented this functionality.

39.     After reviewing the clearly invalidating prior art and the claims of prior commercial use provided by Captaris, Motorola made the determination to abandon any attempt to enforce the '488 patent against Captaris.

40.     On April 4, 2004, Motorola assigned its rights in the '488 patent to Freescale, one of Motorola's subsidiaries.  On or about July 20, 2004, Freescale contacted Captaris to allege that Captaris' Rightfax product was infringing the '488 patent, and requested that Captaris take a license.

41.     Captaris, through its counsel, notified Freescale that its Rightfax product already contained the exact functionality being asserted under the '488 patent as an "invention" in its commercial version of Rightfax being sold more than one year prior to the September 12, 1994 application date of the '488 patent.  Captaris also made citations to a number of references, including the user guides and manuals associated with Rightfax, which documented this functionality, and provided courtesy copies to Freescale.

42.     After reviewing the clearly invalidating prior art and the claims of prior commercial use provided by Captaris, Freescale, like Motorola before it, also made the determination to abandon  any attempt to enforce the '488 patent against Captaris.

43.     On March 22, 2006, j2 acquired the rights to the '488 patent from Freescale and, on July 25, 2006, j2 assigned the rights in the '488 patent to its litigation vehicle Dynamic Depth.

44.     Notwithstanding the fact that Dynamic Depth was theoretically the "owner" of the rights to the '488 patent, on or about May 17, 2007, j2, not Dynamic Depth, contacted Captaris seeking for Captaris to license the '488 patent.

45.     Following this demand by j2, Captaris, through its counsel, informed j2 that it had already been through similar exchanges with both Motorola and Freescale, both of whom opted not to attempt to enforce the '488 patent against Captaris.  Captaris also provided its j2 with its correspondence with those entities.  Captaris also provided j2 with an explanation how its Rightfax product already contained the exact functionality being asserted under the '488 patent in the commercial version of Rightfax being sold more than one year prior to the September 12, 1994 application date of the '488 patent.  Finally, Captaris made citations to a number of prior art references, including the user guides and manuals associated with Rightfax, which documented this functionality, and provided courtesy copies to j2.

46.     Rule 11 of the Federal Rules of Civil Procedure ("Rule 11") places an affirmative obligation on a party and its attorney to perform an investigation prior to filing a complaint alleging wrongdoing.  Moreover, the initiation of a lawsuit for which a proper pre-filing investigation was not made in advance will not be saved by the subsequent discovery or development of facts upon which the filing could have been based.

47.     In the context of patent litigation, the Federal Circuit has made clear that a mere good faith belief of infringement falls well short of Rule 11's requirements.  To initiate patent litigation, the requirement of a pre-filing investigation must entail more than simply observing an allegedly infringing device from a distance and surmising how it operates from the patentee's technical or industry know-how or experience.  Before filing a lawsuit, counsel is required to take into consideration the patent's prosecution history and all known and available material information and public use.

48.     Notwithstanding this clear requirement, and j2's clear possession and knowledge of invalidating prior art and Rightfax's prior commercial use, j2, through its litigation vehicle

Dynamic Depth, initiated the Dynamic Depth case on June 25, 2007, without conducting a meaningful pre-filing investigation as required by law.

49.     In addition, at least as early as June 25, 2007, Captaris' manuals and user-guides were publicly available to the general public for anyone to download on its website.

50.     Faced with clear, unequivocal information that undercut the factual and legal basis for its claims, and having an affirmative obligation and duty to further investigate and consider known prior art and public use, j2 nevertheless persisted in having its patent litigation vehicle Dynamic Depth initiate objectively baseless litigation against Captaris in violation of Rule 11.

51.     When filed, the Dynamic Depth litigation was a sham orchestrated solely to extort Captaris into entering into a licensing agreement with j2 and/or Dynamic Depth.  The claims asserted thereunder were objectively baseless and no reasonable litigant could have realistically expected success on the merits.

52.     Instead, j2 attempted to utilize the Dynamic Depth case as an attempt to interfere with one of its competitors as an anticompetitive weapon by asserting costly patent litigation claims for a patent that was clearly invalid, that j2 was aware of and in possession of the bases for invalidity, and that j2 had a duty to investigate further in light of the fact that its two predecessors-in-interest of the '488 patent, Motorola and Freescale, both had chosen not to pursue claims based on the information provided by Captaris.

53.     j2's actions in asserting the Dynamic Depth fits with j2's overall pattern of asserting sham litigation proceedings, which a number of other competitors have alleged against j2.  This series of sham lawsuits against competitors represents a purposeful scheme by j2 to

assert patent infringement claims without regard to the merits of those claims for purposes of injuring its market rivals.

54.     Following the filing of the Dynamic Depth case, j2 continued a dialogue with Captaris attempting to negotiate an arrangement whereby Captaris would license the '488 patent and/or other patents in j2's portfolio.  Captaris resisted these efforts and told j2 that its claims were without merit.

