48.     Notwithstanding this clear requirement, and j2's clear possession and knowledge of invalidating prior art and Rightfax's prior commercial use, j2, through its litigation vehicle Dynamic Depth, initiated the Dynamic Depth case on June 25, 2007, without conducting a meaningful pre-filing investigation as required by law.

49.     In addition, at least as early as June 25, 2007, Captaris' manuals and user-guides were publicly available to the general public for anyone to download on its website.

50.     Faced with clear, unequivocal information that undercut the factual and legal basis for its claims, and having an affirmative obligation and duty to further investigate and consider known prior art and public use, j2 nevertheless persisted in having its patent litigation vehicle Dynamic Depth initiate objectively baseless litigation against Captaris in violation of Rule 11.

51.     When filed, the Dynamic Depth litigation was a sham orchestrated solely to extort Captaris into entering into a licensing agreement with j2 and/or Dynamic Depth. The claims asserted thereunder were objectively baseless and no reasonable litigant could have realistically expected success on the merits.

52.     Instead, j2 attempted to utilize the Dynamic Depth case as an attempt to interfere with one of its competitors as an anticompetitive weapon by asserting costly patent litigation claims for a patent that was clearly invalid, that j2 was aware of and in possession of the bases for invalidity, and that j2 had a duty to investigate further in light of the fact that its two predecessors-in-interest of the '488 patent, Motorola and Freescale, both had chosen not to pursue claims based on the information provided by Captaris.

53.     j2's actions in asserting the Dynamic Depth case fits with j2's overall pattern of asserting sham litigation proceedings. This series of sham lawsuits against competitors represents a purposeful scheme by j2 to assert patent infringement claims without regard to the merits of those claims for purposes of

1    injuring its market rivals, and a number of other competitors have alleged sham
2    litigation against j2.

3          54.    Following the filing of the Dynamic Depth case, j2 continued a
4    dialogue with Captaris attempting to negotiate an arrangement whereby Captaris
5    would license the '488 patent and/or other patents in j2's portfolio.  Captaris resisted
6    these efforts and told j2 that its claims were without merit.

7          55.    In addition to Captaris' repeated admonitions to j2, on May 27, 2008,
8    Captaris served its invalidity contentions upon j2 in the Dynamic Depth case, further
9    disclosing numerous examples of invalidating prior art, as well as the functionality
10   of the Rightfax product that long predated j2's asserted invention.

11         56.    Faced with the clear requirements of a pre-filing investigation under
12   Rule 11, in possession of and having knowledge of invalidating prior art and
13   Rightfax's prior commercial use, and having access to Captaris' invalidity
14   contentions in the Dynamic Depth case, j2 nevertheless initiated a second baseless
15   lawsuit, the instant case, against Captaris on June 26, 2008.

16         57.    Although it has actual and constructive knowledge of information
17   which undercut its claims, and an affirmative obligation and duty to investigate and
18   consider known prior art, j2 nevertheless persisted in filing the instant objectively
19   baseless litigation against Captaris in violation of Rule 11.

20         58.    When filed, the instant lawsuit was a sham orchestrated solely to extort
21   Captaris into entering into a licensing agreement with j2 and/or Dynamic Depth.
22   The claims asserted hereunder are objectively baseless and no reasonable litigant
23   could have realistically expected success on the merits.

24         59.    Instead, j2 is attempting to utilize this litigation as an effort to interfere
25   with one of its competitors as an anticompetitive weapon by asserting costly patent
26   litigation claims for a patent that was clearly invalid and for which j2 was aware of
27   and in possession of the bases for invalidity.

28

## j2's **AUDIOFAX SHAM LITIGATION**

60.    At the time Catch Curve acquired the AudioFax patent portfolio, j2 knew that the patents in the AudioFax patent portfolio were invalid or inapplicable to small and home office facsimile services. At least two other patents, U.S. Patent Nos. 3,920,895 and 3,958,088 (assigned to Xerox Corporation) were filed on March 29, 1974, well before the AudioFax patents, and were known to Catch Curve and j2. They described store and forward facilities for fax communications almost 15 years before AudioFax patents were filed. Indeed, the first line of both patents describes "[a] switched communications system including store and forward facilities" and then describes the use of the store and forward facilities in fax communication. Catch Curve and j2 nevertheless persisted with the filing of lawsuits against j2's competitors despite knowing about the existence of prior art invalidating the AudioFax patents and the almost certain reality that those defendants did not infringe.

61.    j2's unlawful intent in connection with the AudioFax patents is further displayed through j2's own public court filings made under the strictures of Rule 11. Specifically, in an earlier lawsuit, the prior owner of the AudioFax patent portfolio sued j2 for patent infringement, accusing j2 of infringing the same AudioFax patents in connection with j2's operation of its own small and home office internet facsimile service (the "j2/AudioFax Suit").

