O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| j2 GLOBAL COMMUNICATIONS INC., | ) ) | Case No. CV 09-04150 DDP (AJWx) |
| Plaintiff, | ) ) ) | **CLAIM CONSTRUCTION ORDER** |
| v. | ) ) | [Plaintiffs' Opening Claim |
| CAPTARIS INC., | ) ) | Construction Brief Filed on June 11, 2010, <u>Markman</u> hearing held on |
| Defendant. | ) ) | October 15, 2010] |
| _____ | ) | |

The plaintiff, j2 Global Communications, Inc. ("j2") is the owner of U.S. Patent Numbers 6,208,638 ("'638 Patent"); 6,350,066 ("'066 Patent"); 6,597,688 ("'688 Patent"); and 7,020,132 ("'132 Patent").  j2 alleges that Captaris, Inc. and Easylink Services International Corp. (collectively "Defendants") have offered to sell and provide, have sold and provided, and continue to offer to sell and provide products and services that infringe one or more claims of the patents.

After reviewing the materials submitted by the parties and holding a <u>Markman</u> hearing on October 15, 2010, the court construes

the disputed claim terms related to the '066 Patent and the '638 Patent in the manner set forth below.[1]

## I.    BACKGROUND AND PATENTS-IN-SUIT

### A.    Generally

The technology at issue relates to user receipt and transmission of facsimile and telephone messages over the Internet, and of ways to making those messages available to users.  The '066 Patent describes a method or system for making messages available to users over the internet.  The '638 Patent describes a method for accomplishing reliable transmission of facsimile messages to users in email form.  The '688 and '132 Patents, which share common specifications and drawings, relate the ability of the user to send messages via e-mail that can be received at a facsimile machine.

The four patents can generally be grouped into two categories: Patents '066 and '638 relate to a message being received by a user, or an "inbound" message; Patents '688 and '132 relate to a message that a user is sending, or an "outbound" message.

Three of the Patents, '066, '638, and '688, have undergone reexamination.  A reexamination certificate issued May 9, 2009, for the '066 Patent, cancelling claims 1-35 and adding claims 36-57 as amended versions of claims 1-35; claims 36-57 were determined to be patentable. (May 9, 2009, '066 Reexamination Certificate; App. Sec. 1C.)  A reexamination certificate issued December 9, 2008, for the '638 with claims 1 and 13 determined to be patentable as amended;

---

[1]    The court heard arguments at the October 15, 2010, Markman hearing with respect to the '066 Patent and the '638 Patent.  The court, therefore, at this time reserves construction of the disputed terms with respect to the '132 Patent and the '688 Patent until it hears corresponding oral arguments.

claims 2-12 and 14-22 determined to be patentable as dependent from claims 1 and 13; and newly-added claims 23-40 determined to be patentable. (Dec. 9, 2008, '638 Reexamination Certificate; App. Sec. 2C.)  A reexamination certificate issued March 11, 2008, for the '688 Patent, determining that all of claims 1-27 were patentable as originally issued.

## II.  THE CLAIM CONSTRUCTION PROCESS

A patent infringement analysis involves two steps: (1) determining the meaning and scope of the patent claims asserted to be infringed; and (2) comparing the properly construed claims to the accused device.  See generally Markman v. Westview Instruments, Inc., 517 U.S. 370 (1996).  The first step in this sequence is presently before the Court.

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (internal quotation marks omitted).  The construction of a particular patent claim term presents a question of law, to be decided by the Court.  Markman, 517 U.S. at 391.

The starting point for claim construction is a disputed term's ordinary meaning.  Phillips, 415 F.3d at 1313.  Ordinary meaning, in the patent claim construction context, is the meaning that a person of ordinary skill in the art would attribute to a claim term in the context of the entire patent at the time of the invention, i.e., as of the effective filing date of the patent application. ICU Med., Inc. v. Alaris Med. Sys., Inc., 558 F.3d 1368, 1374 (Fed. Cir. 2009).

1    The claims, of course, do not stand alone; a person of
2  ordinary skill in the art "is deemed to read [a] claim term not
3  only in the context of the particular claim in which the disputed
4  term appears, <u>but in the context of the entire patent, including</u>
5  <u>the specification</u>." <u>Phillips</u>, 415 F.3d at 1313-14 (emphasis
6  added).  Accordingly, the specification is "the <u>primary basis</u> for
7  construing the claims" in light of the "statutory requirement that
8  the specification describe the claimed invention in full, clear,
9  concise, and exact terms." <u>Id.</u> at 1315 (internal quotation marks
10  omitted) (emphasis added).

