```
 1                    UNITED STATES DISTRICT COURT
                     CENTRAL DISTRICT OF CALIFORNIA
 2                   WESTERN DIVISION - LOS ANGELES

 3

 4   j2 GLOBAL COMMUNICATIONS,    .  Case No. CV 09-4150-DDP (AJWx)
     INC., et al.,                .
 5                                .  Los Angeles, California
          Plaintiffs,            .  Monday, November 14, 2011
 6                                .  10:36 A.M. to 11:37 A.M.
            v.                    .
 7                                .
     CAPTARIS, INC., et al.,      .
 8                                .
          Defendants.            .
 9   . . . . . . . . . . . . . .  .

10

                        TRANSCRIPT OF PROCEEDINGS
11           BEFORE THE HONORABLE ANDREW J. WISTRICH
                   UNITED STATES MAGISTRATE JUDGE.
12

13

14   Appearances:              See Page 2

15   Deputy Clerk:             Ysela Benavides

16   Court Reporter:           Recorded; CourtSmart

17   Transcription Service:    JAMS Certified Transcription
                               16000 Ventura Boulevard #1010
18                             Encino, California  91436
                               (661) 609-4528
19

20

21

22

23

24
     Proceedings recorded by electronic sound recording;
25   transcript produced by transcription service.
```

```
 1   APPEARANCES:

 2

 3   For the Plaintiffs:        Sullivan & Cromwell LLP
                                By:  BRIAN R. ENGLAND, ESQ.
 4                                   EDWARD E. JOHNSON, ESQ.
                                1888 Century Park East, Suite 2100
 5                              Los Angeles, California  90067-1725
                                (310) 712-6600
 6                              englandb@sullcrom.com
                                johnsonee@sullcrom.com
 7

 8

 9   For the Defendants:        Loeb & Loeb LLP
                                By:  TIMOTHY J. CARROLL, ESQ.
10                              321 North Clark Street, Suite 2300
                                Chicago, Illinois  60654-4746
11                              (312) 464-3173
                                tcarroll@loeb.com
12
                                Loeb & Loeb LLP
13                              By:  MANNY J. CAIXEIRO, ESQ.
                                345 Park Avenue
14                              New York, New York  10154-1895
                                (212) 407-4000
15                              mcaixeiro@loeb.com

16

17

18

19

20

21

22

23

24

25
```

1   LOS ANGELES, CALIFORNIA, MONDAY, NOVEMBER 14, 2011, 10:36 A.M.

2       (Call to Order of the Court.)

3       THE CLERK:  CV 09-4150-DDP (AJWx), j2 Global

4   Communications, Incorporated, et al. v. Captaris,

5   Incorporated, et al.

6       Counsel, please make your appearances.

7       TIMOTHY CARROLL:  Good morning, Your Honor.

8   Timothy Carroll and Manny Caixeiro on behalf of Captaris and

9   Open Text.

10       BRIAN ENGLAND:  Good morning, Your Honor.

11   Brian England and Eddie Johnson from Sullivan & Cromwell on

12   behalf of j2.

13       THE COURT:  All right.  Let me hear from j2 first.

14       MR. ENGLAND:  Good morning, Your Honor.  We

15   appreciate the hearing this morning on these issues.  There

16   are three pending motions before the Court.  They are

17   substantially overlapping motions.  When they're boiled down,

18   they come to a couple of points.  The first is that this is

19   an indirect-infringement case, and in that instance,

20   Your Honor, we are required as the plaintiff to prove direct

21   infringement by the people actually using the software.

22       THE COURT:  Okay.  Let me stop you right there.

23   Have you identified any actual users who have directly

24   infringed?

25       MR. ENGLAND:  At this time, Your Honor, we have

1    not.  What we tried to do -- and this goes to the point of

2    discussing how the subpoena targets were selected in the

3    first instance.  What we have tried to do is take a

4    thoughtful approach based upon the court's construction of

5    the patents, what types of technologies would be infringing

6    under the court's Markman rulings, as well as publicly

7    available information as to which types of customers Captaris

8    and Open Text have that would be the most likely to have that

9    infringing technology and we --

10             THE COURT:  Okay.  Well, you've alleged, I assume,

11   direct infringement by customers.

12             MR. ENGLAND:  Yes, Your Honor, we have.

13             THE COURT:  And what was the factual basis for

14   that?

15             MR. ENGLAND:  Well, in part, Your Honor, it's based

16   upon some of the marketing information that we have from

17   Captaris where they describe in their marketing documents and

18   their instruction manuals to the customers ways to implement

19   the system that would constitute an infringing use of the

20   service as we understand it from our experts and our patent

21   counsel.  So it is actually not true, Your Honor, that it was

22   just a scattershot approach of identifying 66 subpoena

23   recipients.  In fact, it was exactly the opposite.  It was a

24   very thoughtful and deliberate approach based upon, again,

25   the court's rulings on the construction of the patents,

1  expert analysis of the patents and the infringing software,

2  and those customers which would be the most likely to have

3  used the system in a redundant way or in a way that infringes

4  the patents.

5          THE COURT:  In a redundant way?

6          MR. ENGLAND:  Well, redundancy is one of the

7  important terms under the patent, Your Honor.  So, when I say

8  that, I didn't mean the person's using it redundantly.  It's

9  -- redundancy is a key term of one of the patents at suit.

10         THE COURT:  You know, I have to say it seems really

11 odd to me that -- what? -- two years into this case you still

12 haven't identified a single customer that directly infringes.

13 It just seems very strange to me.  Why is that?

14         MR. ENGLAND:  Well, Your Honor, I don't necessarily

15 disagree with you.  In part it was -- again, in contrast to

16 what the allegations are, we have tried to pursue the

17 discovery in a very thoughtful and deliberate way seeking,

18 first, this information from Captaris.  As Your Honor knows,

19 we've been here before on motions to compel in this case.  We

20 tried to get that information from them.  Once it became

21 clear that we were not going to get any additional

22 information from Captaris, that's when we were required to go

23 out and find it from a third party.  And it was only at that

24 point -- once the -- at least the first wave of the subpoenas

25 had been served -- that Captaris approached us and said,

1  "Well, we might now have some of this information."  So I
2  don't disagree with Your Honor, but that's been part of the
3  process of this case.

4       The other thing is that it has taken a long time,
5  but because of the way that the Markman process was extended
6  at the district court, there were periods of inactivity
7  during that time where we were waiting for claim-construction
8  rulings before we went forward.

9       So that is -- it's not as if there's been active,
10 ongoing battles for two years nonstop about that issue.  That
11 would have certainly shortened the time.

12      THE COURT:  Okay.  So you said there were, I guess,
13 two other things that you thought were important?

14      MR. ENGLAND:  Well, I think that -- well, there's
15 one other that's a side issue, Your Honor, which is the
16 request to take five additional party depositions and
17 those -- the argument against those is just -- is an argument
18 about burden, but even Captaris in their papers suggests that
19 if it weren't for the issue of the third-party subpoenas that
20 they likely would not have opposed those requests.  So that's
21 a minor issue on the side, Your Honor, but I'm happy to
22 address it further if you would like.

23      The more overarching issue is that, as I said,
24 we're required to prove direct infringement, and there are
25 only two places we can get that information.  We can get it

1   from the party Captaris, which is the subject of the motion

2   to compel that's currently pending before Your Honor.  We had

3   been told that all of the documents responsive to those long-

4   outstanding requests had been produced, and it was in the

5   process of meeting and conferring about the subpoenas that it

6   came to light that perhaps there might be more responsive

7   information.  So that's why we've asked Your Honor to order

8   the party to produce that information.

9          Even if they produce that information, though,

10  taking as true the testimony we received from their

11  executives and former executives, it will be necessary to go

12  out into the marketplace and get additional information from

13  third parties in order to establish which customers are

14  following the recommendation of Captaris and implementing and

15  using the software in an infringing way.  There just isn't

16  any other way to get that information.