55.     In addition to Captaris' repeated admonitions to j2, on May 27, 2008, Captaris served its invalidity contentions upon j2 in the Dynamic Depth case, further disclosing numerous examples of invalidating prior art, as well as the functionality of the Rightfax product that long predated j2's asserted invention.

56.     Faced with the clear requirements of a pre-filing investigation under Rule 11, in possession of and having knowledge of invalidating prior art and Rightfax's prior commercial use, and having access to Captaris' invalidity contentions in the Dynamic Depth case, j2 nevertheless initiated a second baseless lawsuit, the instant case, against Captaris on June 26, 2008.

57.     Although it has actual and constructive knowledge of information which undercut its claims, and an affirmative obligation and duty to investigate and consider known prior art, j2 nevertheless persisted in filing the instant objectively baseless litigation against Captaris in violation of Rule 11.

58.     When filed, the instant lawsuit was a sham orchestrated solely to extort Captaris into entering into a licensing agreement with j2 and/or Dynamic Depth.  The claims asserted hereunder are objectively baseless and no reasonable litigant could have realistically expected success on the merits.

59.     Instead, j2 is attempting to utilize this litigation as an attempt to interfere with one of its competitors as an anticompetitive weapon by asserting costly patent litigation claims for a patent that was clearly invalid and for which j2 was aware of and in possession of the bases for invalidity.

## j2's AUDIOFAX SHAM LITIGATION

60.     At the time Catch Curve acquired the AudioFax patent portfolio, j2 knew that the patents in the AudioFax patent portfolio were invalid or inapplicable to small and home office facsimile services.  At least two other patents, U.S. Patent Nos. 3,920,895 and 3,958,088 (assigned to Xerox Corporation) were filed on March 29, 1974, well before the AudioFax patents, and were known to Catch Curve and j2.  They described store and forward facilities for fax communications almost 15 years before AudioFax patents were filed.  Indeed, the first line of both patents describes "[a] switched communications system including store and forward facilities" and then describes the use of the store and forward facilities in fax communication.  Catch Curve and j2 nevertheless persisted with the filing of lawsuits against j2's competitors despite knowing about the existence of prior art invalidating the AudioFax patents and the almost certain reality that those defendants did not infringe.

61.     j2's unlawful intent in connection with the AudioFax patents is further displayed through j2's own public court filings made under the strictures of Rule 11.  Specifically, in an earlier lawsuit the prior owner of the AudioFax patent portfolio sued j2 for patent infringement, accusing j2 of infringing the same AudioFax patents in connection with j2's operation of its own small and home office internet facsimile service (the "j2/AudioFax Suit").

62.     In its own defense in the j2/AudioFax Suit, j2 asserted in sworn court submissions that the AudioFax patents do not apply to internet based facsimile services, which is clear from the face of the patents.

63.     j2 settled the j2/AudioFax Suit and later agreed to purchase the AudioFax patents. However, once j2 had acquired the AudioFax patents, they became ammunition to further j2's anticompetitive scheme.  j2, through its controlled alter-ego and wholly-owned subsidiary Catch Curve, began using the AudioFax patents to assert infringement claims against its competitors (the "Sham AudioFax Suits").

64.     Tellingly, in the Sham AudioFax Suits, j2 and Catch Curve alleged infringement of the AudioFax patents in connection with internet based facsimile services – the very same conduct that j2 had earlier contended, in a sworn disclosure, was not covered by the AudioFax patents.

65.     To date, j2, either alone or in conjunction with, and with the assistance and coordination of the patent litigation subsidiaries, have filed at least 19 infringement lawsuits against j2's competitors in the Relevant Markets in an extortion scheme that is calculated to raise j2's competitors' costs, force licensing fees from them or drive them out of the market entirely.

66.     Not a single lawsuit ever filed by Catch Curve or j2 in connection with these patents has ever resulted in a judicial finding of infringement by any defendant in any forum.  In fact, quite the opposite, the lone dispositive ruling connected with the AudioFax patents was a grant of summary judgment *against* j2 and Catch Curve.

67.     j2 knows that the patents it seeks to monetize and enforce against companies in the Relevant Market through its litigation subsidiaries are invalid, unenforceable and do not cover the services sold by the competitors they have sued.  These strike suits  are predicated on

patents that no reasonable litigant would expect to be infringed by companies competing in the Relevant Market, and result in j2's competitors incurring substantial litigation expenses to defend themselves against meritless allegations of infringement – allegations j2 itself asserted were without merit when j2 found itself defending against the same patents.

68.     j2's strike suits and predatory litigation scheme has forced many of its competitors into agreeing to unnecessary and unwanted licensing arrangements for irrelevant patents.  These competitors admit that they entered into such agreements not because of the merit of j2 and its litigation subsidiaries' legal position, but solely to avoid the costs of protracted patent litigation against a larger, litigious rival.

69.     j2's conduct has also restrained competition that would otherwise occur, making it much more difficult for lower priced competing services to gain a foothold in the Relevant Market.