62.    In its own defense in the j2/AudioFax Suit, j2 asserted in sworn court submissions that the AudioFax patents do not apply to internet based facsimile services, which is clear from the face of the patents.

63.    j2 settled the j2/AudioFax Suit and later agreed to purchase the AudioFax patents. However, once j2 had acquired the AudioFax patents, they became ammunition to further j2's anticompetitive scheme. j2, through its controlled alter-ego and wholly-owned subsidiary Catch Curve, began using the

1  AudioFax patents to assert infringement claims against its competitors (the "Sham
2  AudioFax Suits").

3      64.   Tellingly, in the Sham AudioFax Suits, j2 and Catch Curve alleged
4  infringement of the AudioFax patents in connection with internet based facsimile
5  services – the very same conduct that j2 had earlier contended, in a sworn
6  disclosure, was not covered by the AudioFax patents.

7      65.   To date, j2, either alone or in conjunction with, and with the assistance
8  and coordination of the patent litigation subsidiaries, have filed at least 19
9  infringement lawsuits against j2's competitors in the Relevant Markets in an
10 extortion scheme that is calculated to raise j2's competitors' costs, force licensing
11 fees from them or drive them out of the market entirely.

12     66.   Not a single lawsuit ever filed by Catch Curve or j2 in connection with
13 these patents has ever resulted in a judicial finding of infringement by any defendant
14 in any forum.  In fact, quite the opposite: the lone dispositive ruling connected with
15 the AudioFax patents was a grant of summary judgment *against* j2 and Catch Curve.

16     67.   j2 knows that the patents it seeks to monetize and enforce against
17 companies in the Relevant Market through its litigation subsidiaries are invalid,
18 unenforceable and do not cover the services sold by the competitors they have sued.
19 These strike suits are predicated on patents that no reasonable litigant would expect
20 to be infringed by companies competing in the Relevant Market, and result in j2's
21 competitors incurring substantial litigation expenses to defend themselves against
22 meritless allegations of infringement – allegations j2 itself asserted were without
23 merit when j2 found itself defending against the same patents.

24     68.   j2's strike suits and predatory litigation scheme has forced many of its
25 competitors into agreeing to unnecessary and unwanted licensing arrangements for
26 irrelevant patents.  These competitors admit that they entered into such agreements
27 not because of the merit of j2 and its litigation subsidiaries' legal position, but solely
28 to avoid the costs of protracted patent litigation against a larger, litigious rival.

Loeb & Loeb
imited Liability Partnership
Including Professional

24

CAPTARIS' ANSWER AND COUNTERCLAIM
TO FIRST AMENDED COMPLAINT
No. CV09-4150 DDP (AJWx)

1   69.   j2's conduct has also restrained competition that would otherwise

2   occur, making it much more difficult for lower priced competing services to gain a

3   foothold in the Relevant Market.

4   **OTHER EXAMPLES OF j2's PATTERN OF SHAM LITIGATION**

5   70.   One such example of j2's anticompetitive scheme involved j2's attempt

6   to use litigation to extort one of its competitors into agreeing to be acquired by j2.

7   71.   According to Venali, Inc. ("Venali"), in order to thwart competition by

8   Venali, j2 sued Venali on February 1, 2004, for alleged infringement of the '638

9   patent and the '688 patent.  In the Fall of 2004, j2 amended its complaint against

10   Venali in the lawsuit to include two of the patents invented by Charles R. Bobo, II,

11   U.S. Patent No. 6,350,066 ("the '066 patent") and U.S. Patent No.6,564,321 ("the

12   '321 patent") (collectively, "the Bobo patents").  The sole purpose of the lawsuit

13   was to bar Venali from competing with j2 in the Relevant Markets.

14   72.   In the Winter of 2004, Venali met with j2 to address (among other

15   things) the invalidity of the j2 patents.  Subsequent communications between the

16   parties made it clear that j2's real desire was not to extract a license to its invalid

17   patent portfolio, but rather to eliminate competition entirely by forcing Venali to

18   accede to a proposed buyout by j2.

19   73.   During those discussions, Venali made clear to j2 that it did not

20   infringe any of the patents at issue.  Venali also demonstrated that, based on prior

21   art, the j2 patents were clearly invalid.

22   74.   j2 responded by having its patent litigation vehicle Catch Curve file a

23   lawsuit on July 1, 2005, against Venali in the Central District of California, alleging

24   that Venali infringed the AudioFax patents.  Catch Curve listed j2 as an "interested"

25   party, purposefully obfuscating the actual nature or extent of j2's interest.