11    In determining the proper construction, the claim language,
12  specification, and prosecution history – together referred to as
13  the "intrinsic evidence" – are of paramount importance. <u>Id.</u> at
14  1315 ("[T]he best source for understanding a technical term is the
15  specification from which it arose, informed, as needed, by the
16  prosecution history." (emphasis added) (internal quotation marks
17  omitted)).  Consistent with this principle, courts have recognized
18  that the specification may reveal a special definition given to a
19  claim term by the patentee that differs from the meaning it would
20  otherwise possess. <u>Id.</u> at 1316.  In such cases, the inventor's
21  lexicography governs. <u>Id.</u>  In other cases, the specification may
22  reveal an intentional disclaimer, or disavowal, of claim scope by
23  the inventor. <u>Id.</u>

24    While the court interprets claim terms in light of the
25  specification, it should generally not "import[] limitations from
26  the specification into the claims absent a clear disclaimer of
27  claim scope." <u>Andersen Corp. v. Fiber Composites, LLC</u>, 474 F.3d
28  1361, 1373 (Fed. Cir. 2007).  "[T]he distinction between using the

4

specification to interpret the meaning of a claim and importing limitations from the specification into the claim can be a difficult one to apply in practice." Phillips, 415 F.3d at 1323. In walking this "tightrope," Andersen, 474 F.3d at 1373, the court hews to the question of "how a person of ordinary skill in the art would understand the claim terms." Phillips, 415 F.3d at 1323.

Consideration of intrinsic evidence will resolve any claim term ambiguity in most circumstances. See id. at 1313-14. Where it does not, however, the Court may consider certain "extrinsic evidence." See id. at 1317. Expert testimony, for example, may provide helpful background on the technology at issue, explain how an invention works, or establish that a claim term has a particular meaning in the relevant field. See id. at 1319. Dictionaries and treatises may also be helpful in this regard. Id. at 1318. Precedent counsels against reliance on dictionary definitions at the expense of the specification, however, because such reliance "focuses the inquiry on the abstract meaning of words rather than on the meaning of claim terms within the context of the patent." Id. at 1321; see also Nystrom v. Trex Co., 424 F.3d 1136, 1145 (Fed. Cir. 2005).

The court's ultimate goal is to construe the disputed terms in a manner consistent with the way the inventor defined them and a person of ordinary skill in the art would understand them. "The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." Phillips, 415 F.3d at 1316 (internal quotation marks ommitted).

V.   **CONSTRUCTION OF CLAIM TERMS**

   A.   **Claim Terms for Patent '066**

      1.   <u>"Message Signal"</u>

| J2 CONSTRUCTION | CAPTARIS CONSTRUCTION | COURT CONSTRUCTION |
|---|---|---|
| A signal that can include a fax, voice, or data message. | The signal that is transmitted over a telephone network and includes the contents of the message. | A signal that includes the contents of a message. |

   j2 offers that a "message signal" is "a signal that can
include a fax, voice, or data message." (Pl.'s Opening Brief
10:15-18.) Captaris's would limit "message signals" to signals
transmitted over a telephone network.  Captaris's definition,
however, cannot be reconciled with the plain language of the
Patent.  Although the Patent requires the incoming call be over a
public switched telephone network ("PSTN"), further limitation is
not consistent with intrinsic evidence.  For example, in the first
preferred embodiment, the "message signal" is delivered to a
computer via the World Wide Web, not a telephone network.  ('066
Patent, Figure 1.)  In the "Summary of the Invention," the Patent
specification further explains that the message is "transmitted to
the user over a network," but does not continue to limit "network"
to be exclusively a PSTN.  ('066 Patent, 5:49-50.)  Captaris'
proposed definition would exclude the preferred embodiment and is
at odds with the plain language of the patent.  Because it is
generally error to adopt a claim construction that would exclude
one of the patentee's preferred embodiments, the court rejects

1    Captaris' suggestion that "message signal" include the limitation
2    that the message be transmitted via a PSTN.  See MBO Labs., Inc. v.
3    Becton, Dickinson & Co., 474 F.3d 1323, 1333 (Fed. Cir. 2007).
4        Other than the dispute as to whether the definition of
5    "message signal" must include reference to a telephone network, the
6    parties agreed at oral argument that, with respect to the remainder
7    of the definition, a "message signal" was "a signal that includes
8    the contents of a message."
9        THE COURT: Why is it necessary to even mention a
10                  fax, voice or data message as opposed to a signal
11                  that includes the contents of a message?
12       MR. SACKS: That would be acceptable, Your Honor.
13       THE COURT: Okay. Anybody on this side wish to be heard?
14       MR. CARMODY: Your Honor, yes. There's a couple of
15                  points I'd like to raise, both generally and in
16                  response to what Mr. Sacks brought up. First of all,
17                  in response to your question, it can't just be a
18                  signal that includes the contents of the message
19                  because it has to be clear that there is something
20                  more than just the signal. The patent makes clear
21                  that -- or something more than just a message,
22                  rather. The patent makes clear that it is a message
23                  plus a bunch of correlated data that comes in on
24                  that signal. So it's important for the -- for the
25                  definition to encompass --
26       THE COURT: Well, when it says "a signal that includes the
27                  contents of a message," that just says that the
28                  contents of the message are included --

7

1                                    . . . .