17         Now, we've tried to do it in a measured way with

18  subpoenas that are seeking documents, and it's true that

19  we've asked for a lot of depositions, but in part that was to

20  avoid seriatim motions to Your Honor about doing this.  It's

21  true that we will need to look at the documents produced by

22  the individual third parties in order to determine which ones

23  actually need to be deposed and which ones are not.  There's

24  just no substitute.  It's guesswork if you don't have that

25  information.  And so that's why we've approached it in the

1    way that we have.

2         We've tried at every step that we could to minimize

3    the burden on those third parties.  There was a -- prior to

4    these motions being filed, there was a detailed and ongoing

5    meet-and-confer process going between j2's counsel and

6    counsel for many of those third parties who called with

7    specific objections and concerns as tailored to their

8    individual circumstances, and we were addressing those on a

9    one-off basis.  In part, the way that this approach has been

10   dumped in Your Honor's lap is an unfair process because it

11   presupposes a one-size-fits-all resolution will apply here

12   when, in fact, the customers and the third parties that have

13   been subpoenaed fall in very different circumstances.

14         So, for example, one of them that was mentioned in

15   Captaris's papers would be Pfizer.  Well, Pfizer is a

16   sophisticated company with lots of subsidiaries, they're also

17   represented in this context by Boies Schiller, they've

18   contacted us -- j2's counsel, we've had multiple rounds of

19   meet-and-confers with them and had no indication that we

20   weren't going to be able to resolve all of those disputes.

21   They're not here.

22         We don't have any testimony from any third-party

23   witness that this is burdensome to them or that it's

24   harassing them in any way.  And lacking that evidence,

25   Your Honor, there just isn't a proper -- a procedurally

1   proper basis for implementing or issuing a protective order

2   to those subpoenas.

3          And I think that's the point, Your Honor, is that

4   we need this information from one of two sources.  We're here

5   in front of you --

6          THE COURT:  Okay.  I get that.  Thank you.

7          MR. ENGLAND:  -- to get it from both.

8          THE COURT:  All right.  Your turn.

9          MR. CAIXEIRO:  Good morning, Your Honor.  There is

10  a common question on all three of these motions that are

11  pending before the Court today, and really it's what is a

12  fair, reasonable, and proportional amount of discovery that

13  j2 should be allowed to take at this last minute in

14  discovery?  It's notable that, since the filing of these

15  motions, we were before Judge Pregerson just last week on a

16  motion that Open Text had made to stay the case, and j2 was

17  making an argument that this case is nearly trial ready; no

18  stay should be put in place; let's go to trial.  And that's

19  hard to reconcile with a request for 66 subpoenas and 66

20  depositions and a brand new --

21         THE COURT:  Well, can't we all agree that they

22  should be allowed to take 5 additional party depositions?

23         MR. CAIXEIRO:  If -- no, because they haven't

24  demonstrated why these party witnesses -- party depositions

25  are necessary.  You know, I can't object to the --

 1              THE COURT:  What else do they have to say?

 2              MR. CAIXEIRO:  Well, they've taken a number of

 3   depositions already.  They took a second 30(b)(6) deposition

 4   on technical issues, and the party witnesses that they're

 5   going after, as I understand it, are more technical

 6   witnesses.  So, in other words, they haven't established why

 7   they need these five new witnesses when they were just

 8   allowed to take a second 30(b)(6) deposition on these same

 9   issues, not to mention interrogatories --

10              THE COURT:  All right.

11              MR. CAIXEIRO:  -- document productions.

12              THE COURT:  As to the 5 party depositions, I'm

13   going to grant the motion.

14              So let's move on to the third-party depositions.

15              MR. CAIXEIRO:  Sure.

16              THE COURT:  To me, they've made an adequate

17   showing.  I mean, these are people you listed on your

18   client's initial disclosures; correct?

19              MR. CAIXEIRO:  Yes.  Although, Your Honor, that's

20   not adequate --

21              THE COURT:  I know that's the be all and end all,

22   but let's be realistic here.

23              MR. CAIXEIRO:  Uh-huh.

24              THE COURT:  If they really had enough information,

25   why would they waste their own time?  So, to me, it's

 1   sufficient for that modest increase in the deposition limit.

 2          MR. CAIXEIRO:  Okay.

 3          THE COURT:  Okay?

 4          MR. CAIXEIRO:  Well, turning to the third-party

 5   depositions, if that pleases Your Honor, a party coming to

 6   the court and asking for even 1 deposition above the Federal

 7   Rules limit of 10 has to make a particularized showing why

 8   that additional deposition is needed.  j2 comes to the Court

 9   saying, "Give us up to 66 depositions, but we can't tell you

10   who we really need, why we really need them."  The two

11   arguments that they put forward -- you know, the first, which

12   I think is very telling, is they might need these depositions

13   for authentication purposes.  But, you know, Your Honor,

14   there hasn't even been a document production yet.  We're not

15   at --

16          THE COURT:  Okay.  Let me stop you right here.  You

17   know, I think there's a problem here.  Okay?  As long as

18   their indirect-infringement claim is in the case and hasn't

19   been dismissed, they're entitled to try to develop some facts

20   to support it.  Now, the way this situation looks to me is

21   that they couldn't get that from you for one reason or

22   another so they had to turn to the customers.  Now, I can

23   imagine you're very concerned about your customers getting

24   upset, about you're having to deal with your client's

25   customers on a litigation-related issue like this, but, you

1  know, it seems to me that you could have done a lot more to

2  get ahead of the curve on this and either produced the

3  documents from your client's files or coordinate this with

4  your client's customers ahead of time.

5  MR. CAIXEIRO:  Well --

6  THE COURT:  Instead, you've kind of left them with

7  no choice, as I see it.  Now, 66; that's a large number.

8  That concerns me but -- so I'm certainly open to the

9  possibility of limiting that, but can I really fault them for

10  the way they've approached it?  I mean, you know, they start

11  out by subpoenaing these people, they're discussing the

12  situation with them, some of the customers may be able to

13  persuade them "No, we didn't follow the recommendation, we

14  didn't configure our system in that way," and they'll, you

15  know, I'm sure, move on to the next one.  But, you know, I

16  see this as kind of a self-inflicted problem to some extent.

17  MR. CAIXEIRO:  Well, Your Honor, if I could address

18  that on a couple of different levels.  First, I don't think

19  this is a self-inflicted problem from Open Text.  We simply

20  don't have the kind of document -- the kind of customer-

21  specific configuration documents that j2 is saying they want

22  to obtain from us.  So it's not, essentially, that we're --

23  THE COURT:  Okay.  Assuming you're right --

24  MR. CAIXEIRO:  Uh-huh.

25  THE COURT:  -- that's fine.  So they have to go to

1  the customers, then, don't they?

2          MR. CAIXEIRO:  Yes, but their requests are not

3  limited -- we are not opposing -- and I think this is a point

4  that's very important to make.  We're not trying to oppose j2

5  from obtaining configuration information from the customers.

6  They've issued -- the 66 subpoenas contain 638 different

7  individual document requests --

8          THE COURT:  Okay.  Hold on a minute.  I just want

9  to make note of this.

10          So, if you're not opposing their getting the

11  configuration information from the customers, what is it that

12  you are opposing?

13          MR. CAIXEIRO:  Well, two things:  I should say that

14  we oppose the numerosity.  We think 66 is extreme.  We think

15  that --

16          THE COURT:  All right.  What number would you

17  recommend?  And maybe to just put this more starkly

18          MR. CAIXEIRO:  Uh-huh.

19          THE COURT:  -- what number would you say is a fair

20  sample from which they can extrapolate?

21          MR. CAIXEIRO:  I don't think there's any -- first

22  of all, I don't think there's any number that they can

23  extrapolate from, and I don't think that with --

24          THE COURT:  So you're saying that, really, they

25  should be noticing the deposition of every single one of your

1  customers.

2       MR. CAIXEIRO:  No.  Your Honor, there are 20,000

3  customers from Open Text.  There's no affidavit from an

4  expert in their motion saying "If you let me take 66, as

5  opposed to 27, as opposed to 10, as opposed to 5, I can do a

6  meaningful analysis and tell you what" --

7       THE COURT:  Okay.  Well, that was why I asked you.

8       MR. CAIXEIRO:  Yeah.

9       THE COURT:  What sample would your client be

10 willing to accept as sufficient?