## OTHER EXAMPLES OF j2's PATTERN OF SHAM LITIGATION

70.     One such example of j2's anticompetitive scheme involved j2's attempt to use litigation to extort one of its competitors into agreeing to be acquired by j2.

71.     According to Venali, in order to thwart competition by Venali, j2 sued Venali on February 1, 2004, for alleged infringement of the '638 patent and the '688 patent.  In the Fall of 2004, j2 amended its complaint against Venali in the lawsuit to include two of the Bobo patents, the '066 patent and the '321 patent.  The sole purpose of the lawsuit was to bar Venali from competing with j2 in the Relevant Markets.

72.     In the Winter of 2004, Venali met with j2 to address (among other things) the invalidity of the j2 patents.  Subsequent communications between the parties made it clear that j2's real desire was not to extract a license to its invalid patent portfolio, but rather to eliminate competition entirely by forcing Venali to accede to a proposed buyout by j2.

24

73.     During those discussions, Venali made clear to j2 that it did not infringe any of the patents at issue.  Venali also demonstrated that, based on prior art, the j2 patents were clearly invalid.

74.     j2's responded by having its patent litigation vehicle Catch Curve file a lawsuit on July 1, 2005, against Venali in the Central District of California, alleging that Venali infringed the AudioFax patents.  Catch Curve listed j2 as an "interested" party, purposefully obfuscating the actual nature or extent of j2's interest.

75.     Catch Curve never offered a license to Venali before filing suit.  Moreover, rather than making its standard licensing terms available to Venali, Catch Curve told Venali that it would need to negotiate any license to the AudioFax patents directly with j2, thus tying those claims.  Once approached, j2 effectively required Venali to license the invalid '638 and '688 patents in order to settle the litigation and obtain a license to the AudioFax patents.  j2 made these demands even though j2 itself had previously asserted that the AudioFax patents were invalid and not infringed by internet based faxing services.

76.     GoDaddy is another alleged victim of j2's patent trolling scheme.  According to GoDaddy, j2 has targeted GoDaddy in an effort to impose costs on GoDaddy that are disproportionately large compared with the total sales of GoDaddy in the Relevant Market, in an effort to raise GoDaddy's costs to conduct that business and prevent GoDaddy from expanding its sales and market share in that market.

77.     On March 21, 2005, j2 sent GoDaddy a letter stating that GoDaddy's internet facsimile service "may employ inventions covered by one or more of' j2's patents, including Bobo patents, the '638 patent and the '688 patent."  The letter stated that GoDaddy "may be interested in taking a license" under the patents.

78.     On April 18, 2005, GoDaddy informed j2 that GoDaddy's Fax Thru Email[TM] service was based on open source software ("HylaFAX[Tm]") first used in public in 1991, more than one year prior to the earliest priority date for the Bobo patents, hence rendering those patent claims invalid.  GoDaddy therefore declined j2's demand for a license.

79.     On April 20, 2005, j2 reiterated in a letter to GoDaddy that "the inventions covered by [the Bobo, '638 and '688] patents were not in use prior to their respective filing dates."  j2 again unjustifiably urged GoDaddy to discuss obtaining a license.

80.     GoDaddy heard nothing more for several months.  Beginning on February 17, 2006, however, j2 had Catch Curve go after GoDaddy's competitive "Fax Thru Email[TM]" service.  GoDaddy was sent a letter introducing GoDaddy to Catch Curve's "licensing program," claiming that GoDaddy's "Fax Thru Email[TM]" service infringed the AudioFax patents and demanding that GoDaddy purchase a license to the patents or face litigation.

81.     On May 19, 2006, GoDaddy responded by rejecting the demand explaining that GoDaddy's services clearly do not infringe any of the AudioFax patents.

82.     On July 12, 2006, Catch Curve, upon information and belief acting on j2's direction, filed a lawsuit against GoDaddy in the Northern District of Georgia for infringement of the AudioFax patents.  The same day, Catch Curve's lawyers sent a letter to GoDaddy along with a copy of the Complaint.  In the letter, Catch Curve (through its lawyers) again threatened to serve the complaint if GoDaddy did not purchase a license to the AudioFax patents.

83.     On July 20, 2006, GoDaddy again rejected Catch Curve's demand, insisting again that its Fax Thru Email [TM] service did not infringe the AudioFax patents.  Catch Curve served GoDaddy with a complaint for patent infringement on August 11, 2006.  This suit was withdrawn on September 25, 2006 with a similar complaint against GoDaddy re-filed on the

same day.  This lawsuit was objectively baseless, as GoDaddy, j2 and Catch Curve all understood that GoDaddy did not infringe the AudioFax patents.

84.    Regardless of the merits of their claims, j2 and Catch Curve have engaged in a pattern and practice of using strike suits and predatory litigation, or the threat thereof, as part of j2's standard negotiations to acquire its competitors, force them into unnecessary licensing arrangements and/or run them out of business.