26   75.   Catch Curve never offered a license to Venali before filing suit.

27   Moreover, rather than making its standard licensing terms available to Venali, Catch

28   Curve told Venali that it would need to negotiate any license to the AudioFax

1  patents directly with j2, thus tying those claims.  Once approached, j2 effectively

2  required Venali to license the invalid '638 and '699 patents in order to settle the

3  litigation and obtain a license to the AudioFax patents.  j2 made these demands

4  even though j2 itself had previously asserted that the AudioFax patents were

5  invalid and not infringed by internet based faxing services.

6      76.    GoDaddy is another alleged victim of j2's patent trolling scheme.

7  According to GoDaddy, j2 has targeted GoDaddy in an effort to impose costs on

8  GoDaddy that are disproportionately large compared with the total sales of

9  GoDaddy in the Relevant Market, in an effort to raise GoDaddy's costs to conduct

10  that business and prevent GoDaddy from expanding its sales and market share in

11  that market.

12      77.    On March 21, 2005, j2 sent GoDaddy a letter stating that GoDaddy's

13  internet facsimile service "may employ inventions covered by one or more of j2's

14  patents, including Bobo patents, the '638 patent and the '688 patent."  The letter

15  stated that GoDaddy "may be interested in taking a license" under the patents.

16      78.    On April 18, 2005, GoDaddy informed j2 that GoDaddy's Fax Thru

17  Email$^{TM}$ service was based on open source software ("HylaFAX$^{TM}$") first used in

18  public in 1991, more than one year prior to the earliest priority date for the Bobo

19  patents, hence rendering those patent claims invalid.  GoDaddy therefore declined

20  j2's demand for a license.

21      79.    On April 20, 2005, j2 reiterated in a letter to GoDaddy that "the

22  inventions covered by [the Bobo, '638 and '688] patents were not in use prior to

23  their respective filing dates."  j2 again unjustifiably urged GoDaddy to discuss

24  obtaining a license.

25      80.    GoDaddy heard nothing more for several months.  Beginning on

26  February 17, 2006, however, j2 had Catch Curve go after GoDaddy's competitive

27  Fax Thru Email$^{TM}$ service.  GoDaddy was sent a letter introducing GoDaddy to

28  Catch Curve's "licensing program," claiming that GoDaddy's Fax Thru Email$^{TM}$

26

1  service infringed the AudioFax patents and demanding that GoDaddy purchase a

2  license to the patents or face litigation.

3      81.    On May 19, 2006, GoDaddy responded by rejecting the demand

4  explaining that GoDaddy's services clearly do not infringe any of the AudioFax

5  patents.

6      82.    On July 12, 2006, Catch Curve, upon information and belief acting on

7  j2's direction, filed a lawsuit against GoDaddy in the Northern District of Georgia

8  for infringement of the AudioFax patents. The same day, Catch Curve's lawyers

9  sent a letter to GoDaddy along with a copy of the Complaint. In the letter, Catch

10 Curve (through its lawyers) again threatened to serve the complaint if GoDaddy did

11 not purchase a license to the AudioFax patents.

12     83.    On July 20, 2006, GoDaddy again rejected Catch Curve's demand,

13 insisting again that its Fax Thru Email $^{TM}$ service did not infringe the AudioFax

14 patents. Catch Curve served GoDaddy with a complaint for patent infringement on

15 August 11, 2006. This suit was withdrawn on September 25, 2006 with a similar

16 complaint against GoDaddy re-filed on the same day. This lawsuit was objectively

17 baseless, as GoDaddy, j2 and Catch Curve all understood that GoDaddy did not

18 infringe the AudioFax patents.

19     84.    Regardless of the merits of their claims, j2 and Catch Curve have

20 engaged in a pattern and practice of using strike suits and predatory litigation, or the

21 threat thereof, as part of j2's standard negotiations to acquire its competitors, force

22 them into unnecessary licensing arrangements and/or run them out of business.

23     85.    In addition to the patent infringement litigation against Venali and

24 GoDaddy brought in bad faith by j2 and separately by Catch Curve, j2 and/or Catch

25 Curve have also filed patent infringement lawsuits against industry competitors such

26 as IGC, Call Wave, EasyTel Communications ("EasyTel"), Comodo, Packetel,

27 Protus IP Solutions ("Protus"), and Mijanda, among many others. Notably, three of

28

1   these lawsuits were filed within weeks of EasyTel, Protus and Mijanda objecting to
2   j2's efforts to trademark the generic term "efax."

3       86.    Aware of the invalidity and unenforceability of the '688 patent and '132
4   patent, j2 has also sought additional patents to assert against its competitors in the
5   Relevant Markets.  To that end, j2 purchased a portfolio of patents from NetOffice
6   Solutions, Inc. in 2004, which included the Bobo patents.  j2 has also begun to assert
7   these patents against its competitors in the Relevant Markets in a campaign to obtain
8   and maintain its dominant market share in the Relevant Markets.