2        MR. CARMODY: I was just confused. If we're clear on that

3              point, then I think that's fine.

4        THE COURT: That's fine. It's a signal that includes the

5              contents of a message.

6        MR. CARMODY: Right.

7        THE COURT: There's no objection from anybody concerning that

8              definition; correct?

9        MR. SACKS: Correct, Your Honor.

10   (TR. 6:17-8:1.) Accordingly, the court, for the reasons discussed

11   above, omits reference to a telephone network, and adopts the

12   following definition of message signal: "A signal that includes the

13   contents of a message."

14       2.   "Hyper-Text Transfer Protocol Deamon"

| J2 CONSTRUCTION | CAPTARIS CONSTRUCTION | COURT CONSTRUCTION |
|---|---|---|
| A program constantly running on a server that communicates according to an http standard. | A software program running on a server in the message storage and delivery system, which communicates with web browser clients by processing and responding to HTTP requests. | A program constantly running on a server that communicates according to an http standard. |

23       j2 asserts that the inventor intended "hyper-text transfer

24   protocol daemon" ("HTTP Daemon") to encompass a constantly running

25   program on a server that communicates according to an HTTP

26   standard.  (Pl.'s Opening Brief 12:23-25.)  Captaris's definition

27   imports two limitations, (1) that the server on which the program

28

1  runs be located in the message storage delivery system; and (2)

2  that the program communicate with web browser clients.

3        As to the second limitation, Captaris would limit the HTTP

4  Daemon to a server that "communicates with web browser clients,"

5  i.e. includes an Internet connection or web browser.  This

6  limitation would effectively require that the HTTP Deamon

7  communicate over the World Wide Web.  The Patent specification does

8  not support Captaris' narrow definition.  In fact, the

9  specification clearly notes that the Internet server, which houses

10  the HTTP Daemon, need not be connected to the Internet at all, but

11  "may be connected to other types of networks," for example, "a

12  large private network, such as one established for a large

13  corporation." ('066 Patent, 18:52-57.)  The specification also

14  states that while "[i]n general" HTTP is a data access protocol run

15  over . . . the World Wide Web," the invention is "not limited to

16  any particular version or standard of HTTP and thus not to any

17  particular hyper-text transfer protocol deamon." ('066 Patent,

18  21:45-50.)  Absent a basis to limit the definition as Defendants

19  argue, and in consideration of the ordinary meaning of the Patent

20  description, the court adopts j2's proposed construction.

21

22        3.   "Network Server"

23

| J2 CONSTRUCTION | CAPTARIS CONSTRUCTION | COURT CONSTRUCTION |
|---|---|---|
|  |  |  |

25

26

27

28

9

| A server that communicates with other servers over a network. | A server residing on a network that receives and handles requests transmitted by client computers, and interfaces with a storage medium to retrieve and process files from the storage medium. | A server that communicates with other servers and/or client computers over a network. |
| --- | --- | --- |

Captaris argues that "network server," in the context of the '066 Patent, is a server that performs specific functions, namely receiving and transmitting requests by a client computer while interfacing with a storage medium to process files. (Consolidated Opening Brief 12:24-28.) J2 argues that Captaris' proposed construction includes unnecessary language, which describes functionality of the invention as a whole and is not particular to the term. The court agrees. Captaris' construction superfluously describes the function of the invention, which is separately described in the claims and need not be included in the construction of the present claim term.