11      MR. CAIXEIRO:  Well, I think at this point, without

12 the benefit of any expert guidance, I'm not able -- I'm not a

13 damages expert.  I'm not able to answer what a sufficient

14 number is.

15      THE COURT:  Okay.  So your position, then, as of

16 today would be they need to obtain information from every

17 single one of your client's customers.

18      MR. CAIXEIRO:  I --

19      THE COURT:  Because no sample would be sufficient,

20 in your view, at least that you could say today.

21      MR. CAIXEIRO:  Your Honor, what I would say is

22 that, if they're seeking damages for an infringement, they

23 have to connect that damage amount to an actual infringement.

24 That's their responsibility as a plaintiff.  If they've come

25 to this Court and they've made an allegation of indirect

1  infringement without being able to identify anybody or any

2  number of third parties who are supposedly directly

3  infringing this case, that's a problem that falls on their

4  shoulders.  Whether -- 20,000 -- maybe it's appropriate if

5  20,000 people are infringing.  I don't know.

6          THE COURT:  Well, I think they're trying to get

7  that problem off of their shoulders, and the first thing they

8  did was try to get the information from your client.  Okay.

9  Your client doesn't have it.

10         MR. CAIXEIRO:  Uh-huh.

11         THE COURT:  That's fine.  So now they're trying to

12 get it from the customers.

13         MR. CAIXEIRO:  And what we've said is "proceed

14 reasonably."  What we've said is -- let's put aside the

15 numerosity issue.  We've said, "Go to the customers.  Get the

16 configuration information.  If you can come up with a showing

17 -- I'm not talking about marshaling all your trial

18 evidence -- but a good-faith showing to believe that these 5

19 customers or these 10 customers have developed the

20 configuration that you allege is infringing, then we can

21 begin to tackle things like financial, sales, marketing,

22 communications documents."

23         The problem with the third-party subpoenas as

24 they've been presented is that there are 638 different

25 requests, the vast majority of which go far beyond

1    configuration information.  So our position here, Your Honor,

2    is we're saying, yes, putting aside the number, the third

3    parties are the only people that would have the configuration

4    information, but that doesn't justify these scores of

5    categories of documents beyond the configuration at this

6    stage.

7         THE COURT:  So what you're saying is they really

8    should subpoena your customers twice:  first, to find out

9    what configuration they're using, maybe take a deposition

10   about that if it's necessary; and then, if they identify a

11   customer who's doing something they feel is infringement,

12   they should subpoena them a second time for financial records

13   and an additional deposition.  Is that how you think they

14   should proceed?

15        MR. CAIXEIRO:  Well, whether a second subpoena is

16   necessary, I mean, I don't know, but I think it should be a

17   staged approach.  I think that, you know, when you're talking

18   about 66 third-party depositions, particularly of customers,

19   sensitive business relationships, I think the responsible way

20   to proceed is to say, "Well, let's figure out who among the

21   66 even has the configuration that we're going to allege is

22   infringing," and then we can maybe -- let's even say we can

23   cut half of them out.  That's 33 third-party subpoenas, 33

24   depositions that don't need to be taken at that point.  So

25   that's what we're saying is the reasonable way to proceed.

1  Whether it requires another subpoena, you know, that's a

2  technical matter, but a staged approach.

3          THE COURT:  All right.  So when would you

4  suggest -- what would be the schedule that you would propose

5  for your process of staging?

6          MR. CAIXEIRO:  Well, I think that, once there's a

7  number selected, once they go to those subpoena recipients,

8  they get the documents, then I think it would be incumbent

9  upon counsel to figure out who they still think they need

10  additional information from, who they need depositions from,

11  and then we can revisit this issue.

12         THE COURT:  Okay.  So let's just play this out

13  here.  So the customers would all produce their documents

14  when?

15         MR. CAIXEIRO:  I can't -- I don't represent the

16  customers, I can't speak for all of them, but, you know,

17  within a certain number of weeks or -- you know, I can't

18  speak for them, but a few weeks.

19         THE COURT:  I'm just wondering how practically --

20  suppose I were attracted to your approach --

21         MR. CAIXEIRO:  Uh-huh.

22         THE COURT:  -- you know, what kind of schedule

23  would I set to implement that?

24         MR. CAIXEIRO:  Well, I mean, this is, I think,

25  subject to the parties working out details.  I think you're

1    talking about a few weeks to do the initial document

2    production from the third parties, some short evaluation

3    period where both sides can look at what these documents are

4    and figure out what's actually in there, and then, you know,

5    I think there would have to be, you know, a period set aside

6    where either they can follow up, they can see which

7    depositions are needed.  I can't say.  Maybe it'll take two

8    months.  Maybe it'll take three months.  I can't say because

9    I don't know what's in these documents.

10            THE COURT:  Do we have the time to do that --

11            MR. CAIXEIRO:  No, but I --

12            THE COURT:  -- under the case schedule?

13            MR. CAIXEIRO:  No, but I don't think that that's --

14   but on some level, isn't that j2's responsibility?  They

15   didn't bring up this third-party discovery until the last

16   minute.  We're -- this case was commenced in 2008.

17            THE COURT:  Well, you know, I think you have

18   somewhat of a point there.  I mean, it seems to me they could

19   have embarked on this earlier than they did.  I'm not

20   familiar with all the details of what's been going on in the

21   case, but, I mean, did you tell them from the beginning, "We

22   have no documents about configuration by customers"?

23            MR. CAIXEIRO:  I don't think we said that.  They

24   were never -- early on, they weren't asking for those

25   documents.  So there would have been no occasion for that

1    conversation.

2         THE COURT:  Well, they weren't included in their

3    requests to you?

4         MR. CAIXEIRO:  Not on a customer-specific basis.  I

5    mean, that's something that -- and then, you know, we

6    conducted a substantial document production -- you know, over

7    300,000 pages, produced source code, et cetera -- and at no

8    time during that period did they say, "We need these

9    documents for how the customers are configuring their fax

10   servers."  This is something that arose in August for the

11   first time.

12        THE COURT:  Uh-huh.

13        MR. CAIXEIRO:  You know, and so on some level what

14   j2 is doing here is they're -- and this goes back to what

15   they were -- last week in front Of Judge Pregerson.  They're

16   saying, "There's this cutoff," and "Your Honor, keep that

17   cutoff there."  On the other hand, they're saying, "We need

18   broad discovery because we're running up against the cutoff."

19   And it's kind of a catch-22 for Open Text.

20        THE COURT:  Well, that's not why they want the

21   broad discovery.

22        MR. CAIXEIRO:  No.  No.  No.  No.

23        THE COURT:  They want the broad discovery --

24        MR. CAIXEIRO:  What I'm -- I'm talking about the

25   mechanism that --

1              THE COURT:  Right.

2              MR. CAIXEIRO:  You know, had this begun several

3    years earlier, this could have proceeded in a methodical,

4    thoughtful manner.

5              THE COURT:  Well, when you say "several years

6    earlier" -- let's see.  When was the case filed?

7              MR. CAIXEIRO:  2008.

8              THE COURT:  No.  2009.

9              MR. CAIXEIRO:  Well, it was in Texas in 2008 --

10             THE COURT:  The middle of 2009.  So --

11             MR. CAIXEIRO:  -- and transferred to this court in

12   2009.

13             THE COURT:  -- when should they have started?

14             MR. CAIXEIRO:  Well --

15             THE COURT:  "Several years" -- what is that?  Four,

16   five years ago?

17             MR. CAIXEIRO:  Well, let's go back to when we did

18   our main document production, which was over a year ago,

19   sometime in the middle of 2010, I believe.  At that point, we

20   were regularly in contact with j2's attorneys about the types

21   of documents we were looking for, the types of searches we

22   were running, the types of things we were being -- that would

23   be produced, and at no point during that time did j2 give us

24   any indication that they wanted these kinds of documents.