85.    In addition to the patent infringement litigation against Venali and GoDaddy brought in bad faith by j2 and separately by Catch Curve, j2 and/or Catch Curve have also filed patent infringement lawsuits against industry competitors such as IGC, Call Wave, EasyTel Communications ("EasyTel"), Protus IP Solutions ("Protus"), and Mijanda.  Notably, three of these lawsuits were filed within weeks of EasyTel, Protus and Mijanda objecting to j2's efforts to trademark the generic term "efax."

86.    Aware of the invalidity and unenforceability of the '688 patent and '132 patent, j2 has also sought additional patents to assert against its competitors in the Relevant Markets.  To that end, j2 purchased a portfolio of patents from NetOffice Solutions, Inc. (the "Bobo patents") in 2004.  These included in part U.S. Patent Nos. 6,350,066 (the "'066 patent") and 6,564,321 (the "'321 patent").  j2 has also begun to assert these patents against its competitors in the Relevant Markets in a campaign to obtain and maintain its dominant market share in the Relevant Markets.

87.    All these patent infringement lawsuits are objectively baseless. Recently, after a claim construction hearing involving the AudioFax patents, the United States District Court for the Central District of California issued a Claim Construction Order dated May 11, 2007, finding that the clams of the AudioFax patents are not infringed by any internet facsimile

services that deliver documents to its customers by any means other than conventional phone lines; something that was obvious from the initiation of the suits.

88.      j2's exclusionary conduct unlawfully enabled j2 to sell internet facsimile services without being subject to true competition.  But for j2's illegal conduct, j2 would have been subjected to additional, more effective competition in the Relevant Market.

89.      By preventing competitors, including Captaris, from entering and competing in the market, j2 denied consumers and other home purchasers of internet facsimile services the benefits of competition and choice.

90.      Unless enjoined, the natural and proximate result of j2's conduct will be to maintain and strengthen its position as the dominant provider of internet facsimile services to home offices and businesses, to the exclusion of actual competitors and potential competitors, including Captaris.  j2 specifically intends to achieve this exclusionary effect through the predatory conduct described in these Counterclaims.

91.      j2's unlawful actions also have caused and are causing injury to competition in the relevant market.  Among other things, j2's actions have raised Captaris' and other rivals' costs of doing business, impairing its ability to compete effectively against j2.  Moreover, if j2 succeeds in disrupting its competitors, eliminating them, or forcing them into incur additional costs through unnecessary licenses, taken to avoid the cost of sham litigation, consumers will be deprived of the benefits of competition in price, quality and service.

92.      Captaris will lose profits and business opportunities as a result of j2's unlawful actions.

93.      j2's unlawful actions have also caused Captaris irreparable harm for which it has no adequate remedy at law.

## COUNTERCLAIM – COUNT ONE
### Non-Infringement of the '688 Patent and '132 Patent

94.     Captaris incorporates by reference Paragraph Nos. 1 through 93 above, as though fully set forth herein.

95.     Captaris has not infringed and does not infringe (either directly, contributorily or by inducement) any valid claims of the '688 patent or the '132 patent, either literally or under the doctrine of equivalents.

96.     Captaris is therefore entitled to a declaratory judgment that it has not infringed either the '688 patent or the '132 patent.

## COUNTERCLAIM – COUNT TWO
### Invalidity of the '688 Patent and '132 Patent

97.     Captaris incorporates by reference Paragraph Nos. 1 through 93 above, as though fully set forth herein.

98.     The relevant claims of the '688 patent and '132 patent are invalid and/or unenforceable because they fail to comply with the applicable requirements of the Patent Act, including, but without limitation, sections 101, 102, 103, and/or 112, and for failure to comply with the statutes and regulations governing the application for and prosecution of patents.

99.     Captaris is therefore entitled to a declaratory judgment that the relevant claims of the '688 patent and the '132 patent are invalid.

## COUNTERCLAIM – COUNT THREE
### Unenforceability Based on Inequitable Conduct

100.     Captaris incorporates by reference Paragraph Nos. 1 through 93 above, as though fully set forth herein.

101.     At all times during the pendency of a patent application, all individuals associated with the filing or prosecution of a patent application have a duty of candor and good faith to

meaningfully and truthfully disclose to the PTO material information of which they were aware (the "Duty of Candor").  For purposes of the Duty of Candor, information is material "where there is a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent."  37 C.F.R. Section 1.56(b)(1991). In some cases, a stricter standard of materiality has been cited wherein information is "material to patentability when it is not cumulative to information already of record or being made of record in the application, and: (1) establishes, by itself or in combination with other information, a *prima facie* case of unpatentability of a claim; or (2) refutes, or is inconsistent with, a position the applicant takes in opposing an argument of unpatentability relied on by the PTO, or asserting an argument of patentability.  37 C.F.C. Section 1.56(b)(1992).