9       87.    All these patent infringement lawsuits are objectively baseless.
10  Recently, after a claim construction hearing involving the AudioFax patents, the
11  United States District Court for the Central District of California issued a
12  Claim Construction Order dated May 11, 2007, finding that the clams of the
13  AudioFax patents are not infringed by any internet facsimile services that deliver
14  documents to its customers by any means other than conventional phone lines;
15  something that was obvious from the initiation of the suits.

16      88.    j2's exclusionary conduct unlawfully enabled j2 to sell internet
17  facsimile services without being subject to true competition.  But for j2's illegal
18  conduct, j2 would have been subjected to additional, more effective competition in
19  the Relevant Market.

20      89.    By preventing competitors, including Captaris, from entering and
21  competing in the market, j2 denied consumers and other home purchasers of internet
22  facsimile services the benefits of competition and choice.

23      90.    Unless enjoined, the natural and proximate result of j2's conduct will
24  be to maintain and strengthen its position as the dominant provider of internet
25  facsimile services to home offices and businesses, to the exclusion of actual
26  competitors and potential competitors, including Captaris.  j2 specifically intends to
27  achieve this exclusionary effect through the predatory conduct described in these
28  Counterclaims.

91.    j2's unlawful actions also have caused and are causing injury to competition in the relevant market.  Among other things, j2's actions have raised Captaris' and other rivals' costs of doing business, impairing its ability to compete effectively against j2.  Moreover, if j2 succeeds in disrupting its competitors, eliminating them, or forcing them into incur additional costs through unnecessary licenses, taken to avoid the cost of sham litigation, consumers will be deprived of the benefits of competition in price, quality and service.

92.    Captaris will lose profits and business opportunities as a result of j2's unlawful actions.

93.    j2's unlawful actions have also caused Captaris irreparable harm for which it has no adequate remedy at law.

## FIRST CLAIM FOR RELIEF

### (Non-Infringement of the '688, '132, '066 and '638 Patents)

94.    Captaris incorporates by reference paragraph 1 through 93 above, as though fully set forth herein.

95.    Captaris has not infringed and does not infringe (either directly, contributorily or by inducement) any valid claims of the '688 patent, the '132 patent, the '066 patent, or the '638 patent, either literally or under the doctrine of equivalents.

96.    Captaris is therefore entitled to a declaratory judgment that it has not infringed the '688 patent, the '132 patent, the '066 patent, or the '638 patent.

## SECOND CLAIM FOR RELIEF
### (Invalidity of the '688, '132, '066 and '638 Patents)

97.    Captaris incorporates by reference paragraph 1 through 93 above, as though fully set forth herein.

98.    The relevant claims of the '688 patent, the '132 patent, the '066 patent and the '638 patent are invalid and/or unenforceable because they fail to comply with the applicable requirements of the Patent Act, including, but without limitation,

1   sections 101, 102, 103, and/or 112, and for failure to comply with the statutes and
2   regulations governing the application for and prosecution of patents.

3       99.   Captaris is therefore entitled to a declaratory judgment that the relevant
4   claims of the '688 patent, the '132 patent, the '066 patent and the '638 patent are
5   invalid.

6   **THIRD CLAIM FOR RELIEF**

7   **(Unenforceability Based on Inequitable Conduct)**

8       100.   Captaris incorporates by reference paragraph 1 through 93 above, as
9   though fully set forth herein.

10       101.   At all times during the pendency of a patent application, all individuals
11   associated with the filing or prosecution of a patent application have a duty of
12   candor and good faith to meaningfully and truthfully disclose to the PTO material
13   information of which they were aware (the "Duty of Candor"). For purposes of the
14   Duty of Candor, information is material "where there is a substantial likelihood that
15   a reasonable examiner would consider it important in deciding whether to allow the
16   application to issue as a patent." 37 C.F.R. § 1.56(b)(1991). In some cases, a
17   stricter standard of materiality has been cited wherein information is "material to
18   patentability when it is not cumulative to information already of record or being
19   made of record in the application, and: (1) establishes, by itself or in combination
20   with other information, a *prima facie* case of unpatentability of a claim; or (2)
21   refutes, or is inconsistent with, a position the applicant takes in opposing an
22   argument of unpatentability relied on by the PTO, or asserting an argument of
23   patentability. 37 C.F.C. Section 1.56(b)(1992).

24       102.   On June 12, 1998, j2 filed with the PTO the first United States patent
25   application in the series of applications that led to the issuance of the '688 patent
26   (the "'688 Patent Application").