The court agrees with Captaris that the specifications are clear that a network server does as one of its unique and necessary functions communicate with client computers over a network. The court also agrees with j2 that the network server similarly communicates with other servers. The ordinary meaning of the Patent expressly comprehends these two functions. The Patent Abstract, for example, states that the HTTP Daemon "forwards requests for certain files or messages to a network server which transmits at least part of the message to the HTTPD and then to the user." ('066 Patent, Abstract.) Claim 36 also states that the

network server both "forward[s] at least part of the message signal to the" HTTP Daemon and, in response to an access request, "transmits to the computer," where the computer is an end-user client computer, a message. ('066 Patent Reexamination Certificate 1:35-66.) "In construing claims, the analytical focus must begin and remain centered on the language of the claims themselves, for it is that language that the patentee chose to use to 'particularly point[ ] out and distinctly claim[ ] the subject matter which the patentee regards as his invention.' " Interactive Gift Express, Inc. v. Compuserve, Inc., 256 F.3d 1323, 1331 (Fed. Cir. 2001). The terms used in the claims bear a presumption that they mean what they say and have the ordinary meaning that would be attributed to those words by persons skilled in the relevant art. See CCS Fitness, Inc. v. Brunswick Corp., 288 F.3d 1359, 1366 (Fed. Cir. 2002). The court adopts the following construction of "network server": A server that communicates with other servers and/or users over a network.

4.   "The Network Server...forwarding at least part of the message signal to the hyper-text transfer protocol deamon/forwarding at least part of the message signal from the network server to the hyper-text transfer protocol deamon"

| J2 CONSTRUCTION | CAPTARIS' CONSTRUCTION | COURT CONSTRUCTION |
|---|---|---|
| The hypertext transfer protocol deamon, running on the network server, receives at least part of the message signal from the network server. | Indefinite | The hypertext transfer protocol deamon, running on the network server, receives at least part of the message signal from the network server. |

1     The parties disagree about whether the term "network server .
2   . . forwarding at least part of the message signal to the hyper-
3   text transfer protocol deamon, running on the network server,
4   receives at least part of the message signal from the network
5   server," is amenable to construction.  If the court determines that
6   a claim is not "amenable to construction," then the claim is
7   invalid as indefinite under 35 U.S.C. § 112, ¶ 2. Exxon Research &
8   Eng'g Co. v. United States, 265 F.3d 1371, 1375 (Fed. Cir. 2001).
9   The definiteness requirement of § 112, ¶ 2 "focuses on whether the
10  claims, as interpreted in view of the written description,
11  adequately perform their function of notifying the public of the
12  [scope of the] patentee's right to exclude." S3 Inc. v. nVIDIA
13  Corp., 259 F.3d 1364, 1371-72 (Fed. Cir. 2001) (internal citation
14  omitted).  It requires "that the claims be amenable to
15  construction, however difficult that task may be."  Exxon Research,
16  265 F.3d at 1375.  Because a claim is presumed valid, a claim is
17  indefinite only if the "claim is insolubly ambiguous, and no
18  narrowing construction can properly be adopted." Id.
19     Here, Captaris argues that the long-winded term is indefinite.
20  The court disagrees.  As noted, a term is indefinite only if it is
21  "insolubly ambiguous."  Honeywell Intern., Inc. v. International
22  Trade Com'n, 341 F.3d 1332,1338 (9th Cir. 2003).  The term
23  "forwarding" is a common term and easily understood by one having
24  ordinary skill in the art.  The terms "hypertext transfer protocol
25  deamon" and "network server" have already been defined in the
26  course of this markman hearing and are not indefinite.
27  Accordingly, the court finds that the term is not insolubly
28  ambiguous and adopts j2's proposed construction.

5.  "Access Request"

| J2 CONSTRUCTION | CAPTARIS's CONSTRUCTION | COURT CONSTRUCTION |
|---|---|---|
| A request to access a stored message. | An end-user request for authorization to gain entrance. | A request to access a stored message from a hypertext browser triggered by a user. |

A central point of contention for J2 and Captaris is whether an "access request" must necessarily be made by an "end-user." Captaris argues that it must.  The court agrees.  J2 argues that the "access request" is one from a hypertext browser. (TR. 38: 10-11 ("The access request is a request that comes from the hypertext browser.").) The court also agrees with j2.

First, Captaris' construction includes a limitation supported by the specification.  The Patent specification explains that "after a <u>request</u> has been received <u>from the user</u>," "a portion of the message is then transmitted."  ('066 Patent, 5:49-52.) The preferred embodiment similarly states that a "<u>user</u> accesses" the URL associated with his or her "mailbox," and then, "to access the mailbox," the "<u>user</u>" — by way of a URL-based request — supplies an ID and password.  ('066 Patent, 8:23-47.) J2 argues that the limitation proposed by Captaris "need not be added into the definition of the term itself," but sites no language in the Patent in support of its proposed construction or which contradicts a definition that includes the limitation of "user."  In fact, j2 relies on the very same language in the specification in support of its argument, and that language, as explained above, is clear that a <u>user</u> is the one seeking access.

1   The Patent specification, however, is also clear that it is
2   not the user directly seeking access to the message storage and
3   delivery system ("MSDS").  Rather, a user triggers — by way of a
4   hypertext browser — a URL request, which is received by the HTTP
5   Deamon and triggers retrieval of the message.  (See '066 Patent,
6   8:27-33.)