25             THE COURT:  Okay.  So I just want to be clear about

1   something.  You're telling me that their requests prior to

2   your production never asked for this kind of information --

3           MR. CAIXEIRO:  Not --

4           THE COURT:  -- that this kind of information about

5   customer configurations would not have been responsive to any

6   of their requests.

7           MR. CAIXEIRO:  Well --

8           THE COURT:  Because, if it were responsive, it's

9   not their responsibility to keep reminding you about that.

10  It's your responsibility to comply with the request.

11          MR. CAIXEIRO:  Yes, Your Honor.  Putting aside the

12  sixth set of request for productions, which came out in the

13  summer of 2011, before that, there were not document requests

14  that sought this granular level, at least as we understood

15  them -- and, Your Honor, the reality is we objected to those

16  requests on a number of grounds.  As we understood the

17  requests, they were not seeking these documents from

18  customers on the granular level showing us what -- "Customer

19  by customer, show us the configuration each customer is

20  using."  And this is -- and we had multiple meet-and-confer

21  conversations with them.  So it's not that we adopted some

22  vision of these requests and ran with it.

23          THE COURT:  Uh-huh.

24          MR. CAIXEIRO:  It's that we were trying in good

25  faith to --

1          THE COURT:  Well, anyway, your position is you have

2    no such information -- right? -- there's nothing for you to

3    produce.

4          MR. CAIXEIRO:  Yeah.  Or at least, if there's

5    something in there, it would be so -- if there's a loose

6    document somewhere --

7          THE COURT:  Okay.  Let me just ask you.

8          MR. CAIXEIRO:  Uh-huh.

9          THE COURT:  I mean, are you telling me you have no

10   information about that, or are you saying, "Oh, it's possible

11   there might be something"?

12         MR. CAIXEIRO:  No.  What I'm saying is that --

13   look, Open Text is a huge company.  I can't tell you for

14   certain that there's not one document floating in a file

15   somewhere.  That wouldn't be responsible for me to do.  What

16   I can tell you is this:  Open Text did a good-faith search

17   for these documents --

18         THE COURT:  For documents about --

19         MR. CAIXEIRO:  No.  No.

20         THE COURT:  -- customer configurations at a

21   granular level?

22         MR. CAIXEIRO:  No.  No.  No.  What we did was is

23   this -- let me -- in August, when these subpoenas first came

24   down, the first 27 subpoenas -- all right? -- which were

25   subsequently expanded to 66, we went back to our client and

1  said, "Let's try to pull together what we can find, what

2  there might be out there."  That process alone -- just to

3  find, you know, something that mentions Pfizer -- "What would

4  it take for us to identify these products" -- "these

5  documents if they exist?" -- for those 27 clients alone, that

6  was going to be about a $50,000 project in just attorney-

7  review fees.  And make no mistake, Your Honor, they're not

8  limiting this to 66 customers.  They want 20,000 customers'

9  worth of information.  So I cannot guarantee that somewhere

10  among the 20,000 customers --

11          THE COURT:  All right.  But you're saying it would

12  be totally abhorrent, random kind of thing; right?

13          MR. CAIXEIRO:  Exactly.

14          THE COURT:  Okay.  So, I mean, what you're saying

15  suggests that maybe going directly to the customers is the

16  most reasonable approach.

17          MR. CAIXEIRO:  And -- but that's all we've said.

18          THE COURT:  Okay.

19          MR. CAIXEIRO:  We've said, "Go to the customer to

20  get the configuration documents."  But what we said is "Don't

21  bother these customers" -- or "Don't force them to go through

22  the burden of producing financial information, sales

23  information, communications with Open Text, knowledge about

24  this lawsuit," when for who knows --

25          THE COURT:  Of course, their communications with

1   Open Text would be quite relevant -- wouldn't they? -- if

2   Open Text is telling them, "Hey, configure your system this

3   way," and that's the way the plaintiff argues is infringing.

4           MR. CAIXEIRO:  Only if it's an infringing

5   configuration.  That's what I'm saying.  Open Text

6   communications with customers is completely irrelevant if

7   there's no infringing configuration.  So that's what we're

8   is, you know, the starting point should be who has a

9   configuration that j2 thinks is infringing?

10           THE COURT:  Well, what if your client was inducing

11   infringement but this particular customer didn't actually

12   configure its system that way so it wasn't actually

13   infringing?  Wouldn't that be relevant to the case?

14           MR. CAIXEIRO:  No, because they're claiming these

15   documents are relevant for damages purposes.  If there's been

16   an inducement that didn't result in any infringement, then I

17   would -- then it would be completely irrelevant.

18           THE COURT:  Okay.  Well, one thing that occurs to

19   me -- I mean, I guess my sense is that, even if they could

20   have started, perhaps, a little bit earlier than they did,

21   they're probably entitled to what they're seeking.  And, you

22   know, it occurred to me that maybe the best thing would be

23   for counsel to talk about how to do this in a reasonable way

24   that minimizes the burden on the customers, you know, even if

25   it is coupled with either, you know, my -- because this

1    motion is before me, allowing it to be done on a slightly

2    different schedule or going to the trial judge and asking for

3    more time to complete this process.  Because, you know, the

4    way it looks to me is it's -- to complete this, or even if I

5    limit it a bit, it's going to be, you know, a tremendous

6    burden on counsel, and it's not necessarily going to give the

7    customers the time they need to do this in the most

8    convenient way.

9          MR. CAIXEIRO:  May I ask, Your Honor, are you

10   referring just to the subpoenas, or are you also referring to

11   the third-party depositions as well because --

12         THE COURT:  Well, I think it's all of a piece, to

13   me.

14         MR. CAIXEIRO:  Uh-huh.

15         THE COURT:  I mean, you have some good ideas about

16   how this might be staged, but given the schedule, I'm not

17   sure we would have time to implement something like that.

18   So, you know, that suggests to me that the best approach

19   would be for maybe counsel to take a few minutes and discuss

20   this and see if you can come up with a reasonable plan, and

21   then we can talk about how best to implement it and fit it

22   into the case schedule.

23         MR. CAIXEIRO:  Uh-huh.  Your Honor, if I could make

24   one other point.  Your Honor expresses concerns about the

25   schedule as I've proposed it, but the schedule as j2 proposed

1   it is equally unworkable.  I mean, they want to take 70

2   depositions, receive documents, go through them; that's

3   equally undoable under the current schedule.

4            THE COURT:  You know, it's been done.  As a lawyer

5   I was involved in situations like that, and, you know, if you

6   have to take six depositions a day and do them on weekends,

7   you can do it.  It's a tremendous amount of work, it's, you

8   know, a real burden on counsel to do it, but it can be done.

9            You know, I'm just trying to suggest to you, not

10  only for your own convenience but also for the convenience of

11  the customers about whom you've expressed concern, you know,

12  why don't you think about how to do this in a practical,

13  realistic way?  Because, otherwise, you know, I feel I'm

14  going to have to grant this, and, you know, the schedule

15  could be very challenging.  You want to take a few minutes

16  and discuss it?

17           MR. CARROLL:  Your Honor, Timothy Carroll, once

18  again, on behalf of Captaris.  Your Honor, thank you for your

19  time today.

20           Two points:  one is that, given the amount of third

21  parties involved and the need for us to caucus with our

22  client about any agreement to a staged discovery plan, I'm

23  not sure that a few minutes this morning would be adequate.

24  Unfortunately, counsel for j2 and I are in regular contact on

25  a variety of matters.  It's been all of about three or four

1   days since I've seen Mr. England in a conference room for a

2   deposition in the case.  So we do talk periodically and

3   regularly, and what I would suggest, Your Honor, is that

4   maybe we take some time this week -- we have some other

5   scheduling matters that we have to work out -- add this to

6   our discussion, which will give us an opportunity to go get

7   feedback from the third parties and customers that we've had

8   contact with, and then perhaps report back to the Court in a

9   week or so.