102.    On June 12, 1998, j2 filed with the PTO the first United States patent application in the series of applications that led to the issuance of the '688 patent (the "'688 Patent Application").

103.    PTO practice required each individual associated with the filing or prosecution of the '688 Patent Application who was aware of material information to submit, or cause to submit, such information to the PTO as part of an Information Disclosure Statement ("IDS") as early in the prosecution of the '688 Patent Application as it was known.  37 C.F.R. § 1.56(c):

> Individuals associated with the filing or prosecution of a patent application within the meaning of this section are: (1) Each inventor named in the application; (2) Each attorney or agent who prepares or prosecutes the application; and (3) Every other person who is substantively involved in the preparation or prosecution of the application and who is associated with the inventor, with the assignee or with anyone to whom there is an obligation to assign the application.

104.    During the course of prosecution of the '688 Patent Application, the named inventors, and the attorneys, agents, and employees of j2 acting on behalf of j2 in connection

with the filing and prosecution of the '688 Patent Application ("the Applicants"), had a Duty of Candor to the PTO.  Moreover, the Applicants knew or were charged with knowledge that they had such a Duty of Candor.

105.     During the course of the prosecution of the '688 Patent Application, the Duty of Candor required, among other things, that each Applicant disclose to the PTO material information arising from, among other places, industry sources and other copending U.S. patent applications.  *See* Section 2001.06 of the Manual of Patent Examining Procedure (MPEP) (emphasis added):

> Such individuals may be or become aware of material information from various sources such as, for example, co-workers, trade shows, communications from or with competitors, potential infringers, or other third parties, related foreign applications (see MPEP Section 2001.06(a)), prior or copending United States patent applications (see MPEP Section 2001.06(b)), related litigation (see MPEP Section 2001.06(c)) and preliminary examination searches.

106.     As set forth below, Applicants violated their Duty of Candor in an effort to hide material information from the PTO in connection with the prosecution of the '688 Patent Application, the '132 Patent Application, and the reexamination of the '688 patent.  Applicants failed to disclose material, non-cumulative information, with intent to deceive the PTO.

## j2 Fails to Disclose Known Prior Art to the PTO

107.     In March of 2005, Venali, Inc. filed a request for reexamination of the '688 patent with the PTO.  Among other references, the request for reexamination cited various new prior art documents relating to versions 4.5 and 5.0 of Captaris' own Rightfax product.

108.     Captaris creates and distributes product manuals, including Installation and Administration Guides, describing various aspects of its Rightfax products, and which were available online during the time of the reexamination.

109.    j2 was aware of the existence of, and had access to, the Rightfax product manuals, the Rightfax functionality and other prior art during the pendency of the '688 patent reexamination proceedings, yet did not disclose any of this documentation or information to the PTO.  In particular, at minimum j2 was made explicitly aware of the Rigthfax prior art and functionality in connection with the Dynamic Depth case, which was filed on June 25, 2007, long before the reexamination was completed on March 11, 2008.

110.    In a December 6, 2006 Office Action, the Examiner in the reexamination proceedings of the '688 patent further highlighted the relevance of Rightfax, concluding that the Rightfax product was prior art, but noting that the articles relating to the Rightfax product cited during the reexamination proceedings did not teach the network architecture recited in the claims.  Specifically, the Examiner stated that the Rightfax articles did not "include a processing server communicatively coupled to a separate database server by an internal, packet-switched network."

111.    However, the Rightfax Installation and Administration Guides, which were known to j2 and available during he pendency of the reexamination proceedings, disclose the use of the Rightfax software on one server coupled to a database server over an internal (packet-switched) network.  The Rightfax product is therefore, at minimum, anticipatory prior art under 35 U.S.C. § 102(b).

112.    Under Federal Circuit law, one cannot cultivate ignorance, or disregard numerous warnings that material information or prior art may exist, merely to avoid actual knowledge of that information or prior art.  Where an applicant knows of information the materiality of which may so readily be determined, he or she cannot intentionally avoid learning of its materiality, even through gross negligence; in such cases the district court may find that the applicant should

have known of the materiality of the information.  Thus, a duty to inquire arises when the prosecuting attorney is on notice of the likelihood that specific, relevant, material information exists and should be disclosed.  In such a case, the applicant or prosecuting attorney is not free to choose not to investigate the facts necessary to determine the materiality of the reference in an effort to avoid complying with their duty to disclose.

113.    j2 asserted infringement under the '688 patent against Venali, Inc.  in *J2 Global Communications, Inc. v. Venali, Inc.*, Case No. CV04-01172 (C.D. Cal.).  During that litigation, Venali filed a request for ex parte re-examination of the '688 patent with the PTO, which the PTO granted on May 12, 2005.

114.    Applicable regulations, including but not limited to 37 C.F.R. § 1.555, require that "[e]ach individual associated with the patent owner in a reexamination proceeding has a duty of candor and good faith in dealing with the Office, which includes a duty to disclose to the Office all information known to that individual to be material to patentability in a reexamination proceeding."