27       103.   PTO practice required each individual associated with the filing or
28   prosecution of the '688 Patent Application who was aware of material information

1  to submit, or cause to submit, such information to the PTO as part of an Information

2  Disclosure Statement ("IDS") as early in the prosecution of the '688 Patent

3  Application as it was known.  37 C.F.R. § 1.56(c):

4            Individuals associated with the filing or prosecution of a

5            patent application within the meaning of this section are:

6            (1) Each inventor named in the application; (2) Each

7            attorney or agent who prepares or prosecutes the

8            application; and (3) Every other person who is

9            substantively involved in the preparation or prosecution of

10           the application and who is associated with the inventor,

11           with the assignee or with anyone to whom there is an

12           obligation to assign the application.

13       104.  During the course of prosecution of the '688 Patent Application, the

14  named inventors, and the attorneys, agents, and employees of j2 acting on behalf of

15  j2 in connection with the filing and prosecution of the '688 Patent Application ("the

16  Applicants"), had a Duty of Candor to the PTO.  Moreover, the Applicants knew or

17  were charged with knowledge that they had such a Duty of Candor.

18       105.  During the course of the prosecution of the '688 Patent Application, the

19  Duty of Candor required, among other things, that each Applicant disclose to the

20  PTO material information arising from, among other places, industry sources and

21  other copending U.S. patent applications.  *See* Section 2001.06 of the Manual of

22  Patent Examining Procedure (MPEP):

23           Such individuals may be or become aware of material

24           information from various sources such as, for example, co-

25           workers, trade shows, communications from or with

26           competitors, potential infringers, or other third parties,

27           related foreign applications (see MPEP Section

28           2001.06(a)), prior or copending United States patent

1 applications (see MPEP Section 2001.06(b)), related

2 litigation (see MPEP Section 2001.06(c)) and preliminary

3 examination searches.

4 106. As set forth below, Applicants violated their Duty of Candor in an

5 effort to hide material information from the PTO in connection with the prosecution

6 of the '688 Patent Application, the '132 Patent Application, and the reexamination

7 of the '688 patent.  Applicants failed to disclose material, non-cumulative

8 information, with intent to deceive the PTO.

9  **j2 Failed to Disclose Known Prior Art to the PTO**

10 107. In March of 2005, Venali, Inc. filed a request for reexamination of the

11 '688 patent with the PTO.  Among other references, the request for reexamination

12 cited various new prior art documents relating to versions 4.5 and 5.0 of Captaris'

13 own Rightfax product.

14 108. Captaris creates and distributes product manuals, including Installation

15 and Administration Guides, describing various aspects of its Rightfax products,

16 which were available online during the time of the reexamination.

17 109. j2 was aware of the existence of, and had access to, the Rightfax

18 product manuals, the Rightfax functionality and other prior art during the pendency

19 of the '688 patent reexamination proceedings, yet did not disclose any of this

20 documentation or information to the PTO.  In particular, at minimum j2 was made

21 explicitly aware of the Rigthfax prior art and functionality in connection with the

22 Dynamic Depth case, which was filed on June 25, 2007, long before the

23 reexamination was completed on March 11, 2008.

24 110. In a December 6, 2006 Office Action, the Examiner in the

25 reexamination proceedings of the '688 patent further highlighted the relevance of

26 Rightfax, concluding that the Rightfax product was prior art, but noting that the

27 articles relating to the Rightfax product cited during the reexamination proceedings

28 did not teach the network architecture recited in the claims.  Specifically, the

1  Examiner stated that the Rightfax articles did not "include a processing server
2  communicatively coupled to a separate database server by an internal, packet-
3  switched network."

4      111.   However, the Rightfax Installation and Administration Guides, which
5  were known to j2 and available during he pendency of the reexamination
6  proceedings, disclose the use of the Rightfax software on one server coupled to a
7  database server over an internal (packet-switched) network.  The Rightfax product is
8  therefore, at minimum, anticipatory prior art under 35 U.S.C. § 102(b).

9      112.   Under Federal Circuit law, one cannot cultivate ignorance, or disregard
10  numerous warnings that material information or prior art may exist, merely to avoid
11  actual knowledge of that information or prior art.  Where an applicant knows of
12  information the materiality of which may so readily be determined, he or she cannot
13  intentionally avoid learning its materiality, even through gross negligence; in
14  such cases the district court may find that the applicant should have known of the
15  materiality of the information.  Thus, a duty to inquire arises when the prosecuting
16  attorney is on notice of the likelihood that specific, relevant, material information
17  exists and should be disclosed.  In such a case, the applicant or prosecuting attorney
18  is not free to choose not to investigate the facts necessary to determine the
19  materiality of the reference in an effort to avoid complying with their duty to
20  disclose.