7       The court finds that the limitation proposed by Captaris is
8   not unnecessary or superfluous, is specific to the patent, and
9   supported by the specification.  The court finds, however, that for
10  sake of clarity, j2's clarification, which was made at oral
11  argument, should also be incorporated into the definition.(TR. 38:
12  10-11.)  The court further concludes that "gain entrance" is less
13  precise than "access" and likely to cause confusion.  Accordingly,
14  the court adopts the following definition of "access request":  A
15  request to access a stored message from a hypertext browser
16  triggered by a user.

17          6.   "An Application Layer Address Associated With the
18               Network Server"

| J2 CONSTRUCTION | CAPTARIS CONSTRUCTION | COURT CONSTRUCTION |
|---|---|---|
| A URL that identifies the network server. | A URL that identifies the specific address of the network server. | The URL that identifies the network server's address. |

25      All parties agreed at oral argument to the following
26  construction of the term "A URL that identifies the network
27  server": The URL that identifies the network server's address.
28  (TR. 48:21-25.)

14

7.   <u>"User-Specific Message Storage Area"</u>

| J2 CONSTRUCTION | CAPTARIS CONSTRUCTION | COURT CONSTRUCTION |
|---|---|---|
| An area within a storage medium that stores messages for a recipient in a manner that identifies the message uniquely to the recipient. | A portion of a storage medium, such as a directory, that is specifically allocated for storing all of the message files for a particular intended recipient. | An area within a storage medium that stores messages for a recipient in a manner that identifies the message uniquely to the recipient. |

The parties debate the construction of the term "user-specific message storage area."  Captaris's proposed definition includes the word "portion" in a way that might be misunderstood to refer to a physical portion of a storage medium.  The storage of data, however, is generally understood to be organized into logical and not physical areas.  Furthermore, a logical area may extend over multiple "portions" of the storage medium, while still remaining "user-specific."  Intrinsic evidence supports such an understanding of the invention's method of storing messages.  Specifically, the specification explains that "[i]n the preferred embodiment, the files for each user are stored in a separate directory for a given user . . . ."  ('066 Patent, 12:32-39.)  However, "[t]he memory . . . . <u>may be organized in other ways</u> with the files for a single user being stored in different directories."  (<u>Id</u>.)  The court finds no support in the Patent for imposing the limit Captaris suggests, i.e., defining a storage area as a <u>physical</u> area.  The court, therefore, adopts j2's proposed construction.

8. <u>"Access to a User-Specific Message Storage Area"</u>

15

| J2 CONSTRUCTION | CAPTARIS CONSTRUCTION | COURT CONSTRUCTION |
|---|---|---|
| Access to an area within a storage medium that stores messages for a recipient in a manner that identifies the message uniquely to the recipient. | Entrance, by the intended recipient, to the user-specific message storage area. | Access to an area within a storage medium that stores messages for a recipient in a manner that identifies the message uniquely to the recipient. |

The debated term differs from the prior term by only the following three words: "access to a."  The parties agreed at oral argument that these three words did not, on their own, change the construction of the term.  (TR. 72:13-19 (Plaintiff stating that, with respect to "access to a," "I don't think there is anything else to say about this" and Defendants concurring "[t]hat's correct).)  The construction of the present term is, therefore, entirely controlled by the court's construction of the prior term. Accordingly, the court adopts j2's proposed construction.

9.   "Indicative of a Request by the Intended Recipient to Gain Access to a User-Specific Message Storage Area"

| J2 CONSTRUCTION | CAPTARIS CONSTRUCTION | COURT CONSTRUCTION |
|---|---|---|

16

| Indicating a request to gain access to an area within a storage medium that stores messages for a recipient in a manner that identifies the message uniquely to the recipient. | Provides a request for the intended recipient to gain entrance to the user-specific message storage area. | Is a request originating from the intended recipient to access an area within a storage medium that stores messages for a recipient in a manner that identifies the message uniquely to the recipient. |

The parties dispute the construction of the claim term "indicative of a request by the intended recipient to gain access to a user-specific message storage area."

At oral argument, all parties agreed to the following construction of the first half of the term: "is a request originating from the intended recipient." (TR. 84:6-25.) The second half of the term "access to a user-specific message storage area" has been defined above in accord with the reasons discussed above. The court, therefore, puts the two halves of the term together and adopts the following construction: Is a request originating from the intended recipient to access an area within a storage medium that stores messages for a recipient in a manner that identifies the message uniquely to the recipient.