10          The other comment, if Your Honor finds it

11  exceptional, is, Your Honor, the notion --

12          THE COURT:  "Finds it exceptional"?  I don't --

13          MR. CARROLL:  I'm sorry.  "Acceptable."

14          THE COURT:  Okay.

15          MR. CARROLL: "Acceptable."  I'm thinking faster

16  than my --

17          THE COURT:  I understand.  It's all right.

18          MR. CARROLL:  -- mouth is communicating today.

19          THE COURT:  Okay.

20          MR. CARROLL:  Your Honor, I just, for a point of

21  clarification, want Your Honor to understand that Open Text

22  sells the software RightFax off the shelf, and off the shelf

23  as they sell it, it doesn't infringe.  So -- and I think

24  plaintiff has conceded it does not directly infringe the four

25  patents at issue in the case.  In large measure, we don't

1  typically sell the product to the end-user community.  What

2  happens is there's a group of resellers, and those resellers

3  are the ones who are responsible for selling RightFax in the

4  marketplace.  So there's a very distant bridge between us and

5  the ultimate use of the customer.  So I just want Your Honor

6  to know that the likelihood of us having documents about

7  configurations or technical material saying You have to

8  configure it" this way or that way is unlikely.  Just for the

9  record, Your Honor.

10          So, Your Honor, regarding scheduling, does that

11  sound like an acceptable approach?

12          THE COURT:  Well, let me hear plaintiffs' counsel's

13  --

14          MR. CARROLL:  Okay.

15          THE COURT:  -- reaction to your suggestion.

16          MR. ENGLAND:  Thank you, Your Honor.  I'll be very

17  brief.

18          Just on the last point, it's not entirely clear

19  that that's right because Captaris also has now an extensive

20  customer-service maintenance plan in place where they would

21  have to know the configuration in order to provide that

22  service, and we have -- the evidence is in front of

23  Your Honor in the motion.

24          With respect to the scheduling, Your Honor, we're

25  happy to take a measured approach.  We think that that's

```
1   actually what's already in place with respect to getting the
2   documents first and then identifying which subpoenas we need,
3   but we should -- and we're happy to meet and confer and talk
4   to Your Honor about an appropriate schedule.  We should just
5   not, I think, operate under the assumption that the discovery
6   cutoff in this case is only 30 days away.  Everyone already
7   knows that that's not true.
8           THE COURT:  How so?
9           MR. ENGLAND:  Because the parties have discussed
10  that.  We're already trying to schedule depositions that
11  Captaris wants into the new year, and on one of the related
12  cases, the Easylink case, we were in front of Judge Pregerson
13  on a scheduling order about two weeks ago and raised
14  informally the need -- these cases are coordinated on their
15  schedules, and we raised informally with him at that time the
16  need to extend the schedule to allow additional time, and he
17  indicated a willingness to do that.
18          The scheduling order that's in place -- the
19  operative one now -- which I'm not telling you -- Captaris is
20  not telling you the truth, there is a cutoff in that case,
21  but it was expressly premised on the idea that the court
22  would issue a Markman ruling at a certain time.  The court
23  did not do so.  So there was already built into that schedule
24  that it was going to slide.  So it's true we will need to go
25  back to Judge Pregerson and request additional time, but he
```

1   has already indicated a willingness to do that.  So we can

2   build in time to do this in a reasonable way, where we're not

3   taking six depositions a day.

4           So with that, Your Honor, we're willing to talk

5   about it and work with Your Honor to come up with a schedule.

6           THE COURT:  All right.  So what should the deadline

7   be for getting this resolved?

8           MR. ENGLAND:  Getting all the discovery done or

9   getting this scheduling issue resolved?

10          THE COURT:  Getting the scheduling issues resolved.

11          MR. ENGLAND:  Within a week, Your Honor.  We have

12  to move forward.  We don't have that much time, I guess, is

13  what I'm saying.  This has already been pending since August,

14  and here we are the middle of November almost so -- but I

15  would be more than happy, as Mr. Carroll said, to make myself

16  available -- or our team -- and we'll meet and confer and

17  come up with a scheduling --

18          THE COURT:  All right.  When are you going to be

19  able to meet?

20          MR. ENGLAND:  Well, we've already talked about

21  scheduling a call on Wednesday.  I think we could put in a

22  stipulation to Your Honor on Friday, if that works for

23  counsel, with a proposed schedule for coordinating this.

24          MR. CARROLL:  I'm traveling much of the week.

25  We're going to make ourselves available for that call and for

 1  an extended period.  If we could submit the stipulation a

 2  week from today regarding scheduling?

 3         MR. ENGLAND:  That's fine, too.  We would have no

 4  objection to that.

 5         THE COURT:  All right.  Do we need to talk about

 6  the motion to compel?

 7         MR. ENGLAND:  Well, Your Honor, I think I've

 8  already addressed it from our perspective.  It's clear based

 9  on -- well, I shouldn't say that.  It appears based on the

10  meet-and-confers and the various positions taken by

11  Captaris's counsel in their papers here today that there may

12  be some additional documents that have not been produced.  I

13  don't -- we are not in a position of being able to tell you

14  whether that's true or not.  We're just getting conflicting

15  stories, and so we've brought the motion to cover all the

16  bases in front of Your Honor here at one time.

17         THE COURT:  All right.  With respect to the sixth

18  set -- by the way, we have a rule that prohibits what was

19  done here, which is starting each set over again at one.  Are

20  you familiar with --

21         MR. ENGLAND:  And not numbering them seriatim.

22         THE COURT:  Yeah.  So it makes it a nightmare, of

23  course, for me to keep track of this but -- so I'm sure you

24  won't do that again.

25         MR. ENGLAND:  We will not.

```
 1              THE COURT:  Okay.  So, as to the sixth set, did
 2    they fail to respond within the required time?
 3              MR. ENGLAND:  Yes.  That's right, Your Honor.  No
 4    response was given.
 5              THE COURT:  All right.  So objections were waived,
 6    then, on your view.
 7              MR. ENGLAND:  That's our view --
 8              THE COURT:  Okay.
 9              MR. ENGLAND:  -- as stated in the motion.
10              THE COURT:  All right.
11              MR. ENGLAND:  Absolutely.
12              THE COURT:  Let me hear their response to that.
13              MR. CAIXEIRO:  Your Honor, on the sixth set, let me
14    say there was no formal written response provided.  I think
15    our objections were thoroughly conveyed to the plaintiffs.
16    But I actually think it's almost an irrelevant point on this
17    motion, and here's why:  Our issue with the sixth set of
18    request for production is not that we're trying to object to
19    it.  What we're saying is "You're asking for information
20    about 20,000 customers.  We have no conceivable way to try to
21    track that down."  And there's case --
22              THE COURT:  Okay.  Well, let me just -- so I can
23    proceed in steps here.  Did you ever serve a written response
24    to the sixth set of requests?
25              MR. CAIXEIRO:  Not a formal written response the
```

```
 1  way --
 2              THE COURT:  When was your response due?
 3              MR. CAIXEIRO:  I don't recall the date.
 4              THE COURT:  When was the request served?
 5              MR. CAIXEIRO:  I don't recall the exact date.
 6              THE COURT:  All right.  Let me ask plaintiffs'
 7  counsel.  When was the request served?
 8              MR. ENGLAND:  Your Honor, it's dated August 15th.
 9  So the response would have been due on or about
10  September 15th.
11              THE COURT:  All right.  So we're looking at --
12  what? -- three months, two months late?
13              MR. CAIXEIRO:  Uh-huh.
14              THE COURT:  Still not served.
15              MR. CAIXEIRO:  Your Honor, there's no -- I'm not
16  contesting that.  There's no doubt that --
17              THE COURT:  Why wouldn't you serve a response?
18              MR. CAIXEIRO:  I think it was because of the
19  correspondence we were having with j2 at the time.  I think
20  that we were engaged in these discussions about the scope of
21  third-party and customer-related documents.
22              But, Your Honor, if I may, the real issue here is
23  this --
24              THE COURT:  Well, wait a minute now.  I mean, to
25  me, the real issue is you violated the rule --
```

1          MR. CAIXEIRO:  Uh-huh.

2          THE COURT:  -- and I don't understand that at all,

3   and the case law is very clear that's a waiver of all

4   objections.