115.    Applicable regulations require that "Any information disclosure statement . . . should be filed [with the PTO] within two months of the date of the order for reexamination, or as soon thereafter as possible."

116.    Accordingly, while the PTO was performing its ex parte reexamination of j2's '688 patent, j2 had an obligation to disclose all material information of which it was aware.

117.    j2 acquired the '488 patent on March 22, 2006.  On June 25, 2007, one of j2's wholly-owned patent litigation vehicle, Dynamic Depth, Inc., filed a lawsuit against Captaris in the United States District Court for the Northern District of Georgia, styled *Dynamic Depth v. Captaris,* Case No. 1:07-CV-1488 (the "Dynamic Depth case").

118.    The Dynamic Depth case was initiated while the reexamination of the '688 patent was still underway by the PTO.  In the Dynamic Depth case, j2, through its patent litigation vehicle Dynamic Depth, asserted the '488 patent against Captaris based upon Captaris' Rightfax product.  This is also the very same product that j2 alleges infringes the patents-in-suit in the instant litigation.

119.    Because j2, in sworn court filings, has plead that Captaris' Rightfax product infringes both the '488 patent and the '688 patent, the '488 patent is material prior art to the '688 patent.  In fact, the '488 patent, in combination with the Rightfax documentation already before the PTO, renders the '688 patent obvious and invalid.  Therefore, j2 was under an affirmative duty to disclose the '488 patent to the PTO during the reexamination of the '688 patent.  But for j2's intentional failure to disclose this material information with intent to deceive the PTO, the '688 patent would not have survived reexamination.

120.    Additionally, in November 2001, j2 settled a lawsuit with AudioFAX in which AudioFAX asserted at least U.S. Patent No. 4,994,926 ("the '926 patent.") against j2 (the AudioFAX settlement").  Accordingly, as of at least 2001, j2 was aware and on notice that the '926 patent, at minimum, potentially read onto its system and was relevant to the proposed claims of the '688 patent.

121.    The AudioFAX settlement occurred during the pendency of the '688 patent application, prior to the continuation filing of the '132 patent, and prior to the reexamination of the '688 patent.  Notwithstanding j2's awareness that the '926 patent may read onto its system, j2 failed to disclosed this patent, or any related continuation patents, to the PTO during the prosecution of the '688 patent or at any subsequent time.  j2's intentional withholding of a material reference from the PTO on three separate occasions - during prosecution of the '688

34

patent, the prosecution of the '132 patent, and the reexamination of the '688 patent - amounts to inequitable conduct.

122.     The '926 patent was also one of a series of patents owned by AudioFAX.   The other AudioFAX patents included U.S. Patent Nos. 5,291,302; 5,459,584; 6,643,034; 6,785,021; 7,202,978; and 7,365,884 (collectively with the '926 patent, "the AudioFAX patents"). Following a negotiation and acquisition by j2, on February 17, 2005 AudioFAX assigned the AudioFAX patents to Catch Curve, Inc., one of j2's wholly-owned litigation subsidiaries that was created specifically to hold the AudioFAX patents.

123.     j2's acquisition of the AudioFAX patents occurred while the '132 patent application was still pending and prior to the reexamination of the '688 patent.   Because j2 was already aware that the AudioFAX patents potentially read onto and were related to its system, at minimum j2 should have disclosed the AudioFAX patents to the PTO after it purchased these patents, i.e., during the prosecution of the '132 patent and during the prosecution of the '688 patent reexamination.   j2's intentional failure to disclose this material information with intent to deceive the PTO amounts to inequitable conduct.

124.     j2 is the also the assignee for, was aware of and had in its possession, a number of other patents that disclose various aspects of the '688 and the '132 claims.   For example, j2 acquired U.S. Patent Nos. 5,870,549; 6,549,612; 6,693,729; and 6,707,580 all before the '688 reexamination certificate issued.   These references relate to that which is embodied in the statement of grant by the examiner, as well as the examiner's articulation of the novelty of the '688 patent.   The references were thus material to the reexamination and patentability of the '688 patent, yet j2 purposely and knowingly withheld them from the PTO.

125.    Therefore, j2 has committed inequitable conduct in connection with both the '688 patent and '132 patent, rendering them invalid and unenforceable.

### COUNTERCLAIM – COUNT FOUR

**Unlawful Restraint of Trade in Violation of**
**Section 1 of the Sherman Act and Section 7 of the Clayton Act**

126.    Captaris incorporates by reference Paragraph Nos. 1 through 125 above, as though fully set forth herein.

127.    At all times relevant hereto, j2 possessed monopoly power in the Relevant Market, which is believed to be as high as an 80% market share.

128.    By engaging in sham litigation and threatening patent litigation against its competitors, j2 was able to extract royalties from competitors in the Relevant Market, effectively requiring them to subsidize j2's sham litigation and other anticompetitive tactics.