21      113.   j2 asserted infringement of the '688 patent against Venali, Inc.  in *J2*
22  *Global Communications, Inc. v. Venali, Inc.*, Case No. CV04-01172 (C.D. Cal.).
23  During that litigation, Venali filed a request for ex parte re-examination of the '688
24  patent with the PTO, which the PTO granted on May 12, 2005.

25      114.   Applicable regulations, including but not limited to 37 C.F.R. § 1.555,
26  require that "[e]ach individual associated with the patent owner in a reexamination
27  proceeding has a duty of candor and good faith in dealing with the Office, which

28

1  includes a duty to disclose to the Office all information known to that individual to
2  be material to patentability in a reexamination proceeding."

3      115.   Applicable regulations require that "Any information disclosure
4  statement . . . should be filed [with the PTO] within two months of the date of the
5  order for reexamination, or as soon thereafter as possible." 37 C.F.R. § 1.555.

6      116.   Accordingly, while the PTO was performing its ex parte reexamination
7  of j2's '688 patent, j2 had an obligation to disclose all material information of which
8  it was aware.

9      117.   j2 acquired the '488 patent on March 22, 2006.  On June 25, 2007, one
10 of j2's wholly-owned patent litigation vehicle, Dynamic Depth, Inc., filed a lawsuit
11 against Captaris in the United States District Court for the Northern District of
12 Georgia, styled *Dynamic Depth v. Captaris, Inc.,* Case No. 1:07-CV-1488 (the
13 "Dynamic Depth case").

14     118.   The Dynamic Depth case was initiated while the reexamination of the
15 '688 patent was still underway by the PTO.  In the Dynamic Depth case, j2, through
16 its patent litigation vehicle Dynamic Depth, asserted the '488 patent against Captaris
17 based upon Captaris' Rightfax product.  This is also the very same product that j2
18 alleges infringes the patents-in-suit in the instant litigation.

19     119.   Because j2, in court filings, has plead that Captaris' Rightfax product
20 infringes both the '488 patent and the '688 patent, the '488 patent is material prior
21 art to the '688 patent.  In fact, the '488 patent, in combination with the Rightfax
22 documentation already before the PTO, renders the '688 patent obvious and invalid.
23 Therefore, j2 was under an affirmative duty to disclose the '488 patent to the PTO
24 during the reexamination of the '688 patent.  But for j2's intentional failure to
25 disclose this material information with intent to deceive the PTO, the '688 patent
26 would not have survived reexamination.

27     120.   Additionally, in November 2001, j2 settled a lawsuit with AudioFAX
28 in which AudioFAX asserted at least the '926 patent (the AudioFAX settlement).

1    Accordingly, as of at least 2001, j2 was aware and on notice that the '926 patent, at

2    minimum, potentially read onto its system and was relevant to the proposed claims

3    of the '688 patent.

4        121.   The AudioFAX settlement occurred during the pendency of the '688

5    patent application, prior to the continuation filing of the '132 patent, and prior to the

6    reexamination of the '688 patent.  Notwithstanding j2's awareness that the '926

7    patent may read onto its system, j2 failed to disclosed this patent, or any related

8    continuation patents, to the PTO during the prosecution of the '688 patent or at any

9    subsequent time.  j2's intentional withholding of a material reference from the PTO

10   on three separate occasions - during prosecution of the '688 patent, the prosecution

11   of the '132 patent, and the reexamination of the '688 patent - amounts to inequitable

12   conduct.

13       122.   The '926 patent was also one of a series of patents owned by

14   AudioFAX (the AudioFAX patents).  Following a negotiation and acquisition by j2,

15   on February 17, 2005 AudioFAX assigned the AudioFAX patents to Catch Curve,

16   Inc., one of j2's wholly-owned litigation subsidiaries that was created specifically to

17   hold the AudioFAX patents.

18       123.   j2's acquisition of the AudioFAX patents occurred while the '132

19   patent application was still pending and prior to the reexamination of the '688

20   patent.  Because j2 was already aware that the AudioFAX patents potentially read

21   onto and were related to its system, at minimum j2 should have disclosed the

22   AudioFAX patents to the PTO after it purchased these patents, i.e., during the

23   prosecution of the '132 patent and during the reexamination of the '688 patent .  j2's

24   intentional failure to disclose this material information with intent to deceive the

25   PTO amounts to inequitable conduct.

26       124.   j2 is the also the assignee for, was aware of and had in its possession, a

27   number of other patents that disclose various aspects of the '688 and the '132

28   claims.  For example, j2 acquired U.S. Patent Nos. 5,870,549; 6,549,612; 6,693,729;

1 │ and 6,707,580 all before the '688 reexamination certificate issued. These references

2 │ relate to that which is embodied in the statement of grant by the examiner, as well as

3 │ the examiner's articulation of the novelty of the '688 patent. The references were

4 │ thus material to the reexamination and patentability of the '688 patent, yet j2

5 │ purposely and knowingly withheld them from the PTO.