10. "User Interface"

| J2 CONSTRUCTION | CAPTARIS CONSTRUCTION | COURT CONSTRUCTION |
|---|---|---|
| An interface accessible to a user via a network. | A graphical interface accessible to a user via a hyper-text browser. | Mark up language instructions that enable the user to interface with a network server with a hypertext browser. |

The parties agreed at the Markman hearing to the following construction of "user interface":  Mark up language instructions that enable the user to interface with a network server with a hypertext browser. (TR. 94-96.)  Accordingly, the court adopts the parties' undisputed construction.

**B.   Claim Terms for Patent '638**

1.   "Set of Switches"

| J2 CONSTRUCTION | CAPTARIS & EASYLINK CONSTRUCTION | COURT CONSTRUCTION |
|---|---|---|
| One or more devices that establish communication channels between the circuit switched network and at least two communication servers, each of which is capable of redirecting calls between communication servers. | Two or more devices that establish communication channels between the circuit switched network and at least two communication servers, each of which is capable of redirecting calls between communication servers. | One or more devices that establish communication channels between the circuit switched network and at least two communication servers, each of which is capable of redirecting calls between communication servers. |

The parties dispute whether a "set of switches" could be one device or must, as Captaris and Easylink press, be two devices.  J2 points to the preferred embodiment, which clearly shows only one switch.  ('638 Patent, Figure 1.) Captaris and Easylink argue that the ordinary meaning of "set," as stated in two different dictionaries is two or more.  The court, however, is not persuaded by Defendants' extrinsic evidence.  While it is true that a "set" generally implies at least two, it is equally apparent from the diagram of the preferred embodiment that the patentee understood that a "set of switches" might be housed in one device.  The court sees no reason to construct the term in a way that would exclude

the preferred embodiment, <u>MBO Labs, Inc.,</u> 474 F.3d at 1333, and the
court adopts j2's proposed construction.

    2.   <u>"Incoming Call Signal Includes an Inbound Address
Uniquely Associated With a User Account"</u>

| J2 CONSTRUCTION | CAPTARIS & EASYLINK CONSTRUCTION | COURT CONSTRUCTION |
|---|---|---|
| The inbound address of an incoming call can only be associated with one user account. | The inbound address of an incoming call can only be associated with one user account, and each user account can only be associated with one inbound address. | The inbound address of an incoming call can only be associated with one user account. |

J2 argues that the patentee foresaw and accounted for the
possibility that a user could have multiple accounts, each with a
unique number, and each uniquely associated with that user.
Captaris and Easylink, on the other hand, argue that there is a
"one-to-one" association that limits the number of inbound
addresses a user can have under the Patent to one.  Put
differently, Defendants maintain that a number address corresponds
to only one user and each user only has one number address.  The
court concludes that Defendants' proposed construction is unduly
narrow.

In support of their construction, Defendants rely heavily on a
statement made by the Examiner in the August 26, 2008 Notice of
Intent to Issue Ex Parte Reexamination Certificate regarding the
scope of the term "uniquely associated."  The Federal Circuit has
held, however, that "unilateral statements by an examiner do not
give rise to a clear disavowal of claim scope by an applicant," as
"the applicant has disavowed nothing."  <u>Salazar v. Procter & Gamble</u>

Co., 414 F.3d 1342, 1347 (Fed. Cir. 2005).  "A patentee may limit the meaning of a claim term by making a clear and unmistakable disavowal fo scope during prosecution."  Univ. Of Pittsburg of Commonwealth System of Higher Educ. V. Hedrick, 573 F.3d 1290, 1297 (Fed. Cir. 2009).  "Such a disavowing statement must be so clear as to show reasonable clarity and deliberateness."  Id. at 1296. Here, there is no such disavowing, and, therefore, the court looks to the specification.  Phillips, 415 F.3d at 11312-13.  Looking to the ordinary meaning of the claim terms, the court finds no indication that the Patent is limited in the way Defendants suggest.  It is clear that each inbound address is uniquely associated with a user; however, the claim is silent as to whether a user is equally limited to one inbound address.  The court is persuaded that j2's proposed construction aligns with the most "natural[]" reading of the term.  Id. at 1316.  Defendants' construction would import limitations not apparent in the claim or specification and, which the court considers severely narrow and outside the realm of what one in the ordinary art would have understood the claim terms to include.  Accordingly, the court adopts j2's proposed definition.