5          MR. CAIXEIRO:  Your Honor, while that is a waiver

6   of objections, that doesn't necessarily mean that a motion to

7   compel should be granted.  You know, where -- and I have --

8          THE COURT:  Okay.  Well, what objections did you

9   preserve in your written response?

10         MR. CAIXEIRO:  It's not a question of the

11  objections we've preserved.  The issue is if the discovery

12  request itself is so far beyond the bounds of discovery that

13  could be taken that the courts don't grant a motion to compel

14  regardless of the waiver of the objection.  And at heart,

15  that's what we're saying.  We're not trying to insert an

16  objection --

17         THE COURT:  Who decided not to serve a written

18  response?  Whose responsibility is that?

19         MR. CAIXEIRO:  I don't know the answer to that.

20         THE COURT:  I mean, was it a mistake --

21         MR. CAIXEIRO:  I don't --

22         THE COURT:  -- or did somebody decide?

23         MR. CAIXEIRO:  I don't know the answer to that.

24         THE COURT:  Who could answer that question?

25         MR. CAIXEIRO:  I could tell you I was never part of

1    a decision on that process.

2         MR. CARROLL:  Your Honor, it was not an affirmative

3    decision.  My partner and colleague Matthew Carmody was

4    conversing on a near-daily basis with counsel for j2 and, in

5    so doing, was discussing these very issues and raised on many

6    occasions the objections and the scope of the objections and

7    the problems with these issues, and there is significant

8    correspondence between the parties on these points.  And also

9    Mr. England and I participated in many meet-and-confer

10   sessions over the third-party customer issue in August, and

11   at the time, Your Honor, we were trying to work out a

12   compromise, and in fact, we had agreed to do some things

13   relating to attempting to seek whether we had responsive

14   documents so that we could report back and see whether that

15   would be a worthwhile exercise, and it was at that point that

16   j2 had expanded the volume of subpoenas to 66.

17        And, Your Honor, I think that my colleague

18   Mr. Caixeiro -- we'd be happy to provide today, Your Honor,

19   to complete the record answers and objections, if so

20   permitted, but, you know, Mr. Caixeiro has a case that is on

21   point that we think is supportive of our position in this

22   regard.

23        THE COURT:  Oh, what's the case?

24        MR. CAIXEIRO:  Two, actually, Your Honor.  One is

25   out of the district of Massachusetts, Krewson v. City of

1    Quincy.  I could actually provide copies to you if you

2    prefer.

3           THE COURT:  You can provide it to my clerk after

4    the hearing.  All right?

5           MR. CAIXEIRO:  Yeah.  I will do so.

6           THE COURT:  Okay.  What do the cases hold?

7           MR. CAIXEIRO:  The cases hold that even where

8    there's been a failure to provide written objections or

9    responses to a document request, then the other party moved

10   to compel production of the documents.  And this question

11   came up of waiver, and the court held that there was a

12   waiver.  However, the mere fact of the waiver did not justify

13   granting the motion to compel where, and I quote, "the

14   request far exceeds the bounds of fair discovery."

15          THE COURT:  Okay.  So we have a district court from

16   Massachusetts -- and what's the other court?

17          MR. CAIXEIRO:  Southern District of New York.

18          THE COURT:  Okay.  So I've got two district court

19   decisions from the East Coast --

20          MR. CAIXEIRO:  Uh-huh.

21          THE COURT:  -- and I've got the Richmark case, I've

22   got Davis v. Fendler from the Ninth Circuit --

23          MR. CAIXEIRO:  Uh-huh.

24          THE COURT:  -- saying failure to serve a written

25   response within the time permitted is a waiver of all

1  objections including, in the <u>Davis</u> case, according to the

2  Ninth Circuit, privilege.

3          MR. CAIXEIRO:  But we're not contesting --

4          THE COURT:  So which --

5          MR. CAIXEIRO:  -- the waiver issue.

6          THE COURT:  -- one am I supposed to follow here?

7          MR. CAIXEIRO:  Your Honor, they're consistent.

8  They're not saying that there's no waiver.  These East Coast

9  cases say there's been a waiver.  Okay?  The issue is not

10 that.  Imagine, Your Honor, there's a discovery request

11 "Produce the sun, moon, and the stars," and I didn't -- and

12 Open Text didn't respond to that.

13         THE COURT:  Okay.  You know, I would agree.

14 Something that is logically absurd, you know --

15         MR. CAIXEIRO:  And I think we're approaching that

16 with 20,000 customers' worth of information, Your Honor.  At

17 least, I've stated, there's no reasonable way we could search

18 that.

19         THE COURT:  Why did you put yourself in this

20 position?  I just -- I know you don't know the answer to

21 that.  To me, it's just completely inexplicable but -- okay.

22         Let's talk about the second and third sets.

23         MR. CAIXEIRO:  Well, the second and third sets,

24 Your Honor, we conducted a thorough search for documents to

25 find responsive documents.  We used search terms that -- and

1    I'll go into this in detail.  Let me start at the beginning

2    and say we were very much in conversation with j2 and its

3    counsel about what we would be searching for, what was going

4    on.  We spent over $500,000 in attorneys' fees and ultimately

5    produced over 300,000 pages of documents.

6                THE COURT:  Uh-huh.

7                MR. CAIXEIRO:  j2 -- now, at the time, we were in

8    discussion with j2 about specific search terms and a search-

9    term list.  Now, j2 now is taking the position that that

10   search-term list was not meant to apply to the Captaris or

11   Open Text litigation, but rather to a sister litigation, the

12   Protus litigation.  However, both parties knew that the same

13   document collection was being done for both litigations, and

14   for there, I refer Your Honor to j2's own exhibit.  This is

15   the Johnson declaration in support of the motion to compel.

16   Exhibit 6, at the last page, j2 with respect to the second

17   and third request for production saying "These requests are

18   substantially identical to the Protus requests discussed

19   above."  So we discussed in detail what search terms we would

20   run for Protus, it was understood that was going to apply to

21   Captaris-Open Text.  That's what this says.  That's what we

22   understood.  And now -- we spent substantial resources doing

23   that document collection.  Now we come back, and we're being

24   requested to start a brand-new document collection.

25                Now, that's my overarching point on the second and

```
 1   third requests.  If you want to talk -- discuss specific

 2   requests, I'm happy to do that as well.

 3          THE COURT:  I would like to do that.  Yeah.  Let's

 4   talk about second set No. 3.

 5          MR. CAIXEIRO:  Bear with me for one moment,

 6   Your Honor.

 7          THE COURT:  It's on page 6 of the joint

 8   stipulation.

 9          MR. CAIXEIRO:  Thank you.

10          So, Your Honor, we conducted a search for these

11   documents using the search terms that we discussed, you know,

12   our -- and that really is the main point on this.

13          THE COURT:  So have you produced everything

14   responsive to 3?

15          MR. CAIXEIRO:  Everything that we pulled up in that

16   search.  We conducted a fair, reasonable, burdensome

17   search --

18          THE COURT:  Well, I'm just -- I guess I'm asking

19   you is there anything else?  I mean, is it your position you

20   have no other responsive material or --

21          MR. CAIXEIRO:  Again, outside of the abhorrent

22   document which we discussed earlier -- I can't stand here and

23   say I know every single document in Open Text files.  What

24   I've said is we've done a reasonable search using over 200

25   search terms for many document custodians, and we pulled --
```

1    we produced whatever responsive, nonprivileged documents that

2    pulled up, and I think that satisfies our burden.

3            And I'd also point out that this request No. 3 does

4    not seek documents on a customer-by-customer basis.  It's

5    talking about Captaris products, illustrations or

6    descriptions of the installation with customers, but, you

7    know, that's different from what they're seeking here, which

8    is "Give us for every single customer every single document

9    that you have relating to these issues."

10           THE COURT:  Well, this sounds like illustrations or

11   descriptions that your client provides to customers --

12           MR. CAIXEIRO:  Uh-huh.

13           THE COURT:  -- to me.

14           MR. CAIXEIRO:  And we searched for them, and the

15   results were produced.