129.    j2's anticompetitive acts, including but not limited to using its wholly-owned patent subsidiaries to file objectively baseless lawsuits seeking to enforce invalid patents against competitors who do not infringe, have served to deter rivals and competitors from attempting to enter the Relevant Market.

130.    j2 agreements with Catch Curve, Dynamic Depth, and other entities that carry out its unlawful scheme, unreasonably restrains trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  In addition, the agreement violates Section 7 of the Clayton Act, 15 U.S.C. § 18, because the effect of the acquisition is to substantially lessen competition and tend to create a monopoly.

131.    During all relevant periods, j2 continued to hold a monopoly position in the Relevant Market.

132.   j2's conspiracy carried out by its patent litigation subsidiaries has enabled j2 to maintain and strengthen its monopoly position in the relevant market.  This resulted in j2 and the litigation subsidiaries pursuing sham litigation competitors and threatening others with patent infringement litigation based upon obviously invalid patents.

133.   j2 has not used many of its patents, including but not limited to the AudioFax patents, for any pro-competitive purpose.  Indeed, when faced with charges of infringement of those same AudioFax patents (before they were acquired by j2), j2 filed sworn disclosures asserting that the AudioFax patents are invalid and do not apply to internet fax services.

134.   On information and belief, j2 and its patent litigation subsidiaries have conspired to systematically pursue sham litigation against j2's competitors, including Captaris, in the Relevant Market based upon patents they know to be invalid, for the purpose of impairing their competitors' ability to compete and/or extracting unnecessary royalties from its competitors.

135.   j2's actions have had a substantial effect on interstate commerce by, among other things, impeding competition in the Relevant Market.

136.   j2's actions have injured Captaris in its business or property within the meaning of Section 4 of the Clayton Act, 15 U.S.C. § 15.  The injury to Captaris is of the type that the antitrust laws were designed to prevent and flows from that which makes j2's actions unlawful.

137.   In addition, Defendants' actions have injured competition in the Relevant Market, which has caused damage to end-user consumers.

## COUNTERCLAIM – COUNT FIVE
### Conspiracy to Monopolize in Violation of Section 2 of the Sherman Act

138.   Captaris incorporates by reference Paragraph Nos. 1 through 125 above, as though fully set forth herein.

139.     Through the actions set forth above, j2 and its wholly-owned patent litigation subsidiaries have entered into a combination or conspiracy to monopolize the Relevant Market in violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2.

140.     The overt actions of j2 and its co-conspirators alleged above were taken with the specific purpose and intent to exclude competition from Captaris and any other rivals in the Relevant Market.

141.     j2's actions have had a substantial effect on interstate commerce by, among other things, impeding competition in the Relevant Market, thereby damaging j2's rivals and consumers.

142.     j2's actions have injured Captaris in its business or property within the meaning of Section 4 of the Clayton Act, 15 U.S.C. § 15.  The injury to Captaris is an injury of the type that the antitrust laws were designed to prevent and flows from that which makes j2's actions unlawful.

### COUNTERCLAIM – COUNT SIX
### Monopolization in Violation of Section 2 of the Sherman Act

143.     Captaris incorporates by reference Paragraph Nos. 1 through 125 above, as though fully set forth herein.

144.     Through the exclusionary and anticompetitive actions set forth above, j2 has willfully acquired and maintained an unlawful monopoly in the Relevant Market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

145.     j2's actions have had a substantial effect on interstate commerce by, among other things, impeding competition in the Relevant Market.

146.     j2's actions have injured Captaris in its business or property within the meaning of Section 4 of the Clayton Act, 15 U.S.C. § 15.  The injury to Captaris is an injury of the type

that the antitrust laws were designed to prevent and flow from that which makes j2's actions unlawful.

## COUNTERCLAIM – COUNT SEVEN
### Attempted Monopolization in Violation of Section 2 of the Sherman Act

147.    Captaris incorporates by reference Paragraph Nos. 1 through 125 above, as though fully set forth herein.

148.    Through the anticompetitive acts set forth above, j2 has attempted to monopolize the Relevant Market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

149.    j2 specifically intended and has the continuing intent to monopolize the Relevant Market.

150.    To the extent it has not already done so, j2 has a dangerous probability of successfully monopolizing the Relevant Market and exercising its monopoly power to exclude competition, thereby damaging consumers.

151.    j2's actions have had a substantial effect on interstate commerce by, among other things, impeding competition in the Relevant Market.

152.    j2's actions have injured Captaris in its business or property within the meaning of Section 4 of the Clayton Act, 15 U.S.C. § 15.  The injury to Captaris is an injury of the type that the antitrust laws were designed to prevent and flows from that which makes j2's actions unlawful.

## COUNTERCLAIM – COUNT EIGHT
### Restraint of Trade in Violation of California Bus. & Prof. Code § 16720

153.    Captaris incorporates by reference Paragraph Nos. 1 through 125 above, as though fully set forth herein.

154.    Jurisdiction of the Court over this claim is based on principles of supplemental jurisdiction.

155.    j2 is based in California and commands its various subsidiaries, including its patent litigation subsidiaries, from the State of California.  j2's unlawful conduct complained of herein has therefore occurred in substantial part in the State of California.