6 │     125.   Therefore, j2 has committed inequitable conduct in connection with

7 │ both the '688 patent and '132 patent, rendering them invalid and unenforceable.

8 │ **FOURTH CLAIM FOR RELIEF**

9 │ **(Monopolization in Violation of Section 2 of the Sherman Act)**

10 │     126.   Captaris incorporates by reference paragraphs 1 through 125 above, as

11 │ though fully set forth herein.

12 │     127.   Through the exclusionary and anticompetitive actions set forth above,

13 │ j2 has willfully acquired and maintained an unlawful monopoly in the Relevant

14 │ Market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

15 │     128.   j2's actions have had a substantial effect on interstate commerce by,

16 │ among other things, impeding competition in the Relevant Market.

17 │     129.   j2's actions have injured Captaris in its business or property within the

18 │ meaning of Section 4 of the Clayton Act, 15 U.S.C. § 15. The injury to Captaris is

19 │ an injury of the type that the antitrust laws were designed to prevent and flow from

20 │ that which makes j2's actions unlawful.

21 │ **FIFTH CLAIM FOR RELIEF**

22 │ **(Attempted Monopolization in Violation of Section 2 of the Sherman Act)**

23 │     130.   Captaris incorporates by reference paragraph 1 through 125 above, as

24 │ though fully set forth herein.

25 │     131.   Through the anticompetitive acts set forth above, j2 has attempted to

26 │ monopolize the Relevant Market in violation of Section 2 of the Sherman Act, 15

27 │ U.S.C. § 2.

28 │

1  132. j2 specifically intended and has the continuing intent to monopolize the

2 Relevant Market.

3  133. To the extent it has not already done so, j2 has a dangerous probability

4 of successfully monopolizing the Relevant Market and exercising its monopoly

5 power to exclude competition, thereby damaging consumers.

6  134. j2's actions have had a substantial effect on interstate commerce by,

7 among other things, impeding competition in the Relevant Market.

8  135. j2's actions have injured Captaris in its business or property within the

9 meaning of Section 4 of the Clayton Act, 15 U.S.C. § 15. The injury to Captaris is

10 an injury of the type that the antitrust laws were designed to prevent and flows from

11 that which makes j2's actions unlawful.

12      **SIXTH CLAIM FOR RELIEF**

13   **(Restraint of Trade in Violation of Cal. Bus. & Prof. Code § 16720)**

14  136. Captaris incorporates by reference paragraph. 1 through 125 above, as

15 though fully set forth herein.

16  137. Jurisdiction of the Court over this claim is based on principles of

17 supplemental jurisdiction.

18  138. j2 is based in California and commands its various subsidiaries,

19 including its patent litigation subsidiaries, from the State of California. j2's

20 unlawful conduct complained of herein has therefore occurred in substantial part in

21 the State of California.

22  139. j2's actions described above constitute an unlawful restriction of trade

23 or commerce in violation of California Bus. & Prof. Code § 16720.

24  140. j2's actions have injured Captaris in its business or property.

25  141. In addition, j2's actions have injured competition in the Relevant

26 Market, which has also injured the public.

27      **SEVENTH COUNTERCLAIM**

28  **(Unfair Competition in Violation of Cal. Bus. & Prof. Code § 17200)**

142.   Captaris incorporates by reference paragraph 1 through 125 above, as though fully set forth herein.

143.   Jurisdiction of this Court over this claim is based on principles of supplemental jurisdiction.

144.   j2 is based in California and commands its various subsidiaries, including its wholly-owned patent litigation subsidiaries, from the State of California. J2's unlawful conduct complained of herein has therefore occurred in substantial part in the State of California.

145.   j2's actions described above constitute an unlawful restriction of trade or commerce in violation of California Bus. & Prof. Code § 17200.

146.   j2's actions have injured Captaris in its business or property.

147.   In addition, j2's actions have injured competition in the Relevant Market, which has also injured the public.

## EXCEPTIONAL CASE 35 U.S.C. § 285

148.   In light of j2's knowing violation of its Duty of Candor, and because both the '688 patent and '132 patent exist as a result of j2's inequitable conduct, this case is exceptional as defined by 35 U.S.C. § 285, and Captaris is entitled to its attorneys fees and costs in defending this action.