   3.   "Communications Server"

| J2 CONSTRUCTION | CAPTARIS & EASYLINK CONSTRUCTION | COURT CONSTRUCTION |
|---|---|---|

| A device that receives and processes incoming call signals. | A stand-alone device, distinct from a database server, that interfaces to the set of switches and a packet switched network to receive, process, and transmit incoming call. | A device that receives and processes incoming call signals. |
|---|---|---|

The parties dispute centers on whether a "communications server" is necessarily a stand alone device distinct from the database server.  Defendants argue a definition that did not require the communications server to be a stand-alone device, distinct from the database server, would negate the overarching redundancy objective of the patent.

J2 points to language in the specification that states:

> In the preferred embodiment, each one of database server 195, system management unit 197, mail server 160, and client 190, are stand-alone computers or workstations containing the hardware and software resources to enable the operation of the present invention.  In alternate embodiments, the functions provided by each one of database server 195, system management unit 197, mail server 160, and client 190, are provided by <u>any number of computer systems</u>.

('638 Patent, App. Sec. 2A, 3:19-27.)  The court is persuaded by the plain meaning of the specification, and the court does not see anything, nor can Defendants point to any language, to suggest that the communications server is physically distinct device from the database server.  While the specification notes that the system will be "maintained in a distributed and redundant fashion," there is no indication that such redundancy necessarily requires distinct hardware in the manner Defendants would require here. ('638 Patent, App. Sec. 2, 2:13-15.) The court adopts j2's proposed definition.

4.   "A Second Communications Server"

| J2 CONSTRUCTION | CAPTARIS & EASYLINK CONSTRUCTION | COURT CONSTRUCTION |
|---|---|---|
| A device that receives and processes incoming call signals. | An alternate communications server that provides redundancy for the first communications server. | Any server can act as a second communication server; when a server functions as a second communication server, it acts as an alternate and provides redundancy for the first communications server. |

Both parties agreed at oral argument that any one of the servers can act as a second communication server. (See TR. 143:5-6.)  The parties main point of contention had to do with the word alternate.  Defendants felt that "alternate" served a necessary clarifying function, and j2 expressed concern that "alternate" implied a dominant and nondominat server system.  (TR. 148:4-7.) Accordingly, the court adopts a definition of second communication server that incorporates the parties shared understanding of the term.

5.   "Audio Message"

| J2 CONSTRUCTION | CAPTARIS, CONSTRUCTION | EASYLINK CONSTRUCTION | COURT CONSTRUCTION |
|---|---|---|---|
| An audible message that contains a voice or facsimile message. | A voice mail message | A message, such as a voice message (but not a facsimile message), that is intended to be audibly heard by a recipient. | An audible message that contains a voice or facsimile message. |

1      Defendants argue that "audio message" is synonymous in the
2  specification with "voice message," and excludes a facsimile.  j2
3  argues that audio message encompasses both facsimile and audio
4  messages. j2 urge the court to ignore variance in the claims and
5  specification and asks the court to interpret these terms by
6  looking at the context of the claims. "Proper claim construction,
7  however, demands interpretation of the entire claim in context, not
8  a single element in isolation." <u>Hockerson-Halberstadt, Inc. v.</u>
9  <u>Converse, Inc.</u>, 183 F.3d 1369, 1374 (Fed. Cir. 1999).

10      The words of a patent are given their ordinary and customary
11  meaning. <u>Phillips</u>, 415 F.3d at 1312-1313.  j2 argue that using
12  ordinary meaning, claim 13 covers both fax and voicemail messages
13  and claim 21 covers fax messages.  The preferred embodiment of the
14  invention encompasses a method and system for processing both
15  voicemail and faxes.  Well-settled Federal Circuit precedent holds
16  that a claim construction that excludes the preferred embodiment is
17  "rarely, if ever, correct." <u>Playtex Prods., Inc. v. Proctor &</u>
18  <u>Gamble Co.</u>, 400 F.3d 901 , 904 (Fed. Cir. 2005).

19      Defendants argue that, according to the specification — and in
20  admitted conflict with the claim terms — an "audio message" is
21  exclusively a voice message.  Furthermore, Defendants argue that
22  even though patent law enables a patentee to be his own
23  lexicographer, this should not allow a patentee to later redefine
24  claim terms in a manner that is inconsistent with common usage and
25  not supported by the originally filed application.  Defendants

26
27
28

23

1  assert that the specification of the original patent application

2  discusses voice and fax messages separately.[2]

3       Here, the amendment to the patent occurred during the patent

4  issuance process as a result of a request for clarification from

5  the PTO.  This is not a case of later amendment to an issued patent

6  (post formal allowance), but the result of an interaction between

7  the patent office and the patentee.  Although the court

8  acknowledges that the specification at times makes a distinction

9  between an audio and facsimile message — which would be nonsensical

10 if an facsimile message <u>is</u> an audio message — the court is

11 sufficiently persuaded that the language of the claims makes clear

12 that an "audio message" includes facsimiles.  Claim 1 refers to an

13 "audio message," and claim 11 claims "[t]he system of claim 1,

14 where the <u>audio message is a facsimile message</u>."  ('638 Patent

15 Reexam, 1:25-42).  Claim 21 unequivocally equates an audio message

16 with a fax.  Accordingly, the court adopts the following

17 construction of audio message: An audible message that contains

18 a voice or facsimile message.