16           THE COURT:  And as to (r), you've produced all the

17   agreements between your client and the customers?

18           MR. CAIXEIRO:  No.  I can't say that we've produced

19   every single agreement between --

20           THE COURT:  I mean, this is very explicit; right?

21           MR. CAIXEIRO:  But, again, we'd asserted

22   objections, we met and conferred with j2, and we produced

23   what they said was the appropriate subset of documents they

24   were looking for here.

25           THE COURT:  Okay.  So as to (i) -- 3(i) --

1          MR. CAIXEIRO:  Uh-huh.

2          THE COURT:  -- you think you've already produced,

3    essentially, everything.  Is that fair?

4          MR. CAIXEIRO:  That's what I believe.

5          THE COURT:  All right.  As to (r), you haven't

6    produced.

7          MR. CAIXEIRO:  As for (r), I can tell you I know

8    that there are some other agreements out there.  I don't know

9    that they are all relevant.  I don't know that they bear on

10   these products.  You know, this is talking for any agreement

11   relating to development, marketing, sale, license,

12   distribution of the product, or service.  As we -- I

13   mentioned --

14         THE COURT:  Let me just stop you.  I'm trying to

15   understand the scope of your prior production.

16         MR. CAIXEIRO:  Sure.

17         THE COURT:  So was it your intention, when you did

18   the prior production, to produce everything responsive to

19   (r)?

20         MR. CAIXEIRO:  Yes, as bounded by the search terms

21   that we'd agreed upon with j2.

22         THE COURT:  So basically what you're saying is

23   that, other than the search terms, j2 has waived any other

24   material that might have come up in response to the request,

25   that they limited their request to your search terms.

```
 1            MR. CAIXEIRO:  No, not necessarily, Your Honor.  I
 2   mean, if they identify -- if they said, "Look, Open Text, GE"
 3   -- "give us" -- "make" -- "we want the 2003" -- I don't know
 4   that this document exists -- you know, "Give us the 2003
 5   license agreement with GE.  Go dig, and find that, and give
 6   that to us," that's not something we would be fighting over.
 7   The question is, you know, for 20,000 customers, once we've
 8   done a document production -- an expensive, burdensome
 9   document production, trying to cooperate with them and meet
10   and confer with them, for them now to come afterward and say,
11   "For all 20,000 again, we want you to start over from
12   scratch," you know, that seems disproportionate and unfair.
13            THE COURT:  Well, did you try to produce the
14   agreements for all your customers in response to 3(r) or not?
15            MR. CAIXEIRO:  Again, to the extent they were
16   responsive to the search -- to the meet-and-confer search
17   terms.
18            THE COURT:  All right.  Well, then, I mean, if
19   they're not limited by the search terms, what is your
20   objection to this request?
21            MR. CAIXEIRO:  Well, again, I think they're limited
22   -- again, if there were one-off instance -- if there's one
23   customer, they said, "Give us" some document, we could do
24   that.  "Waiver" seems to be an extreme word here, but by and
25   large, yes, I think that they are limited.
```

1          THE COURT:  Well, look, they're either entitled to

2    rely on their request or they're limited to the search terms.

3    I don't know which it is.

4          MR. CAIXEIRO:  But I think they're limited because

5    it's disproportionate and unfair for us to start this all

6    over again.  You know, they've staked out a position here,

7    which is for two years --

8          THE COURT:  So your position is, by agreeing to the

9    search terms, they waived any other scope of the request

10   other than what came up in response to those search terms.

11         MR. CAIXEIRO:  And it's not just the search terms,

12   Your Honor.  It's two years of the parties going back and

13   forth about what's being produced, what's not being produced,

14   and j2 never mentioning this.  It's not just that we did the

15   search terms and then we didn't speak to them for two years

16   about it.  You know, this went on for years with j2 never

17   raising an issue.

18         THE COURT:  Okay.

19         Okay.  Let's look at 16.  That's on page 26.

20         MR. CAIXEIRO:  Uh-huh.

21         Again, we've produced documents responsive to this

22   request, and I know we've produced substantial financial

23   information, you know -- notably, this document request does

24   not request that information on a customer-by-customer basis,

25   but we've produced substantial financial and revenue

```
 1    information here, which I think satisfies 16.  And the

 2    30(b)(6) on this issue, too.

 3              THE COURT:  Okay.

 4              Let me ask j2's counsel about 16 for a minute.  It

 5    did occur to me that maybe you already had pretty much

 6    everything you needed on this?

 7              MR. ENGLAND:  Your Honor, if you could give me just

 8    one second --

 9              THE COURT:  Uh-huh.

10              MR. ENGLAND:  -- to confer with Mr. Johnson.

11              (Pause.)

12              MR. ENGLAND:  Your Honor, very briefly, I think

13    with respect to the aggregate Open Text financial

14    information, they have produced a substantial amount of that

15    information.  The question is whether or not they have

16    customer-specific information about the individual sales,

17    which will be necessary to prove the damages relating to the

18    direct infringement, and if Open Text is willing to say they

19    don't, then we can get that from the third parties.  They

20    have -- so I'm not disagreeing with counsel.  He has produced

21    a substantial amount of aggregated data.

22              THE COURT:  But you want it broken down by customer

23    and year -- something like that?

24              MR. ENGLAND:  To the extent they have it, yes,

25    Your Honor.
```

1          THE COURT:  Okay.

2          MR. CAIXEIRO:  Your Honor, that's not what 16 asks

3    for.  And I also happen to know that we don't have documents

4    breaking it down that way.  So --

5          THE COURT:  Well -- okay.  First of all, 16 asks

6    for everything.

7          MR. CAIXEIRO:  Uh-huh.

8          THE COURT:  So --

9          MR. CAIXEIRO:  Well, done on a customer-by-customer

10   basis.  It's saying all documents concerning financial

11   information so --

12         THE COURT:  Or projections.

13         MR. CAIXEIRO:  I mean --

14         THE COURT:  Concerning any -- I mean, that would

15   include absolutely anything.

16         MR. CAIXEIRO:  Well, I --

17         THE COURT:  So here's my -- but here's kind of a

18   different question, and that is, you're not telling me that,

19   if the CEO said, "Gee, how much have we" -- "how much revenue

20   have we gotten from this customer during the past couple

21   years?," people would say, "Geez, I don't know.  There's no

22   way to figure that out"?

23         MR. CAIXEIRO:  I'm not saying that.  What I'm

24   saying is, as I understand it, there are no documents that

25   show that.  Whether or not there's loose information that

1  people could try to string together and create a document to

2  report to the CEO, that's a different story, but as I

3  understand it, that's not what we would be required to

4  produce in response to 16.

5           THE COURT:  So there's no tracking by customer of

6  revenue?

7           MR. CAIXEIRO:  My understanding is no.  Again, as

8  Mr. Carroll points out, it's because we sell through third

9  parties.  We sell through resellers.  You know, we -- the

10 resellers are making these sales to the ultimate customers.

11          THE COURT:  So the resellers, I guess, would know;

12 huh?

13          MR. CAIXEIRO:  It's possible.  It's possible.

14          THE COURT:  Okay.  Does your client track revenue

15 by reseller?

16          MR. CAIXEIRO:  I don't know the answer to that.  I

17 don't know the answer to that.

18          THE COURT:  So they have no way of knowing whether

19 a particular reseller sells virtually nothing and another one

20 is a wonderful --

21          MR. CAIXEIRO:  I --

22          THE COURT:  -- customer as a reseller?

23          MR. CAIXEIRO:  I don't know the answer to that but

24 I --

25          MR. CARROLL:  Your Honor, if I may, I know that --

1    I know certain resellers can achieve a certain status by

2    volume of sales.  So I'm certain that there's some way to

3    discern which of the resellers have, you know, met certain

4    thresholds.  In the interest of candor, that's all I can tell

5    you right now.

6               THE COURT:  Okay.

7               MR. CAIXEIRO:  And I'm not sure how that helps the

8    damages analysis anyway.  Right?  If it's reseller

9    information and the damages are based on what customers are

10   doing --

11              THE COURT:  Well, I see your point about that.

12              Let me ask j2's counsel on that issue.  Breaking it

13   down by reseller doesn't seem particularly helpful, does it?