156.    j2's actions described above constitute an unlawful restriction of trade or commerce in violation of California Bus. & Prof. Code § 16720.

157.    j2's actions have injured Captaris in its business or property.

158.    In addition, j2's actions have injured competition in the Relevant Market, which has also injured the public.

### COUNTERCLAIM – COUNT NINE
### Unfair Competition in Violation of California Bus. & Prof. Code § 17200

159.    Captaris incorporates by reference Paragraph Nos. 1 through 125 above, as though fully set forth herein.

160.    Jurisdiction of this Court over this claim is based on principles of supplemental jurisdiction.

161.    j2 is based in California and commands its various subsidiaries, including its wholly-owned patent litigation subsidiaries, from the State of California.  J2's unlawful conduct complained of herein has therefore occurred in substantial part in the State of California.

162.    j2's actions described above constitute an unlawful restriction of trade or commerce in violation of California Bus. & Prof. Code § 17200.

163.    j2's actions have injured Captaris in its business or property.

164.    In addition, j2's actions have injured competition in the Relevant Market, which has also injured the public.

## EXCEPTIONAL CASE 35 U.S.C. § 285

165.    In light of j2's knowing violation of its Duty of Candor, and because both the '688 patent and '132 patent exist as a result of j2's inequitable conduct, this case is exceptional as defined by 35 U.S.C. § 285, and Captaris is entitled to its attorneys fees and costs in defending this action.

## PRAYER FOR RELIEF

WHEREFORE, Defendant / Counter-Claimant Captaris, Inc. asks the Court to enter judgment in its favor and grant the following relief:

A.    Dismissing, with prejudice, the entirety of j2's Complaint;

B.    Denying all remedies and relief sought in j2's Complaint;

C.    Declaring that Captaris has not infringed, and is not infringing any valid and enforceable claim of either the '688 patent or the '132 patent, either directly or indirectly, literally or under the doctrine of equivalents, neither has Captaris contributed to, nor induced infringement thereof;

D.    Declaring the claims of both of the '688 patent or the '132 patent to be invalid, unenforceable, and void in law;

E.    Declaring that the '688 patent or the '132 patent were procured by way of inequitable conduct and/or fraud upon the United States Patent and Trademark Office;

F.    Finding this to be an exceptional case and awarding Captaris its costs, attorneys' fees, and expenses pursuant to 35 U.S.C. § 285;

G.    Entering an order enjoining j2, and all those acting in concert with j2, including but not limited to its wholly-owned patent litigation subsidiaries, from monopolizing and/or attempting to monopolize the Relevant Market through anticompetitive behavior, including the extortion of licensing agreements and settlement by way of threatening competitors with objectively baseless claims of patent infringement;

H.    Awarding Captaris its the actual damages proven to have been caused by j2's illegal acts, trebled as provided by Section 4 of the Clayton Act (15 U.S.C. § 15) and applicable California law;

J.    Awarding Captaris exemplary and punitive damages for j2's fraud upon the United States Patent and Trademark Office;

K.    Awarding Captaris its costs and expenses, including its reasonable

attorneys' fees as provided by Section 4 of the Clayton Act (15 U.S.C. § 15) and applicable California law; and

L.     Granting all such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Captaris demands trial by jury on all issues so triable.


Dated:  February 6, 2009                              Respectfully submitted,


                                                      /s/ Charles Ainswoth
                                                      Charles Ainsworth
                                                      TX Bar No. 00783521
                                                      Robert Christopher Bunt
                                                      TX Bar No. 00787165
                                                      **PARKER, BUNT & AINSWORTH, P.C.**
                                                      100 E. Furguson, Suite 1114
                                                      Tyler, Texas  75702
                                                      Tel:  903-531-3535 / Fax:  903-533-9687
                                                      Email:  charley@pbatyler.com
                                                      E-mail: rcbunt@pbatyler.com


                                                      Timothy J. Carroll (admitted *pro hac vice*)
                                                      Matthew F. Carmody (admitted *pro hac vice*)
                                                      Stacy A. Manning (admitted *pro hac vice*)
                                                      **LOEB & LOEB LLP**
                                                      321 North Clark Street
                                                      Chicago, Illinois 60654
                                                      (312) 464-3100
                                                      (312) 312.464-3111
                                                      tcarroll@loebl.com
                                                      smanning@loeb.com
                                                      mcarmody@loeb.com

                                                      **Attorneys For Defendant Captaris, Inc.**

## <u>CERTIFICATE OF SERVICE</u>

       I hereby certify that the following counsel of record who are deemed to have consented to electronic service are being served this Friday, February 06, 2009, with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3). Any other counsel of record will be served by first class U.S. mail on this same date.

*/s/ Charles Ainsworth*