## PRAYER FOR RELIEF

WHEREFORE, Defendant / Counter-Claimant Captaris, Inc. asks the Court to enter judgment in its favor and grant the following relief:

A.   Dismissing, with prejudice, the entirety of j2's Complaint;

B.   Denying all remedies and relief sought in j2's Complaint;

C.   Declaring that Captaris has not infringed, and is not infringing any valid and enforceable claim of either the '688 patent, the '132 patent, the '066 patent, or the '638 patent, either directly or indirectly, literally or under the doctrine of equivalents, neither has Captaris contributed to, nor induced infringement thereof;

D.     Declaring the claims of both of the '688 patent or the '132 patent to be invalid, unenforceable, and void in law;

E.     Declaring the claims of both of the '066 patent or the '638 patent to be invalid and void in law;

F.     Declaring that the '688 patent or the '132 patent were procured by way of inequitable conduct and/or fraud upon the United States Patent and Trademark Office;

G.     Finding this to be an exceptional case and awarding Captaris its costs, attorneys' fees, and expenses pursuant to 35 U.S.C. § 285;

H.     Entering an order enjoining j2, and all those acting in concert with j2, including but not limited to its wholly-owned patent litigation subsidiaries, from monopolizing and/or attempting to monopolize the Relevant Market through anticompetitive behavior, including the extortion of licensing agreements and settlement by way of threatening competitors with objectively baseless claims of patent infringement;

I. Awarding Captaris its the actual damages proven to have been caused by j2's illegal acts, trebled as provided by Section 4 of the Clayton Act (15 U.S.C. § 15) and applicable California law;

J.     Awarding Captaris exemplary and punitive damages for j2's fraud upon the United States Patent and Trademark Office;

K.     Awarding Captaris its costs and expenses, including its reasonable attorneys' fees as provided by Section 4 of the Clayton Act (15 U.S.C. § 15) and applicable California law; and

L.     Granting all such other and further relief as the Court may deem just and proper.

## JURY DEMAND

1      Captaris demands trial by jury on all issues so triable.

2   Dated:  October 15, 2009            LOEB & LOEB LLP
                                        TIMOTHY J. CARROLL
3                                       LAURA A. WYTSMA
                                        MATTHEW F. CARMODY
4

5                                   By_____/s/_Timothy J. Carroll_____
                                           Timothy J. Carroll
6                                          Attorneys for Defendant
                                           CAPTARIS, INC.
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**PROOF OF SERVICE**

2      I, Valent Manssourian, the undersigned, declare that:

3      I am employed in the County of Los Angeles, State of California, over the age

4 of 18, and not a party to this cause.  My business address is 10100 Santa Monica

5 Boulevard, Suite 2200, Los Angeles, California 90067-4120.

6      On October 15, 2009, I caused a true copy of the foregoing **AMENDED**

7 **ANSWER AND COUNTERCLAIM OF DEFENDANT CAPTARIS, INC. TO**

8 **PLAINTIFF J2 GLOBAL COMMUNICATIONS, INC.'S FIRST AMENDED**

9 **COMPLAINT FOR PATENT INFRINGEMENT** to be served on the parties in

10 this cause as follows:

11 [X]   (VIA U.S. MAIL) by placing the above named document in a sealed envelope
addressed as set forth below, or on the attached service list and by then placing such

12 sealed envelope for collection and mailing with the United States Postal Service in
accordance with Loeb & Loeb LLP's ordinary business practices.

13

**Please see attached Service List.**

14

15      I am readily familiar with Loeb & Loeb LLP's practice for collecting and

16 processing correspondence for mailing with the United States Postal Service and

17 Overnight Delivery Service. That practice includes the deposit of all correspondence

18 with the United States Postal Service and/or Overnight Delivery Service the same

19 day it is collected and processed.

20      I certify that I am employed in the office of a member of the bar of this court

21 at whose direction the service was made.

22      I declare under penalty of perjury that the foregoing is true and correct.

23      Executed on October 15, 2009, at Los Angeles, California.

24

25

26 Valent Manssourian

27

28

1
## SERVICE LIST
2

3  Robert A. Sacks
   Brian R. England
4  Edward E. Johnson
   SULLIVAN & CROMWELL LLP
5  1888 Century Park East
   Los Angeles, CA  90067-1725
6  Telephone:  (310) 712-6600
   Facsimile:  (310) 712-8800
7  Email:  sacksr@sullcrom.com
   Email:  englandb@sullcrom.com
8  Email:  johnsonee@sullcrom.com

9  Frank L. Bernstein
   Megan Whyman Olesek
10 KENYON & KENYON LLP
   333 W. San Carlos Street, Suite 600
11 San Jose, CA  95110
   Telephone:  (408) 975-7500
12 Facsimile:  (408) 975-7501
   Email:  molesek@kenyon.com
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28