19

20          6.    <u>"The Second Communications Server Stores the
                 Particular Inbound Address and the at Least One
21               Destination Address and Account Status Information
                 Uniquely Associated With the Particular Inbound
22               Address and the User Account"</u>

23

24

25       [2]  As originally filed, the claims of the patent recited a
26  "message."  During prosecution of the patent, j2 amended the
    claims to make it clear that its intent was not to limit the
27  originally-recited message to just voicemail messages. First, the
    independent claims were amended to recite an "audio message" and
28  dependent claims were added to recite that the audio message could
    be a facsimile message.

| J2 CONSTRUCTION | CAPTARIS, CONSTRUCTION | EASYLINK CONSTRUCTION | COURT CONSTRUCTION |
|---|---|---|---|
| The particular inbound address, and the at least one destination address and account status information that are specific to the particular inbound address and the user account, are stored at the second communication server for one or more users. | The particular inbound address, the account status information for the unique user account that is associated with the inbound address, and the at least one destination address associated with the user account are each stored in the memory of the second communications server as part of the duplicate user information for the users originally allocated to the first communications server. | The particular inbound address extracted from the incoming call signal, the account status information for the unique user account that is associated with the inbound address, and the at least one destination address associated with the user account are each stored in the memory of the second communications server. | The particular inbound address, and at least one destination address and account status information that are specific to the particular inbound address and the user account, are stored at the second communication server for one or more users. |

The parties dispute whether the lengthy phrase includes the requirement that the information stored be in the <u>memory</u> of the second communications server and whether the information must be stored as "part of the duplicate information for users originally allocated to the first server." The court finds no support for the inclusion of the requirement that the information be stored in the <u>memory</u> of the second communications server. This limitation, pressed by Defendants, would seem to add confusion rather than clarity and is unsupported. Similarly, the requirement that

1  information stored on the second communication server be "part of

2  the duplicate information" redundancy feature of the patent, while

3  arguably true, unnecessarily imports the function of the patent as

4  a whole into the definition of the term.

5       Because the phrase-long term has been largely defined by the

6  proceeding construction of second communicions server, the court

7  is reluctant to construct the term.  The court, however, finds that

8  j2's proposed construction is clearer than the current

9  construction, is in keeping with the ordinary meaning of the claim

10 term, and may lend clarity in the future.  Accordingly, the court

11 adopts j2's proposed construction.

12
       7.    "Configured to Determine, Based on the Particular Inbound
13           Address, the User Account and the at Least One
             Destination Address on the Packet Switched Network"
14

15
| J2 CONSTRUCTION | PROTUS, CAPTARIS, PACKETEL CONSTRUCTION | EASYLINK CONSTRUCTION | COURT CONSTRUCTION |
16
| --- | --- | --- | --- |
17

18

19

20

21

22

23

24

25

26

27

28

| Configured to determine the user account and the destination address on the packet switched network, based on the particular inbound address which is associated with a user | Configured to search within the group of inbound addresses stored in the memory of the second communications server to locate the particular inbound address, and then identify both a user account and at least one destination address that are stored in that memory and associated with the particular inbound address | Configured to search within the group of inbound addresses stored in a server memory to locate the particular inbound address, and then identify both a user account and at least one destination address stored in the server memory based on that particular inbound address | Configured to determine the user account and the destination address on the packet switched network, based on the particular inbound address which is associated with a user |
|---|---|---|---|

Defendants again seek to limit the storage of information to
"the memory of the second communications server" or, alternately,
the "server memory." As discussed above, Defendants' use of the
term "memory" is not supported by the ordinary meaning of the
patent. Next, Defendants offer a limitation that the determination
be "based on the particular inbound address." J2's proposed
construction incorporates this suggested limitation without
altering the ordinary meaning of the term: "Configured to determine
the user account and the destination address on the packet switched
network, based on <u>the particular inbound address which is
associated with a user</u>." The court, therefore, adopts j2's
proposed construction, which is in accord with the ordinary meaning
of the claim language.

**V. CONCLUSION**

For the reasons set forth above, the court adopts the claim constructions described above.

IT IS SO ORDERED.

Dated: March 4, 2011

DEAN D. PREGERSON
United States District Judge