14              MR. ENGLAND:  Just at that level, Your Honor, no,

15   it would not be.  Although, it's at least -- it's better than

16   no data at all.  But we would prefer to have it broken down

17   by the individual --

18              THE COURT:  I don't know what the value of it is at

19   all.  You have to prove it by customer.  They don't have

20   that, they're telling us.  So you have to go to the customer.

21              MR. ENGLAND:  Well, I think that --

22              THE COURT:  Or the reseller.  Maybe the reseller,

23   presumably, would track that.

24              MR. ENGLAND:  And I don't disagree with any of

25   that, Your Honor, which is why we've taken the steps we have.

1   But I would say that there is some potential relevance in

2   that, to the extent certain resellers are targeted to certain

3   segments of the market that are more likely to use the

4   software in an infringing way, then it is relevant to have a

5   breakdown by the reseller.  I -- that's the best I can give

6   you.

7             THE COURT:  Okay.  All right.

8             MR. ENGLAND:  It's not -- I'm not saying it's the

9   most crucial piece of evidence in the case.

10            THE COURT:  Okay.

11            So what about 18?

12            MR. CAIXEIRO:  Again, I --

13            THE COURT:  This is page 30 of the joint

14   stipulation.

15            MR. CAIXEIRO:  Yes, Your Honor.  I see it.

16            I think there are a couple of issues here.  We

17   objected initially to this term "fax functionality" as vague

18   and ambiguous.  We're not quite sure what that means.  And,

19   you know, that's why we relied on search terms to help guide

20   us to what they're actually looking for here.

21            You know, we produced contracts and licenses.  Is

22   it -- I think that there -- is it possible there's other

23   document -- contracts and licenses out there that fall under

24   this very broad category, you know, all related to "fax

25   functionality," whatever that is?  Possibly, but I'm not sure

1   how that would be relevant.

2          THE COURT:  All right.  So what you're saying is,

3   when you did your initial production, you endeavored to

4   produce everything responsive to 18.

5          MR. CAIXEIRO:  Yes.  As -- again, within the bounds

6   of our understanding with j2.  We're going back and forth.

7   We're meeting and conferring.  You know, j2 may -- you

8   know --

9          THE COURT:  Okay.  See, here's the problem:  I

10  really don't know what the standard is that I'm to measure

11  your production by.  I can look at the request --

12         MR. CAIXEIRO:  Yes.

13         THE COURT:  -- but you never say, "Yes, we've

14  produced," you know, "everything we could find with a

15  reasonable search responsive to this request."  Instead, you

16  refer me to, apparently, months of phone calls and meetings

17  and e-mails.  I --

18         MR. CAIXEIRO:  That's my fault.  What I'm trying to

19  say -- and maybe this is a better way to say this:  We did do

20  a very thorough -- we endeavored to produce these documents.

21  We did everything that we thought was reasonable to locate

22  and produce these documents, and we produced the results of

23  it.  I hope that's helpful.  I'm really trying to be helpful,

24  Your Honor.

25         THE COURT:  So, you know, as far as you know,

1    except for stray documents --

2            MR. CAIXEIRO:  Uh-huh.

3            THE COURT:  -- did you produce everything

4    responsive to 18?

5            MR. CAIXEIRO:  No.  Because 18 involves every

6    contract that Captaris is a party to ever.  And, no, we

7    haven't produced every single contract that Captaris is a

8    party to ever.

9            THE COURT:  Okay.  So what contracts did you

10   produce?  What's the subset that you chose to produce?

11           MR. CAIXEIRO:  Again, this goes back to

12   methodology.  We tried to figure out what's the right way to

13   find the contracts that j2 wanted.  How did we do that?  We

14   went back and forth with j2, and we said, "j2, help us figure

15   out what you want," we ran the searches, and we produced the

16   results.  You know, that was the methodology that was

17   employed.

18           THE COURT:  Okay.  Third set, No. 3, page 34 of the

19   joint stipulation.

20           MR. CAIXEIRO:  Again, Your Honor, my understanding

21   is we've conducted a good-faith, fair search for this and we

22   produced everything that we found under that search.

23           THE COURT:  So is there in the papers somewhere a

24   description of the search that you did?

25           MR. CAIXEIRO:  Yes.  In the Carmody declaration, I

1  believe.  The declaration of Matthew Carmody in opposition to

2  the motion to compel describes the search that we -- the

3  methodology --

4          THE COURT:  It gives the search terms and

5  everything?

6          MR. CAIXEIRO:  The search terms are appended to the

7  Carmody declaration.

8          THE COURT:  Okay.  All right.  And I guess your

9  answer would be the same as to all the rest of these; huh?

10          MR. CAIXEIRO:  I think so, Your Honor.  I mean, and

11  I don't mean it to be facetious in any way.  We tried to

12  figure out what is a good way to identify the documents they

13  were looking for, and we produced them, and then two years

14  went by, and we never heard that there was any problem with

15  it.

16          THE COURT:  So, as to these agreements, for

17  example, that are responsive to a couple of these requests,

18  what percentage of them would you estimate you produced?

19          MR. CAIXEIRO:  I don't know.  Because the agreement

20  -- the request called for literally every agreement Captaris

21  ever entered into, and so I can't say --

22          THE COURT:  Okay.

23          MR. CAIXEIRO:  -- what percentage --

24          THE COURT:  Can you tell me whether it was

25  1 percent, 99 percent, 50 percent, or --

1              MR. CAIXEIRO:  It wasn't 99 percent.  It -- when

2    you compare it to 100,000 customers -- Open Text has multiple

3    products completely unrelated to this litigation.  You know,

4    I can't tell you what percentage of that --

5              THE COURT:  Okay.  You just don't know.  That's a

6    perfectly fair response.

7              MR. CAIXEIRO:  Uh-huh.

8              THE COURT:  Okay?  Thank you.

9         Did -- you know, if there's anything else you want

10   to tell me about this, this is your chance.

11             MR. CAIXEIRO:  I'm just trying to be helpful.

12             THE COURT:  Okay.

13             MR. CAIXEIRO:  I apologize if I'm -- if you're

14   perceiving that I'm trying to avoid the question.  I'm just

15   trying to be helpful and explain as much as I can.

16             THE COURT:  No, it's not that.  I'm just searching

17   for a clear standard against which to compare your production

18   and to get some clear answers about how complete your

19   production was.

20             MR. CAIXEIRO:  Yeah.

21             THE COURT:  Okay.  That's fine.  You may be seated.

22        Anything further from plaintiff?

23             MR. ENGLAND:  Your Honor, two very brief things,

24   that is, the -- pardon me -- get to the monitor first.  The

25   search-term list is detailed -- the discussions back and

1  forth are detailed in the papers.  I'll let Your Honor take a

2  look at that.  The search terms that were relied upon by

3  Captaris related to the case against Protus, a different

4  competitor serving -- I'm sorry -- selling a directly

5  infringing product.  It's a very different case --

6  represented by the same defense counsel, but it's a different

7  case.  Exhibit 6 details that we were asking repeatedly to be

8  involved in the search-term process on Captaris.  We weren't.

9          And also, just solely with respect to the contracts

10 and whether or not -- Your Honor asked if the production was

11 complete.  I can represent to Your Honor that we have in our

12 possession less than 50 of these contracts from their

13 production.  So it just cannot possibly be that it's

14 complete.

15         But with that, unless Your Honor has specific

16 questions, I will --

17             THE COURT:  I don't.

18             All right.  Matter submitted.  Thank you.

19             THE CLERK:  Court is now adjourned.

20       (Proceedings adjourned at 11:37 A.M.)

21 ///

22 ///

23

24

25

1

2

3

4                              CERTIFICATE

5              I certify that the foregoing is a correct

6    transcript from the electronic sound recording of the

7    proceedings in the above-entitled matter.

8

9    /s/ Julie Messa_____          November 20, 2011_____
     Julie Messa, CET**D-403          Date
10   Transcriber

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25