# Exhibit 1

Grant E. Kinsel (Bar No. 172407)
gkinsel@perkinscoie.com
**PERKINS COIE LLP**
1888 Century Park East, Suite 1700
Los Angeles, CA 90067-1721
Telephone: 310.788.9900
Facsimile: 310.788.3399

Timothy J. Carroll (pro hac vice)
tcarroll@perkinscoie.com
Matthew F. Carmody (pro hac vice)
mcarmody@perkinscoie.com
**PERKINS COIE LLP**
131 South Dearborn Street, Suite 1700
Chicago, IL 60603
Telephone: 312.324.8400
Facsimile: 312.324.9400

*Attorneys for Defendants CAPTARIS, INC.,*
*and OPEN TEXT CORPORATION*

[See signature block for full list of counsel]

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| J2 GLOBAL COMMUNICATIONS INC. and ADVANCED MESSAGING TECHNOLOGIES, INC.,<br><br>        Plaintiffs,<br><br>    v.<br><br>CAPTARIS, INC. and OPEN TEXT CORPORATION,<br><br>        Defendants. | Case No. 09-4150-DDP (AJWx)<br><br>**[PROPOSED] FIRST AMENDED COUNTERCLAIMS OF DEFENDANTS OPEN TEXT AND CAPTARIS**<br><br>Date: November 12, 2012<br>Time: 10:00 a.m.<br>Courtroom: 3<br>Judge: Hon. Dean D. Pregerson<br><br>**REDACTED – PUBLIC VERSION** |

1
2    CAPTARIS, INC. and OPEN TEXT
     CORPORATION,
3
                          Counterclaim-
4                         Plaintiffs,

5         v.

6    J2 GLOBAL COMMUNICATIONS
     INC. and ADVANCED MESSAGING
7    TECHNOLOGIES, INC.,

8                         Counterclaim-
9                         Defendants.

10

11   **THE OPEN TEXT DEFENDANTS' FIRST AMENDED COUNTERCLAIMS**

12        Defendants and Counter-Claimants OpenText Corporation and Captaris, Inc.

13   for their Counterclaims against Plaintiff and Counter-Defendant j2 Global

14   Communications, Inc. ("j2"), allege as follows:

15                          **INTRODUCTION**

16        1.    These counterclaims include claims for declaratory judgment of non-

17   infringement and invalidity of U.S. Patent Nos. 6,350,066 ("the '066 patent"),

18   6,208,638 ("the '638 patent"), 6,597,688 ("the '688 patent") and 7,020,132 ("the

19   '132 patent").

20        2.    These counterclaims also include claims for declaratory judgment of

21   unenforceability of the '638 and '688 patents, as well as the '132 patent, which is a

22   continuation of and depends on the disclosure of the application that became the

23   '688 patent.   Discovery during this litigation has revealed that j2's numerous

24   litigation threats, patent lawsuits and resulting licensing revenues have been

25   founded on patents fraudulently obtained by concealing not only prior art developed

26   by others, including Captaris, Inc. ("Captaris") and EasyLink Services International

27   Corp. ("EasyLink"), but by j2 and its predecessor concealing its own prior art

28   products from the PTO, which were publicly disclosed and offered for sale more

1   than one year before j2's predecessor filed the applications that became the '638
2   and '688 patents, and then by destroying the best evidence of how those prior art
3   products operated during the pendency of reexamination proceedings for the
4   asserted patents and years after j2 had sued third parties for infringing these patents.

5         3.    These counterclaims further include claims for tortious interference
6   with prospective business advantage and statutory unfair competition based on j2's
7   knowingly false and improper claims to EasyLink's (now OpenText's) prospective
8   customers that j2's email-to-fax patent or patents prevent EasyLink and all other
9   companies from competing with j2 and offering any email-to-fax product or
10   service.

11         4.    The factual allegations supporting these counterclaims are set forth in
12   detail below.

13                       **JURISDICTION AND VENUE**

14         5.    These Counterclaims arise under the laws of the United States,
15   specifically the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202,
16   and under the laws of the State of California, including California Business &
17   Professions Code §§ 17200 et seq.  The Court has subject matter jurisdiction over
18   these Counterclaims under the provisions of 28 U.S.C. §§ 1331, 1332, 1337(a),
19   1338(a), 1338(b) and 1367(a).

20         6.    j2 transacts business in this judicial district and has filed suit in this
21   district. Venue is therefore proper in accordance with 15 U.S.C. §§ 15 and 22 and
22   28 U.S.C. §§ 1391(b) and (c). Venue is also proper pursuant to 28 U.S.C.
23   § 1400(b), in that this is a patent infringement action arising under the patent laws
24   of the United States, and pursuant to 28 U.S.C. §§ 1391(b) and (c), in that j2 is
25   subject to the personal jurisdiction of this Court by commencing and continuing to
26   prosecute this action.

27         7.    There is a justiciable controversy between the Defendants and j2 as to
28   whether the Defendants have infringed any patent rights owned by plaintiff,

1   including any valid claims of the '066, '638, '688, or the '132 patents (the "patents-

2   in-suit"), whether the patents-in-suit are valid, and whether the '638, '688 or '132

3   patents are enforceable.

**PARTIES**

4

5       8.      Captaris, Inc. is a Washington corporation with a principal place of

6   business at 301 116th Street SE, Bellevue, Washington 98004.

7       9.      EasyLink is a Delaware corporation with a principal place of business

8   at 6052 The Corners Parkway, Suite 100, Norcross, Georgia 30092.

9       10.     OpenText Corporation ("OpenText") is a Canadian corporation with a

10  principal place of business at 275 Frank Tompa Drive, Waterloo, Ontario, Canada

11  N2L OAI.  Since the outset of litigation between j2 and Defendants, OpenText has

12  acquired Captaris and EasyLink.

13      11.     As described by j2 in numerous press releases, j2 was founded in 1995

14  and provides messaging and communications services to individuals and businesses

15  around  the  world.  j2  provides  faxing  and  voicemail  services,  document

16  management    services,    conference    calling,    "unified-messaging"    and

17  communications services under the brand names eFax®, jai®, jConnect®, JFAX®,

18  eFax Corporate®, Electric Mail®, jBlast®, eFax Broadcast®, PaperMaster®,

19  Consensus®, M4 Internet® and Protfax®.   On information and belief, j2 is a

20  Delaware  corporation  with  its  principal  place  of  business  located  at  6922

21  Hollywood Boulevard, Suite 500, Los Angeles, California 90028.

**FIRST CLAIM FOR RELIEF**

**(Declaratory Judgment of Non-Infringement of the '688, '132, '066 and '638 Patents)**

22

23

24      12.     Defendants  incorporate  by  reference  the  preceding  paragraphs  as

25  though fully set forth herein.

26      13.     j2 contends that the Defendants infringe the '688, '132, '066 and '638

27  patents.

28

---

14.     The Defendants have not infringed and do not infringe (either directly, contributorily or by inducement) any valid claims of the '688 patent, the '132 patent, the '066 patent, or the '638 patent, whether literally or under the doctrine of equivalents.

15.     The Defendants are therefore entitled to a declaratory judgment that they have not infringed the '688 patent, the '132 patent, the '066 patent, or the '638 patent.

## SECOND CLAIM FOR RELIEF

### (Declaratory Judgment of Invalidity of the '688, '132, '066 and '638 Patents)

16.     The Defendants incorporate by reference the preceding paragraphs as though fully set forth herein.

17.     The asserted claims of the '688 patent, the '132 patent, the '066 patent and the '638 patent are invalid because they fail to comply with the applicable requirements of the Patent Act, including, but without limitation, sections 101, 102, 103, and/or 112, and for failure to comply with the statutes and regulations governing the application for and prosecution of patents.

18.     j2 contends, however, that the '688 patent, the '132 patent, the '066 patent, and the '638 patent were validly issued.

19.     The Defendants are therefore entitled to a declaratory judgment that the relevant claims of the '688 patent, the '132 patent, the '066 patent and the '638 patent are invalid.

## THIRD CLAIM FOR RELIEF

### (Declaratory Judgment of Unenforceability of the '638, '688 and '132 Patents)

20.     The Defendants incorporate by reference the preceding paragraphs as though fully set forth herein.

21.     The '638, '688 and '132 patents are unenforceable because of inequitable conduct committed by j2's predecessor before the U.S. Patent and Trademark Office (PTO).  During prosecution of the applications that led to the

1    '638 and '688 patents, j2's predecessor knowingly withheld information from the

2    PTO that was material to the patentability of the inventions claimed in the '638 and

3    '688 patents, with the specific intent to deceive the PTO. The '132 patent is a

4    continuation of, and claims priority to, the '688 patent. It is therefore

5    unenforceable because its parent, the '688 patent, is unenforceable.

6        22.   35 U.S.C. § 102(b) bars an applicant from obtaining a patent if the

7    invention was "in public use or on sale in this country, more than one year prior to

8    the date of the application for patent in the United States."

9    **A. j2 Concealed Its Own Prior Art Product From the PTO in Order to Obtain**
     **the '638 Patent**

10

11       23.   The application that led to the '638 patent was filed on April 1, 1997.

12   Thus, any public use or offer for sale of a JFAX service before April 1, 1996, that

13   practiced the claims as set forth in the application that became the '638 patent

14   would bar the applicant from obtaining a patent on those claims.

15       24.   The '638 patent claims a method and apparatus for receiving

16   information, such as a "received audio message," "process[ing]" that message into a

17   "digital representation," and transmitting the information from a "circuit switched

18   network," such as those traditionally used to receive and transmit voice and fax

19   messages over telephone lines, to the address of a user via a "packet switched

20   network," such as those used to transmit emails from one computer user to another

21   (fax-to-email).

22       25.   But j2 was not entitled to the '638 patent, because before April 1,

23   1996, j2's predecessor, JFAX Communications, Inc. ("JFAX"), publicly used and

24   offered for sale the claimed invention, namely, a product and/or service that

25   transmitted voice and fax messages received over phone lines, or from a "circuit-

26   switched network," processing those messages to digital representations that were

27   then routed to users on a "packet-switched network," as claimed in the application

28   that became the '638 patent.

1   26.   Each individual associated with the filing and prosecution of a patent

2   application has a duty of candor and good faith in dealing with the Patent Office,

3   which includes a duty to disclose all information known by that individual to be

4   material to the patentability of the application ("Duty of Candor").  Information that

5   is material to a patent application includes not only information on prior art patents

6   or publications, but also includes information on possible prior public uses, sales or

7   offers for sale.  37 C.F.R. § 1.56.  In fact, for purposes of the Duty of Candor,

8   information is material where a reasonable examiner would likely consider it

9   important in deciding whether to allow the application to issue as a patent.   37

10  C.F.R. § 1.56(b).  In some cases, a stricter standard of materiality has been cited

11  wherein information is "material to patentability when it is not cumulative to

12  information already of record or being made of record in the application, and:

13  (1) [i]t establishes; by itself or in combination with other information, a *prima facie*

14  case of unpatentability of a claim; or (2) [i]t refutes, or is inconsistent with, a

15  position the applicant takes: (i) [o]pposing an argument of unpatentability relied on

16  by the [PTO], or (ii) [a]sserting an argument of patentability."  37 C.F.R. § 1.56(b).

17  27.   Each individual associated with the filing or prosecution of JFAX's

18  patent applications who was aware of material information was required to submit,

19  or cause to submit, such information to the PTO as part of an Information

20  Disclosure Statement ("IDS") as early in the prosecution as it was known.   37

21  C.F.R. § 1.56(c):

22      Individuals associated with the filing or prosecution of a
        patent application within the meaning of this section are:
23      (1) Each inventor named in the application; (2) Each
        attorney or agent who prepares or prosecutes the
24      application;  and  (3) Every  other  person  who  is
        substantively involved in the preparation or prosecution
25      of the application and who is associated with the inventor,
        with the assignee or with anyone to whom there is an
26      obligation to assign the application.

27  28.   During the course of prosecution of JFAX's patent applications, the

28  named inventors, and the attorneys, agents, and employees of j2 acting on behalf of

1    j2 in connection with the filing and prosecution of its patent applications ("the

2    Applicants"), had a Duty of Candor to the PTO. Moreover, the Applicants knew or

3    were charged with knowledge that they had such a Duty of Candor.

4          29.   The product and/or service that JFAX publicly used and offered for

5    sale before April 1, 1996 was referred to publicly and marketed as "JFAX," "JFAX

6    Communicator" and/or "JFAX Personal Telecom."

7          30.   The JFAX, JFAX Communicator and JFAX Personal Telecom

8    products implemented methods and/or embodied an apparatus for transmitting

9    information from a circuit switched network to a packet switched network before

10   April 1, 1996.

11         31.   The methods and functionality used in the JFAX services that were on

12   sale and in public use before April 1, 1996 were material to the question of whether

13   the claims in the application that led to the '638 patent were novel and patentable.

14         32.   If the methods and functionality used in the JFAX services that were

15   on sale and in public use before April 1, 1996 would have been disclosed to the

16   PTO, the PTO would not have granted the '638 patent.

17         33.   The '638 patent names Jack Rieley and Jaye Muller as inventors.

18         34.   Jack   Rieley   and   JFAX   Communications   posted   numerous

19   advertisements to publicly available Internet message boards publicizing JFAX's

20   service and offering it for sale before April 1, 1996. For example, JFAX

21   Communications offered the JFAX service for sale by soliciting readers to "[g]et

22   your own New York City (212), Atlanta (770), or London (0171) fax number and

23   automatic delivery of incoming faxes to your E-mail" in several Usenet newsgroup

24   posts predating April 1, 1996, including a March 20, 1996 post to the Usenet

25   newsgroup "alt.bbs.internet" that, like the others, directed readers to JFAX's web

26   site for "online ordering."

27

28

35.   Although they had an obligation to do so, neither Rieley, JFAX, nor any of their agents, ever disclosed to the PTO these offers for sale in prosecuting the application that led to the '638 patent.

36.   Before April 1, 1996 Jack Rieley individually contacted a potential customer and source of publicity, prominent third-party computer scientist Dr. David Farber, and offered him an account to use the fax-to-email service then offered by JFAX. Dr. Farber accepted that offer. Mr. Rieley and JFAX then made the JFAX service available to Dr. Farber before April 1, 1996, and Dr. Farber began using the service before April 1, 1996. Dr. Farber was not under any confidentiality obligation to JFAX.

37.   On April 29, 1996, Dr. David Farber stated on a publicly available and widely distributed emailing list that he had been using JFAX's service for "the past two months or so" (i.e., beginning before April 1, 1996), and forwarded a JFAX press release in which JFAX offered its fax-to-email services for sale on its web site. Dr. Farber confirmed these facts in deposition.

38.   Although Rieley, JFAX and its agents had an obligation to do so, JFAX never disclosed to the PTO Rieley's specific offer for sale to Farber nor Farber's public use of the JFAX service more than one year before April 1, 1997.

39.   In addition, JFAX's web site during 1996 was displaying offers for sale of its fax-to-email service. Although Rieley, JFAX and its agents had an obligation to do so, JFAX never disclosed to the PTO that it was offering its service on its web site more than one year before April 1, 1997.

40.   In its Reply to EasyLink's Amended Counterclaims filed in Case No. 11-cv-4239 before this Court (Doc. 52), j2 admitted that "products known as JFAX and JFAX Personal Telecom were on sale and/or used publicly in the United States more than one year before the filing date of the application that led to the '638 Patent."

**B. JFAX Swore it Commercially Used the JFAX Product Before April 1, 1996 in Order to Obtain Trademarks and Copyrights**

41.     Although JFAX concealed these early offers and public uses of its product or service from the PTO's patent examiner in order to deceive the PTO into allowing the patent, JFAX *did* disclose and swear to these public uses to a trademark examiner at the PTO and to the U.S. Copyright Office because these public uses supported JFAX's efforts to induce the PTO and the U.S. Copyright Office to grant JFAX intellectual property rights protecting its product/service.

42.     JFAX filed an application to register the JFAX trademark with the PTO on February 1, 1996, which was more than one year before April 1, 1997.

43.     In furtherance of its effort to obtain trademark rights in the JFAX mark, JFAX sought to establish that it had used the JFAX mark in interstate commerce by the time it filed the trademark application on February 1, 1996. Jack Rieley represented to the PTO in a sworn declaration signed on February 18, 1997 that the "JFAX" mark was used in interstate commerce as of February 1, 1996, which was more than one year before the April 1, 1997 filing of the application that became the '638 patent. As evidence of this use in interstate commerce, JFAX relied, among other things, on a printout of a page from its website dated January 27, 1996 offering the JFAX product/service. j2 intentionally withheld this same evidence from the Patent Examiner.

44.     This disclosure, made for the purpose of obtaining trademark rights, was directly contradictory to Rieley's and JFAX's sworn representations to the PTO's patent examiner, in which, on July 14, 1997, Jack Rieley swore that "I do not know and do not believe" that the invention claimed in the '638 patent application "was in public use or on sale … more than one year prior to this application." Although they had an obligation to do so, neither Rieley nor JFAX disclosed their use of the JFAX mark to the patent examiner during their attempt to obtain patent rights protecting the JFAX service.

45.   On July 7, 1996, JFAX filed a registration with the U.S. Copyright Office for the purpose of establishing copyright protection in the source code used in its JFAX fax-to-email service.  As a result of this application, JFAX was able to obtain U.S. Copyright registrations for computer programs comprising the JFAX Communicator, JFAX Communicator for Windows, and JFAX Personal Telecom products.  In particular, JFAX obtained Copyright Registration No. TX0004354397 dated July 1, 1996, for the computer program "JFAX Communicator: JFAX Server," written by Greg James, who as a contractor of JFAX was the author of the code for the initial JFAX fax-to-email product.  In connection with this registration, JFAX represented to the U.S. Copyright Office that the first publication date of the source code to be copyrighted had been January 25, 1996, more than one year before the filing of the '638 patent application.

46.   JFAX also obtained Copyright Registration No. TX0004347682 for the computer program "JFAX Communication for Windows," authored by Richard Bennett, who was a contractor for JFAX.  JFAX swore to a publication date of January 1, 1996 for this source code, which was more than one year before the filing of the '638 patent application.

47.   In connection with the copyright registrations for its source code, JFAX deposited printed copies of some of its source code with the U.S. Copyright Office.  Nevertheless, and although it had an obligation to do so, during prosecution of the application that led to the '638 patent, JFAX did not disclose to the PTO that it had filed a copyright registration for source code it was using to operate its fax-to-email service.  Nor did JFAX disclose to the PTO that it had deposited copies of its source code with the U.S. Copyright Office, nor did it submit that prior art source code nor any accompanying documentation to the PTO.

48.   Although the records of the U.S. Copyright Office indicate this source code was deposited, the Copyright Office no longer has the source code printouts in its possession.

49.   These material omissions were not made because of inadvertent oversight among departments and employees of a large company. Rather, at the time it withheld all documentation related to its prior art products from the PTO, JFAX was a small, closely-held company. Before the hiring of Anand Narasimhan in approximately September 1996, JFAX had only two employees, the named inventors on the '638 patent, Jack Rieley and Jaye Mueller. And by the time that JFAX moved its headquarters from New York City to Los Angeles in 1997, JFAX still only had approximately 20 employees.

50.   Rieley's and JFAX's use of representations and sworn affidavits that their products were publicly used in 1996 in order to obtain copyright and trademark rights while at the same omitting such information in order to obtain patent rights shows that Rieley and JFAX intended to deceive the PTO with their material omissions.

**C.  j2 Also Concealed its Own Prior Art From the PTO in Order to Obtain the '688 Patent**

51.   On June 12, 1998, j2 filed with the PTO the first United States patent application in the series of applications that led to the issuance of the '688 patent (the "'688 Patent Application").

52.   While the '638 patent covers methods for handling messages received over telephone networks as fax or voicemails, and delivering them to users' email (fax-to-email), the '688 patent is directed to a system for sending users' email messages as faxes (email-to-fax).

53.   More specifically, the '688 patent is directed to a server-based system for receiving user messages over a computer network (such as email), validating the users, and sending the messages as faxes (email-to-fax).

54.   Any public use or offer for sale of the system claimed in the '688 patent before June 12, 1997 (more than one year before the application that became

the '688 patent was filed) would render the '688 patent invalid under 35 U.S.C. § 102(b).

55.   In fact, before June 12, 1997, JFAX had publicly used and was offering for sale its email-to-fax service known as "JFAX/Send" and/or "JFAX Personal Telecom Fax/Send." If the PTO had known about these public uses and offers for sale, it would not have granted the '688 patent.

56.   On February 1, 1996, JFAX filed a trademark application with the PTO. In an effort to obtain trademark protection for its products, JFAX swore that it actually used the mark "JFAX" in commerce in the United States as early as July 19, 1995 in connection with email-to-fax services such as those claimed in the '688 patent. As evidence of this use in interstate commerce, JFAX relied, among other things, on an advertisement for JFAX Personal Telecom Fax/Send. Because it would have led to the rejection of JFAX's '688 patent application, however, JFAX withheld this information from the PTO's patent examiner.

57.   JFAX also obtained U.S. Copyright registrations for computer programs comprising the JFAX/Send product. In order to induce the U.S. Copyright Office to grant these rights, JFAX swore to dates of publication for JFAX/Send that were more than one year before the filing of the patent application that became the '688 patent. In particular, JFAX obtained U.S. Copyright registration No. TX0004450197 for the computer program "JFAX Send/server," authored by Greg James and described therein as an "update[e]" of the JFAX fax-to-email source code.

58.   Although the records of the U.S. Copyright Office indicate that JFAX deposited copies of some of its source code in connection with the foregoing registration, the Copyright Office no longer has any copies of the source code in its possession.

59.   In addition, JFAX's web site in 1996 displayed offers for sale of its email-to-fax service. J2 did not disclose these offers or any material displayed on

1    its 1996 web site to the PTO until the prosecution of the '132 patent many years

2    later.  But even in that belated disclosure, j2 did not disclose any documentation or

3    information regarding the functionality of the JFAX/Send product it had offered for

4    sale more than one year before filing the application for the '688 patent.

5         60.    Moreover, on February 3, 1997, which was more than one year before

6    the filing of the application that became the '688 patent, JFAX issued a press

7    release announcing the "immediate availability" of its "outgoing fax service –

8    JFAX/Send."  Although it had an obligation to do so, under the Duty of Candor,

9    during the prosecution of the '688 patent, JFAX never disclosed to the PTO any of

10   the following: (1) the existence of its prior art JFAX/Send email-to-fax

11   product/service, (2) the prior art source code for (or any other documentation of) its

12   email-to-fax product/service, (3) that it had filed a copyright registration for source

13   code it was using to operate its prior art email-to-fax product/service, (4) that it had

14   deposited copies of its source code with the U.S. Copyright Office, or (5) its offers

15   to sell the prior art email-to-fax product/service.

16        61.    JFAX never disclosed this press release or the public disclosure or

17   offer for sale of its JFAX/Send email-to-fax service to the PTO during the

18   prosecution of the '688 patent.

19        62.    Rieley's and JFAX's use of representations and sworn affidavits that

20   their products were publicly used in 1996 and 1997 in order to obtain copyright and

21   trademark rights while at the same omitting such information in order to obtain

22   patent rights shows that Rieley and JFAX intended to deceive the PTO with their

23   material omissions.

24        63.    j2's JFAX and JFAX/Send products would have been material to the

25   prosecution of the '638, '688 and '132 patents.

26        64.    For example, j2's 1996 promotional materials that it submitted in

27   support of its trademark registration suggest that JFAX's prior art service handled

28   incoming fax calls that were associated with an inbound address, where the inbound

address was associated with a user account and a destination address on a packet-switched network, as required by claim 1 of the '638 patent, because the JFAX service's network would receive fax calls on behalf of a subscribed user, and could analyze a fax that had been received to identify and validate the user, and send the fax to the user's email address in the form of an email.

65.   Those materials also suggest that j2's service utilized multiple servers, that the service had the capability of processing an incoming fax message into a digital representation, and that the service kept a database of information tying inbound addresses (such as a user's fax number) to destination addresses (such as a user's email address) as required by Claim 1 of the '638 patent, because j2 offered its service in multiple cities and offered the capability to send received faxes to users as emails.

66.   Claim 1 of the '638 patent also requires that an incoming call signal (such as a fax call) must be redirected from a first server to a second server upon the occurrence of some condition.  The source code operating the JFAX service's servers would have been material to show, for example, the conditions under which an incoming call would be redirected from one server to another.  Accordingly, the source code deleted by j2, and the functions performed by that source code, were material to the patentability of the claims of the '638 patent, including claim 1.

67.   The promotional materials submitted by JFAX in support of its trademark registration also suggest that the JFAX/Send system kept a database containing account information on JFAX's customers, that it had a means for validating that a user attempting to send a fax through the service was a subscriber to the service, and that it had resources for converting an email sent by a user into a format that could be received by a fax machine, as required by claim 19 of the '688 patent and claim 1 of the '132 patent, for example.

68.   Claim 19 of the '688 patent and claim 1 of the '132 patent also require that the system determine which of a plurality of "outbound resources" a request

1  message, such as a user's email intended to be sent as a fax, should be assigned to.

2  The source code operating the JFAX/Send service would be material to show, for

3  example, how it was determined which outbound resources would be used by the

4  service to send emails out as faxes. Accordingly, the source code, and the functions

5  performed by that source code, would be material to the patentability of the '688

6  patent, including claim 19, and the '132 patent, including claim 1.

7     69.   JFAX and its successor j2's knowing concealment of JFAX's prior

8  public uses and offers for sale of products material to the patentability of the '638

9  and '688 patents, with intent to deceive the PTO, constitutes inequitable conduct

10  that renders the '638, '688 and '132 patents unenforceable.

11  **D. j2 Continued to Conceal its Prior Art from the PTO During Reexamination**

12  **and Then Destroyed Evidence of its Inequitable Conduct While Litigation**
     **Was Pending**

13     70.   Due to (i) the prosecution and then reexamination of its patents,

14  combined with (ii) actual and expected litigation against competitors it accused of

15  infringing its patents, j2 and its predecessor, JFAX, have been under a continuous

16  duty to preserve the source code used in the services JFAX offered before it filed

17  for the '638 and '688 patents from 1996 through today.

18     71.   Dr. Anand Narasimhan, one of the named inventors of the '688 patent,

19  was employed as JFAX's Chief Technical Officer from September 1996 until

20  sometime in 2000, the period during which the applications that became the '638

21  and '688 patents were filed.

22     72.   From its earliest days, it was JFAX's policy to preserve its source

23  code, including any previous versions of the code and any changes made to the

24  code, which it did for many years using "version control software."

25     73.   On October 28, 1999, JFAX was sued by AudioFAX IP, LLC, which

26  accused the JFAX products of patent infringement, triggering an obligation on the

1    part of JFAX to preserve evidence relevant to the operation of JFAX, including its

2    source code.

3        74.    The AudioFAX litigation was terminated in November 2001. But j2's

4    obligation to preserve its source code was not extinguished, because by that time,

5    obligations to preserve the source code had independently arisen as a result of

6    JFAX's aggressive efforts, through threatened litigation, to obtain licensing revenue

7    from the '638 patent and its resulting anticipation of litigation. This obligation to

8    preserve the JFAX source code as a result of j2's specific anticipation of litigation

9    and resulting actual litigation continued from at least October 28, 1999 through the

10   present day.

11       75.    On March 27, 2001, the '638 patent was issued.

12       76.    Following the issuance of the '638 patent, j2 immediately began a

13   campaign to extract revenue from third parties by licensing its patents, including the

14   '638 patent.

15       77.    In October 2001, j2 employed the services of EKMS Inc. (EKMS), an

16   intellectual property consulting services company, for the specific purpose of

17   helping j2 extract patent licensing revenue from third parties, including both the

18   '638 patent and the application that became the '688 patent.

19       78.    The services performed by EKMS for j2 included identifying potential

20   infringers and sending numerous letters accusing them of infringing j2's patents,

21   including the '638 patent, threatening litigation, and offering to negotiate licenses.

22   For example, on December 10, 2001, EKMS sent a letter to Callwave.com, Inc.,

23   accusing Callwave.com of infringing the '638 patent, and offering to open license

24   negotiations. Other letters accusing third parties of infringing the '638 patent,

25   including at least PROTUS and Voice & Data Systems, were sent by EKMS on

26   behalf of j2 on March 5, 2002.

27

28

79.    An independent financial analyst noted in November 2002 that, by the fourth quarter of 2001, j2 had received $314,000 in license revenue, and that j2 embarked on a more aggressive patent licensing campaign in February 2002.

80.    On July 25, 2002, j2 was sued by Interstar Technologies, Inc. who accused j2 of threatening patent infringement litigation involving the '638 patent through its exclusive agent EKMS, and requested a declaratory judgment that the '638 patent was invalid and unenforceable.   This litigation continued through January 15, 2003, and required that j2 preserve evidence relating to the validity of the '638 patent, including source code showing how the JFAX product operated before j2 filed the application that became the '638 patent.

81.    On July 22, 2003, the '688 patent was issued.

82.    In February 2004, j2 filed suit against Venali, Inc. ("Venali") alleging patent infringement, including infringement of the '638 and '688 patents.

83.    From February 2004 through 2006, j2 was involved in patent litigation involving the '638 and '688 patents, including at least litigation against Venali and Protus IP Solutions, Inc., which kept alive its ongoing obligation to preserve the source code maintained in its version control system.

84.    On March 21, 2005, an ex parte reexamination request for the '688 patent was submitted to the PTO by Venali, which granted the request and the '688 patent underwent reexamination proceedings through March 11, 2008.

85.    The Duty of Candor to the PTO that applies during the original prosecution of a patent application also applies during reexamination proceedings. Applicable regulations require that "[e]ach individual associated with the patent owner in a reexamination proceeding has a duty of candor and good faith in dealing with the Office, which includes a duty to disclose to the Office all information known to that individual to be material to patentability in a reexamination proceeding." 37 C.F.R. § 1.555.

80040-0001/LEGAL24888552.1

-17-

[PROPOSED] AMENDED
COUNTERCLAIMS

Exhibit 1 Page -28-

86.    Applicable regulations also require that "[a]ny information disclosure statement … should be filed [with the PTO] within two months of the date of the order for reexamination, or as soon thereafter as possible."   37 C.F.R. § 1.555. Accordingly, while the PTO was performing its ex parte reexamination of j2's '688 patent, j2 had an obligation to disclose all material information of which it was aware.

87.    But during the '688 reexamination proceedings, j2 continued to knowingly withhold information material to the patentability of the '688 patent, including 1) the fact that it had publicly used and offered for sale an email-to-fax service more than one year before the application for the '688 patent had been filed, and 2) the source code documenting the functionality of the service as it existed prior to the '688 patent's filing.

88.    On November 7, 2005, an ex parte reexamination request for the '638 patent was submitted to the PTO by Venali, which granted the request and the '638 patent underwent reexamination proceedings through December 9, 2008.

89.    During the '638 reexamination proceedings, j2 continued to knowingly withhold information material to the patentability of the '638 patent's claims in violation of its Duty of Candor to the PTO, including 1) the fact that it had publicly used and offered for sale a fax-to-email service more than one year before the application for the '638 patent had been filed, and 2) the source code documenting the functionality of the service as implemented on j2's computer systems before the '638 patent's filing.

90.    During prosecution of U.S. Patent No. 7,020,132, which was filed on March 20, 2003, and is a continuation of the '688 patent, j2 had an obligation to disclose information and documentation regarding its public use of the JFAX/Send product more than one year before the claimed priority date for the '132 patent, but j2 did not do so.

91.     In 2005, during the '132 prosecution, j2 tacitly admitted the materiality of its pre-filing products by filing screen shots showing pages from its web site as it existed during 1996.  Despite finally making these belated disclosures to the PTO, however (which did not cure the intentional withholding of that information during the prosecution of the '638 and '688 patents), j2 never filed any information or documents showing the PTO any details of how its products and services operated in 1996.

92.     And worse, j2 prevented information showing details of how its prior art product and services operated from ever being discovered because it deleted all the historical versions of its products' source code, choosing to retain only current versions of the code needed to operate its services.  j2 deleted its early source code despite the facts that litigation initiated by j2 relating to the '638 and '688 patents was pending, and reexamination proceedings for the '638 and '688 patents were underway at the PTO.

93.     As shown by its extensive and continuous patent litigation activities in the years preceding the deletion, including reexaminations in the PTO of the '638 and '688 patents themselves, j2's deletion of all its historical source code versions was done with the purpose and effect of (i) concealing the invalidity of the '638 and '688 patents, (ii) further concealing j2's inequitable conduct before the PTO in having withheld information about its prior art products, and (iii) depriving its litigation opponents of the most direct and decisive evidence of that invalidity and j2's inequitable conduct.

94.     The single most natural inference from the facts set forth above is that j2 and its predecessor deliberately withheld the evidence of its own invalidating prior art products from the PTO during prosecution and reexamination of the '638 and '688 patents, as well as the prosecution of the '132 patent, finally deleting that prior art source code so that it could never be submitted to the PTO or discovered in

1    the many lawsuits in which j2 has sought damages from third parties for alleged
2    infringement of the '638 patent, the '688 patent and the '132 patent.

3    **E.   j2 Also Knowingly Withheld Other Material Prior Art From the PTO**

4           95.    j2 also withheld other prior art that it knew to be material to its claims
5    from the PTO during the prosecution and reexamination of the '132 and '688
6    patents.

7           96.    At least by 2005, while the reexamination of the '688 patent was
8    pending and j2 had an obligation to disclose material prior art to the PTO, j2
9    became aware that Captaris' own Rightfax product, the product j2 asserts infringes
10   the '688 patent in this case, constituted material prior art to the '688 patent, but
11   nevertheless withheld information about Rightfax from the PTO.

12          97.    Venali's March 2005 request for reexamination of the '688 patent
13   cited, among other references, various newly disclosed prior art documents relating
14   to versions 4.5 and 5.0 of Captaris' own Rightfax product.

15          98.    Captaris created and distributed product manuals, including
16   Installation and Administration Guides, describing various aspects of its Rightfax
17   products, which were publicly available online during the time of the
18   reexamination.

19          99.    j2 was aware of the existence of, and had access to, the Rightfax
20   product manuals, the Rightfax functionality and other prior art during the pendency
21   of the '688 patent reexamination proceedings, yet did not disclose any of this
22   documentation or information to the PTO.  In particular, at minimum j2 was made
23   explicltly aware of the Rightfax prior art and functionality in connection with a
24   lawsuit filed by j2's subsidiary Dynamic Depth against Captaris in the United
25   States District Court for the Northern District of Georgia, styled *Dynamic Depth v.*
26   *Captaris, Inc.*, Case No. 1:07-CV-1488 (the "Dynamic Depth case"), which was
27   filed on June 25, 2007, long before the '688 patent reexamination was completed on
28   March 11, 2008.

100.   The materiality of the Rightfax documentation was specifically highlighted by the PTO during the '688 reexamination proceedings.  In a December 6, 2006 Office Action, the Examiner asserted that the Rightfax product was prior art, but noted that the articles relating to the Rightfax product cited during the reexamination proceedings did not teach the network architecture recited in the claims.  Specifically, the Examiner stated that the Rightfax articles did not "include a processing server communicatively coupled to a separate database server by an internal, packet-switched network."

101.   However, the Rightfax Installation and Administration Guides, which were known to j2 and available during the pendency of the reexamination proceedings, disclose the use of the Rightfax software on one server coupled to a database server over an internal (packet-switched) network.  The Rightfax product is therefore material to the patentability of the '688 patent because it is, at minimum, anticipatory prior art under 35 U.S.C. § 102(b).

102.   Under Federal Circuit law, one cannot cultivate ignorance, or disregard numerous warnings that material information or prior art may exist, merely to avoid actual knowledge of that information or prior art.  Where an applicant knows of information the materiality of which may so readily be determined, he or she cannot intentionally avoid learning of its materiality; in such cases the district court may find that the applicant should have known of the materiality of the information.  Thus, a duty to inquire arises when the prosecuting attorney is on notice of the likelihood that specific, relevant, material information exists and should be disclosed.  In such a case, the applicant or prosecuting attorney is not free to choose not to investigate the facts necessary to determine the materiality of the reference in an effort to avoid complying with their duty to disclose.

103.   In addition to Rightfax product documents, j2 concealed numerous material prior art patents from the PTO during the reexamination of the '688 patent and prosecution of the '132 patent.  j2 acquired U.S. Patent No. 5,461,488 ("the

1    '488 patent") on March 22, 2006.  j2's subsidiary asserted the '488 patent against

2    Captaris in the Dynamic Depth case.

3         104.  j2 caused the Dynamic Depth case to be initiated while the

4    reexamination of the '688 patent was still underway by the PTO.  In the Dynamic

5    Depth case, j2, through its patent litigation vehicle Dynamic Depth, asserted that

6    Captaris infringed the '488 patent with its Rightfax product.  This is the very same

7    product that j2 alleges infringes the patents-in-suit in the instant litigation.

8         105.  The '488 patent relates to the same subject matter as the '688 patent,

9    namely, "computerized facsimile routing and logging systems and methods."

10   '488(1:6-8).  Because j2, in court filings, has pled that Captaris' Rightfax product

11   infringes both the '488 and the '688 patents, and because the '488 patent was

12   published and issued before the '688 patent was filed, the '488 patent is material

13   prior art to the '688 patent.  In fact, the '488 patent, in combination with the

14   Rightfax documentation already before the PTO, renders the '688 patent obvious

15   and invalid.  Therefore, j2 was under an affirmative duty to disclose the '488 patent

16   to the PTO during the reexamination of the '688 patent, and but for j2's intentional

17   withholding of this material reference, the '688 patent would not have survived

18   reexamination.

19        106.  Additionally, in November 2001, j2 settled its lawsuit with AudioFAX

20   in which AudioFAX had asserted that j2's system infringed at least U.S. Patent No.

21   4,994,926 ("the '926 patent").  Accordingly, as of 2001 at the latest, j2 was aware

22   and on notice that the '926 patent, at minimum, potentially covered its system and

23   was material to the patentability of the proposed claims of the '688 patent.

24        107.  The AudioFAX settlement occurred during the pendency of the '688

25   patent application, prior to the continuation filing of the '132 patent, and prior to

26   the reexamination of the '688 patent.  Notwithstanding j2's awareness that the '926

27   patent may read onto its system and was therefore material to the patentability of

28   the '688 patent's claims, j2 failed to disclose this patent, or any related continuation

1   patents, to the PTO during the prosecution of the '688 patent or at any subsequent

2   time. J2's failure to disclose this material information with intent to deceive the

3   PTO on three separate occasions – during prosecution of the '688 patent, the

4   prosecution of the '132 patent, and the reexamination of the '688 patent – also

5   constitutes, and is part of its pattern and practice of, inequitable conduct before the

6   PTO.

7        108.   The '926 patent was also one of a series of patents owned by

8   AudioFAX.   The other AudioFAX patents include, but are not limited to, U.S.

9   Patent Nos. 5,291,302; 5,459,584; 6,643,034; and 6,785,021 (collectively with the

10  '926 patent, "the AudioFAX patents").   Following a negotiation and acquisition by

11  j2, on February 17, 2005, AudioFAX assigned the AudioFAX patents to Catch

12  Curve, one of j2's wholly-owned litigation subsidiaries that was created specifically

13  to hold the AudioFAX patents.

14       109.   j2's acquisition of the AudioFAX patents occurred while the '132

15  patent application was still pending and prior to the reexamination of the '688

16  patent.  Because j2 was already aware that the AudioFAX patents potentially read

17  onto and were related to its system, at a minimum, j2 should have disclosed the

18  AudioFAX patents to the PTO after it purchased these patents, i.e., during the

19  prosecution of the '132 patent and during the prosecution of the '688 patent

20  reexamination.   j2's failure to disclose this material information with intent to

21  deceive the PTO also constitutes, and is part of its pattern and practice of,

22  inequitable conduct before the PTO.

23       110.   j2 is also the assignee for, was aware of and had in its possession, a

24  number of other patents that disclose various aspects of the claims of the '688

25  patent and the '132 patent.  For example, j2 acquired U.S. Patent Nos. 5,870,549;

26  6,549,612; 6,693,729; and 6,707,580 all before the '688 reexamination prosecution

27  closed and certificate was issued.  These references relate to that which is embodied

28  in the statement of grant by the examiner, as well as the examiner's articulation of

1   the novelty of the '688 patent.    The references were thus material to the

2   reexamination and patentability of the '688 patent, yet j2 purposely and knowingly

3   failed to disclose this material information with intent to deceive the PTO.   j2's

4   failure to disclose this material information with intent to deceive the PTO also

5   constitutes, and is part of its pattern and practice of, inequitable conduct before the

6   PTO.

7        111.   Therefore, j2 has committed inequitable conduct in connection with

8   the '688 patent and the '132 patent as well as the '638 patent, rendering them

9   unenforceable.

10                      **FOURTH CLAIM FOR RELIEF**

11          **(Tortious Interference with Prospective Business Advantage)**

12        112.  Defendants incorporate by reference the preceding paragraphs as

13   though fully set forth herein.

14        113.   OpenText and EasyLink sell fax-to-email products and services, that

15   is, products and services that allow a customer's employees to send faxes as

16   electronic messages directly from their existing email accounts, without having to

17   use a fax machine, scan documents, or convert documents or text into a particular

18   format before sending.

19        114.   In particular, EasyLink sells a fax-to-email service called Fax2Mail.

20   OpenText has acquired EasyLink and is successor-in-interest to EasyLink.

21        115.   j2 is headquartered in Los Angeles, California, and offers a fax-to-

22   email service under the brand eFax.  j2 is aware, and indeed, has contended that its

23   eFax fax-to-email service competes for customers with OpenText's and EasyLink's

24   fax-to-email products and services, including EasyLink's Fax2Mail service.

25        116.   OpenText's and EasyLink's business model includes partnering with

26   third parties to market and resell software and services, such as Fax2Mail.  One of

27   EasyLink's and OpenText's partners is Advantage Technologies.

28

117.   Intermedia.net, Inc. ("Intermedia") is a provider of cloud computing services to small and mid-sized business with headquarters located in Mountain View, California, and is a potential and prospective customer of EasyLink and OpenText.

118.   Advantage Technologies has communicated with Intermedia regarding Intermedia's interest in offering fax-to-email services to its clients, and its potential use of EasyLink's Fax2Mail.

119.   During September 2012, a representative or representatives of j2/eFax claimed to Intermedia that j2 owns patents that cover fax-to-email and web fax services, and that as a result of the patents no one other than eFax may legally provide fax-to-email and web fax services.

120.   On information and belief, j2 was aware of Intermedia's potential purchase of Fax2Mail when its statements were made, and j2's communication to Intermedia was directed to and received in California, and was intended to affect commerce in California.

121.   The statement made by j2 to prospective EasyLink and OpenText customer Intermedia was an intentional and fraudulent misrepresentation, in that j2 knew the statement was false when made, and made the false statement with the intent to induce Intermedia to purchase its own services and to deprive OpenText and EasyLink of the Intermedia business opportunity.

122.   j2's statement was false because, although j2's fax-to-mail patents, the '688 and '132 patents, are directed to certain network configurations when providing those services, they do not and could not cover all ways of providing fax-to-email services, nor could they reasonably be construed to cover all ways of providing fax-to-email services.

123.   For example, the '688 and '132 patents are limited to a service using "processing servers," each of which must be connected to "outbound resources" and to a separate "database server," and could not reasonably be construed to cover

1   any system that did not meet those limitations.  Moreover, each processing server

2   must store messages received over a separate, external packet-switched network,

3   and must validate the user sending each message using account information stored

4   on the separate database server, then determine which of the multiple outbound

5   resources it will assign the message to be sent through.  Finally, the assigned

6   outbound resources, rather than the processing servers or some other element of the

7   service, must be where the message is converted into fax-machine-readable format.

8   The patents could not reasonably be construed to cover systems that use different

9   methods and configurations.  *See* Exhibit A ('688 patent at 14:35-58, 15:33-52,

10  16:42-63); Exhibit B ('132 patent at 13:1-21, 14:6-19, 14:28-16:9)

11       124.  j2 does not, in fact, believe that its patents cover all ways of providing

12  fax-to-email services.    j2 contends,

13

14

15

16

17       125.  Intermedia has not purchased Fax2Mail services from EasyLink or

18  OpenText,   on   information   and   belief   in   reliance   on   j2's   intentional

19  misrepresentation that no other company than j2/eFax can legally provide email-to-

20  fax services.

21       126.  j2's intentional misrepresentation to Intermedia has harmed EasyLink

22  and OpenText by causing the loss of their prospective business relationship with

23  Intermedia and with all other customers or prospective customers to whom j2 has

24  made the same or substantially similar misrepresentations.

### FIFTH CLAIM FOR RELIEF

**(Unfair Competition under Cal. Bus. & Prof. Code § 17200)**

27       127.  Defendants incorporate by reference the preceding paragraphs as

28  though fully set forth herein.

1    128.   j2's conduct described above in the Fourth Claim for Relief constitutes

2    a business act and practice that is unfair, unlawful and fraudulent within the

3    meaning of California Business and Professions Code § 17200.

4    129.   Consumers of email-to-fax services are likely to be deceived by

5    statements such as that made by j2 to Intermedia because such consumers lack

6    information and expertise regarding the nature and scope of patent rights and the

7    progress and positions taken in litigation relating to j2's patents.

8    **EXCEPTIONAL CASE 35 U.S.C. § 285**

9    130.   In light of j2's repeated and knowing violations of its Duty of Candor

10   in multiple patent prosecutions and reexamination spanning decades, culminating in

11   j2's egregious destruction of the best evidence of the functionality of its prior art

12   products during the pendency of litigation in which j2 was asserting these very

13   patents, this case is exceptional as defined by 35 U.S.C. § 285, and the Defendants

14   are entitled to their attorneys fees and costs in defending this action.

15   **PRAYER FOR RELIEF**

16   WHEREFORE, Defendants and Counter-Claimants ask the Court to enter

17   judgment in its favor and grant the following relief:

18   A.   Dismissing, with prejudice, the entirety of j2's Complaint;

19   B.   Denying all remedies and relief sought in j2's Complaint;

20   C.   Declaring that the Defendants have not infringed, and are not

21   infringing any valid and enforceable claim of either the '688 patent, the '132

22   patent, the '066 patent, or the '638 patent, either directly or indirectly,

23   literally or under the doctrine of equivalents, and that the Defendants have

24   not contributed to, nor induced infringement thereof;

25   D.   Declaring the claims of the '638 patent, the '688 patent, the '132

26   patent and the '066 patent to be invalid and void in law;

27   E.   Declaring that the '638 patent, the '688 patent and the '132

28   patent were procured by way of inequitable conduct and/or fraud upon the

1    United States Patent and Trademark Office and are thus unenforceable and

2    void in law;

3         F.     Awarding Defendants compensatory damages in an amount to

4    be proven at trial for j2's tortious interference with prospective business

5    advantage and damages for j2's unfair competition;

6         G.     Finding this to be an exceptional case and awarding the

7    Defendants their costs, attorneys' fees, and expenses pursuant to 35 U.S.C.

8    § 285;

9         H.     Awarding the Defendants exemplary and punitive damages for

10   j2's repeated fraud upon and inequitable conduct before the United States

11   Patent and Trademark Office and its litigation misconduct and its tortious

12   interference with Defendants' prospective business advantage; and

13        I.     Granting all such other and further relief as the Court may deem

14   just and proper.

1

2    Dated:  October 11, 2012                      By: _/s/ David J. Palmer_____

3                                                 Grant Kinsel (Bar No. 172407)
4                                                 gkinsel@perkinscoie.com
                                                  **PERKINS COIE LLP**
5                                                 1888 Century Park East, Suite 1700
                                                  Los Angeles, CA 90067-1721
6                                                 Telephone:  310.788.9900
                                                  Facsimile:  310.788.3399
7

8                                                 Timothy J. Carroll (pro hac vice)
                                                  tcarroll@perkinscoie.com
9                                                 Matthew F. Carmody (pro hac vice)
                                                  mcarmody@perkinscoie.com
10                                                **PERKINS COIE LLP**
11                                                131 South Dearborn Street, Suite
                                                  1700
12                                                Chicago, IL 60603
                                                  Telephone:  312.324.8400
13                                                Facsimile:  312.324.9400

14                                                David J. Palmer (Bar No. 217901)
15                                                dpalmer@perkinscoie.com
                                                  **PERKINS COIE LLP**
16                                                2901 N. Central Avenue, Suite 2000
                                                  Phoenix, AZ  85012
17                                                Telephone:  602.351.8000
                                                  Facsimile:  602.648.7036
18

19                                                _Attorneys for Defendants_
                                                  _CAPTARIS INC. and OPEN TEXT_
20                                                _CORPORATION_

21

22

23

24

25

26

27

28

1

## DEMAND FOR JURY TRIAL

2    The Defendants demand trial by jury on all issues so triable.

3

4

Dated:  October 11, 2012

5
By: */s/ David J. Palmer*

6    Grant Kinsel (Bar No. 172407)
     gkinsel@perkinscoie.com
7    **PERKINS COIE LLP**
     1888 Century Park East, Suite 1700
8    Los Angeles, CA 90067-1721
     Telephone:  310.788.9900
9    Facsimile:  310.788.3399

10

11   Timothy J. Carroll (pro hac vice)
     tcarroll@perkinscoie.com
     Matthew F. Carmody (pro hac vice)
12   mcarmody@perkinscoie.com
     **PERKINS COIE LLP**
13   131 South Dearborn Street, Suite
     1700
14   Chicago, IL 60603
     Telephone: 312.324.8400
15   Facsimile: 312.324.9400

16

17   David J. Palmer (Bar No. 217901)
     dpalmer@perkinscoie.com
18   **PERKINS COIE LLP**
     2901 N. Central Avenue, Suite 2000
19   Phoenix, AZ  85012
     Telephone: 602.351.8000
20   Facsimile: 602.648.7036

21

22   *Attorneys for Defendants*
     *CAPTARIS INC. and OPEN TEXT*
23   *CORPORATION*

24

25

26

27

28

# Exhibit A

Exhibit 1 Page -42-

US006597688B2

(12) **United States Patent**
Narasimhan et al.

(10) Patent No.: **US 6,597,688 B2**
(45) Date of Patent: *Jul. 22, 2003

(54) **SCALABLE ARCHITECTURE FOR TRANSMISSION OF MESSAGES OVER A NETWORK**

(75) Inventors: **Anand Narasimhan**, Beverly Hills, CA (US); **Yaacov Shemesh**, Los Angeles, CA (US); **Amit Kumar**, Los Angeles, CA (US)

(73) Assignee: **j2 Global Communications, Inc.**, Hollywood, CA (US)

( * ) Notice: This patent issued on a continued prosecution application filed under 37 CFR 1.53(d), and is subject to the twenty year patent term provisions of 35 U.S.C. 154(a)(2).

Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/097,307**

(22) Filed: **Jun. 12, 1998**

(65) **Prior Publication Data**

US 2002/0181496 A1 Dec. 5, 2002

(51) Int. Cl.$^7$ ............................................... H04L 12/56
(52) U.S. Cl. ...................... 370/353; 370/465; 370/355; 370/356; 379/220.01
(58) Field of Search ................................. 370/237, 242, 370/252, 352, 353, 360, 389, 401, 465; 379/112, 114, 200, 220; 709/206, 228

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,941,170 A | 7/1990 | Herbst | |
| 5,193,110 A | 3/1993 | Jones et al. | |
| 5,339,156 A | 8/1994 | Ishii | |
| 5,406,557 A | * 4/1995 | Baudoin | 370/61 |
| 5,487,100 A | 1/1996 | Kane | |
| 5,604,788 A | 2/1997 | Tett | |
| 5,608,786 A | 3/1997 | Gordon | |
| 5,675,507 A | 10/1997 | Bobo, II | |
| 5,712,907 A | 1/1998 | Wegner et al. | |
| 5,740,231 A | 4/1998 | Cohn et al. | |
| 5,742,668 A | 4/1998 | Pepe et al. | |
| 5,742,905 A | 4/1998 | Pepe et al. | |

| | | | |
|---|---|---|---|
| 5,758,088 A | 5/1998 | Bezaire et al. | |
| 5,765,033 A | 6/1998 | Miloslavsky | |
| 5,812,786 A | * 9/1998 | Seazholtz et al. | 395/200.63 |
| 5,870,454 A | 2/1999 | Dahlen | |
| 5,999,594 A | 12/1999 | Mizoguchi et al. | |
| 5,999,965 A | * 12/1999 | Kelly | 709/202 |
| 6,025,931 A | 2/2000 | Bloomfield | |
| 6,073,165 A | * 6/2000 | Narasimhan et al. | 709/206 |
| 6,208,638 B1 | * 3/2001 | Rieley et al. | 370/354 |
| 6,215,858 B1 | 4/2001 | Bartholomew et al. | |
| 6,246,983 B1 | 6/2001 | Zou et al. | |
| 6,259,533 B1 | 7/2001 | Toyoda et al. | |
| 6,263,064 B1 | 7/2001 | O'Neal et al. | |
| 6,330,079 B1 | 12/2001 | Dugan et al. | |
| 6,339,591 B1 | 1/2002 | Migimatsu | |
| 6,341,160 B2 | 1/2002 | Tverskoy et al. | |
| 6,356,356 B1 | 3/2002 | Miller, Jr. et al. | |

OTHER PUBLICATIONS

L. Orozco–Barbosa, D. Makrakis, C.H. Yang, and N.D. Georganas, Design and performance evaluation of intelligent multimedia services, Computer Communications 20 (1997) pp. 219–232.*

* cited by examiner

*Primary Examiner*—Hassan Kizou
*Assistant Examiner*—Thai Hoang
(74) *Attorney, Agent, or Firm*—Blakely Sokoloff Taylor & Zafman

(57) **ABSTRACT**

A system for supporting a message delivery service, a method for supporting such a service and a machine accessible medium containing program data for implementing such a system. A number of processing servers are coupled to communicate with a number of outbound resources and a database server over an internal packet-switched data network. The database server contains account information on customers of the service. Request messages received from a customer over an external packet-switched data network are stored in a queue of a processing server. A router filter obtains a request message from the queue and validates a customer associated with the request message, after accessing the database server. A determination is made as to which of the multiple outbound resources to assign the request message. Each of these resources is capable of converting an input request message into a format capable of being received by a fax machine over a telephone network.

**27 Claims, 8 Drawing Sheets**



Exhibit 1 Page -43-



# FIG. 1
## (PRIOR ART)

Exhibit 1 Page -44-



FIG. 2

Exhibit 1 Page -45-



**FIG. 3**

Exhibit 1 Page -46-



FIG. 4A

Exhibit 1 Page -47-

Case 2:09-cv-04150-DDP-AJW   Document 337-1   Filed 10/11/12   Page 39 of 73   Page ID #:7664



FIG. 4B

Exhibit 1 Page -48-



**FIG. 5**

Exhibit 1 Page -49-



FIG. 6

Exhibit 1 Page -50-



FIG. 7

Exhibit 1 Page -51-

US 6,597,688 B2

1

# SCALABLE ARCHITECTURE FOR TRANSMISSION OF MESSAGES OVER A NETWORK

## BACKGROUND OF THE INVENTION

The present invention relates to the field of message receipt/transmission and delivery using computer, phone, wireless and other communications networks. Specifically, the present invention relates to the transmission of e-mail messages which may be text only, text plus an audio file, text plus a video file, text plus a fax file or any combination thereof to a phone, pager or fax machine or other receiving device suitable for the message content, over appropriate communications networks using an architecture which enables easy expansion to handle additional message traffic as well as to connect to additional communications networks, including networks which do not presently exist which may become available in the future.

## DESCRIPTION OF RELATED ART

Voice and data communications systems such as the public switched telephone network (PSTN) are currently used to transfer image and text data transmitted by facsimile ("fax") machines in addition to the normally carried voice traffic. These faxed images are usually transmitted through the PSTN and received for printout or storage of the image on a destination fax machine or computer for the use by the recipient.

In U.S. Pat. No. 6,208,638 entitled Method and Apparatus for Transmission and Retrieval of Facsimile and Audio Messages Over a Circuit or Packet Switched Network, it is disclosed that to provide for the receipt and transmission of audio and fax information by a first user over a circuit switched network such as the public switched telephone network (PSTN) to a second user over a packet switched network such as the Internet, a communications server is connected both to the circuit switched network and a packet switched network.

The communications server contains resources to receive and process incoming audio and facsimile calls from the circuit switched network into a format suitable for transmission over the packet switched network to the second user's address. In addition, a link is first determined between the second user's address on the circuit switched network and the second user's address on the packet switched network, and then an appropriate route to the second user's address on the packet network is determined. With the system being maintained in a distributed and redundant fashion, reliable receipt and transfer of all messages is ensured.

However, the architecture utilized as described in U.S. Pat. No. 6,208,638 is not easily scalable to handle increasingly higher levels of message traffic or to easily connect to networks in addition to the PSTN and the Internet. FIG. 1 shows the essence of the architecture of U.S. Pat. No. 6,208,638. An e-mail message is passed to an outbound resource 11 (communications server 550 in U.S. Pat. No. 6,208,638) which converts the e-mail message to a fax format or to audio for transmission to a fax machine or telephone connected to the PSTN. A database 13 stores customer information necessary for processing of messages

2

(an unnumbered part of communications server 150 in U.S. Pat. No. 6,208,638 which is also contained in database server 195 in U.S. Pat. No. 6,208,638). After processing of an e-mail message by outbound resource 11, a fax or voice mail message is sent over the PSTN or more generally, a generalized switched telephone network (GSTN) which includes cellular telephone networks as well as the PSTN. Optionally, a pager message may also be sent informing a user of the fax which has been sent or availability of a voice mail message as described in U.S. Pat. No. 6,073,165 entitled Processing and Forwarding Messages From a Computer Network to a Forwarding Service.

## SUMMARY OF THE INVENTION

A system for supporting a message delivery service is described that has a highly scalable architecture. Multiple processing servers are each coupled to communicate with multiple outbound resources and with a database server over an internal packet-switched data network. The database server contains account information on customers of the service. Request messages received from a customer over an external packet-switched data network (such as the Internet) are stored in a queue. The queue is polled for pending requests and a request message is obtained therefrom. A customer associated with this obtained request message is validated after accessing the account information in the database server. An outbound resource is assigned to this request message, where each of these resources is capable of converting an input request message into a format capable of being received by a fax machine over a telephone network.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a block diagram of a prior art architecture which performs the functions, but not the scalability of the architecture of the present invention.

FIG. 2 is a block diagram illustrating the architecture of the present invention.

FIG. 3 is a block diagram showing the data/control flow through message queue 21, router/filter 23 and database 27.

FIG. 4 (4a and 4b) is a flow diagram of the processing performed by router/filter 23.

FIG. 5 is a system diagram of a network containing a message server.

FIG. 6 is a block diagram illustrating the message server.

FIG. 7 is a flow diagram illustrating some operations.

## DETAILED DESCRIPTION OF THE INVENTION

The present invention provides a method and apparatus for allowing the receipt and transmission of audio, video and fax information between a circuit switched network and a packet switched network. For purposes of explanation, specific embodiments are set forth to provide a thorough understanding of the present invention. However, it will be understood by one skilled in the art, that the invention may be practiced without these details. Further, although the present invention is described through the use of circuit switched and packet switched networks, most, if not all, aspects of the invention apply to all networks in general. Moreover, well-known elements, devices, process steps and

Exhibit 1 Page -52-

US 6,597,688 B2

3

the like are not set forth in detail in order to avoid obscuring the present invention.

Referring now to FIG. 2, e-mail messages for a customer are sent to/through an external data network 15 (e.g., the Internet) and routed to an appropriate SMTP/HTTP (or SHTTP) server 17 as determined by a domain name server (DNS) 18 according to well known techniques. The e-mail message may be a text message or it may include a file, the content of which may be audio, video or bitmapped (e.g., a fax) or other data. Again, the techniques for creating and sending e-mail messages with these characteristics are well known.

A processing server 19, which includes a message queue 21 and a router/filter 23 first verifies that the message is from or is to a customer using information in database 27. After successful verification, the message is broken into fragments (in the case of files with multiple attachments) and written to message queue 21. Router/filter 23 obtains messages from the message queue and handles least call routing/billing/prioritization/filtering of messages. Filtering is primarily for notification messages for pager delivery. After billing verification and determination of a least cost route, the message is assigned to one or more outbound resources 31 for

4

delivery to the intended recipient by a method or methods selected by the customer as previously recorded in database 27.

In the case of faxes, the outbound resource is a server which dials the destination fax number and sends the fax.

In the case of voice messages, the outbound resource is a server which dials the destination telephone number and plays the voice message.

In the case of notification messages, the outbound resource is a server which dials out to the paging terminal or delivers the notification message through any appropriate paging gateway.

After the message (in whatever form) has been delivered, a receipt with details and an error log (if any) is sent back via a secure protocol to the message queue 21.

The receipt/error log messages are then processed by the router/filter which interfaces with a billing system (not shown) for customer account update.

FIG. 3 is a block diagram showing the data/control flow through message queue 21, router/filter 23 and database 27 using information contained in the following tables as explained with reference to FIGS. 4a and 4b.

TABLE 1

| Message Queue Table | |
|---|---|
| MESSAGE_ID | This is a unique number assigned to each message that arrives in the system. |
| RESOURCE_ID | Unique number assigned to each Outbound Resource |
| RESOURCE_TYPE | Each Resource is identified by the type of messages it can deliver (e.g., FAX, VOICE, NOTIFY, etc.). |
| RESOURCE_ADDRESS | Location of the Resource (such as IP address) |
| MESSAGE_TO_EMAIL_ADDRESS | To: address of the message |
| MESSAGE_FROM_EMAIL_ADDRESS | From: address of the message |
| MESSAGE_LOCATION | Location of actual message on the Message Queue 21 |
| MESSAGE_SIZE | Size of the message in bytes |
| MESSAGE_PRIORITY | Priority of the message (e.g., low, medium, high) |
| MESSAGE_CREATION_DATE | Timestamp identifying the date/time that the message was received by the system |
| MESSAGE_EXPIRY_DURATION | Amount of time after which the message becomes stale |
| MESSAGE_SCHEDULED_DATE | Scheduled delivery timestamp for the message |
| MESSAGE_STATUS | Current status of the message (Active, Pending, Sent, etc.) |
| MESSAGE_ESTIMATED_COST | Estimated cost for the delivery of the message |
| CUSTOMER_KEY | Unique number identifying the customer in the database |
| MESSAGE_PART_OF_BROADCAST | Flag identifying if the message is part of a larger broadcast list waiting to be delivered |
| BROADCAST_ID | Unique number identifying a broadcast list |
| COVERPAGE_ID | Unique number identifying a coverpage (if any) for a fax |
| MESSAGE_SUBJECT | Subject line of the message to be delivered |
| MESSAGE_DURATION | Duration of the message (delivery time of fax, or delivery time for a voice message, etc.) |
| MESSAGE_RATE | Rate for message delivery (dollars per second, etc.) |
| MESSAGE_SEND_DATE | Actual timestamp identifying when the message was delivered |
| MESSAGE_REMOTE_CSID | Identifier of the fax machine to which a FAX message was delivered |
| MESSAGE_TYPE | Type of message (e.g., FAX, VOICE, NOTIFICATION, etc.) |
| RESOURCE_COMMUNICATION_TYPE | Protocol used to communicate with the resource (HTTP, SHTTP, etc.) |
| MESSAGE_LANGUAGE_CODE | Language used for delivery of a receipt or response, based on settings in the customer table |
| MESSAGE_PAGES | Number of pages of a message (used primarily for a fax) |

Exhibit 1 Page -53-

US 6,597,688 B2

5        6

### TABLE 2

| | File Type Table |
| --- | --- |
| FILETYPE_MESSAGE_TYPE | Identifier of a message type (FAX, VOICE, etc.) |
| FILETYPE_RESOURCE_TYPE | Identifier to determine a resource that can handle a particular file type |
| FILETYPE_EXTENSION | The filename extension that identifies a file type (e.g., WAV, TIF, JFX, AU, GSM, etc.) |

### TABLE 3

| | Customer Table |
| --- | --- |
| CUSTOMER_KEY | Unique number identifying a customer in the database |
| FIRSTNAME | First name of customer |
| LASTNAME | Last name of customer |
| COMPANY | Company name of customer |
| ADDRESSLINE1 | Company address |
| ADDRESSLINE2 | Company address |
| CITY | Company city |
| MAILREGION | Company state or equivalent |
| MAILCODE | Zipcode or equivalent |
| COUNTRY | Company country |
| WORKNUMBER | Customer work phone number |
| HOMENUMBER | Customer home phone number |
| EMAILADDRESS | Email address of customer |
| COLLECTIONMETHOD | Collection method such as Credit card, Debit, etc. |
| BILLTYPE | e.g., Customer, Demo, free, corporate, etc. |

### TABLE 5

| | Notification Table |
| --- | --- |
| CUSTOMERKEY | Unique number identifying a customer in the database |
| PAGERTYPECODE | Code to determine the kind of pager service |
| BBSNUMBER | Modem number for pager notification delivery, based on the pager type |
| PAGERNUMBER | Identifier number of the pager unit |
| PIN | PIN code for the pager unit |
| DISPLAYTYPE | Display type of the pager (numeric, alphanumeric, etc.) |

### TABLE 6

| | Response—email Table |
| --- | --- |
| RESPONSE_ID | Unique ID for a response/receipt message to be sent to a customer |
| RESPONSE_SUBJECT | Subject line of the response message |
| RESPONSE_FROM_EMAIL | From line of the response message |
| RESPONSE_BODY | Actual text of the response message |

### TABLE 7

| | Resource Table |
| --- | --- |
| RESOURCE_ID | Unique identifier for the resource |
| RESOURCE_TYPE | Type of resource (FAX, VOICE, etc.) |
| RESOURCE_STATUS | Status of resource (Active, Inactive, etc.) |
| RESOURCE_QUEUE_STATUS | Status of the Queue, number of messages in queue |
| RESOURCE_TIME_ZONE | Time zone for the resource |
| RESOURCE_QUEUE_MAX | Maximum size of the resource queue |
| RESOURCE_ADDRESS | Address of the resource (IP address, etc.) |
| RESOURCE_NAME | Name of the resource |
| RESOURCE_EXPIRY_DURATION | Expiry duration for any message sent to the specified resource |
| RESOURCE_QUEUE_IN_STATUS | Number of messages waiting to be delivered by the resource |
| RESOURCE_COMMUNICATION_TYPE | Method used to communicate with resource (HTTP, SHTTP, etc.) |

### TABLE 3-continued

| | Customer Table |
| --- | --- |
| STATUS | Status of customer, Active, Inactive, etc. |
| LANGUAGECODE | Language of customer, English, German, etc. |
| CURRENCYCODE | Currency for billing the customer, U.S. Dollars, Pound Sterling, etc. |

### TABLE 4

| | Currency Table |
| --- | --- |
| FORMAT | Currency label |
| CURRENCY_SYMBOL | Symbol for currency |

### TABLE 8

| | Resource Rates Table |
| --- | --- |
| RESOURCE_ID | Unique identifier for the resource |
| RESOURCE_PREFIX | Any digits to be dialed before an actual number |
| RESOURCE_CITY_NAME | Name of destination city for the message to be delivered |
| RESOURCE_PROVIDER_RATE | Rate for a particular city (dollars per second, etc.) |
| RESOURCE_MAX_DIGITS | Max number of digits allowed to be dialed |
| RESOURCE_AREA_CODE | Area code for the particular city |

FIGS. 4a and 4b are a flow diagram of the processing performed by router/filter 23 using Tables 1–8. When a message is received it is placed into message queue 21 which is simply a storage area, the specifics of which,

Exhibit 1 Page -54-

US 6,597,688 B2

7

including the mechanism for placing the message into the queue are well known. Certain details concerning the message are also stored in a message queue table (Table 1). In step 41, router/filter, which is a computer program running on processing server 19, polls the message queue table for pending requests as determined by the existence of an active message in the message status field. If no message is found, after a system defined delay, the message queue table is again polled (step 43). Once a message has been found in the table, processing continues with step 45 by determining the message type using the message_type field in Table 1 and the file type information in Table 2. The customer is then validated using information in Table 3 in step 47. In step 49, currency information for the customer is obtained from Table 4. The message is then filtered for possible pager notification using the information in Table 5 in step 51. In step 53, Table 7 is used to check for available resources to deliver the message. In step 55, the rates of available resources are checked to determine the least cost resource using Table 8. Then in step 59, the message is delivered using the determined least cost resource. After the message has been delivered, or after an error in the delivery has occurred, in step 59, a response/receipt is composed using Table 6. In step 61, the response or receipt is delivered to the sender. The system then begins the process over again at step 41.

As noted above outbound resource 31 is equivalent to communications server 150 as described in U.S. Pat. No. 6,208,638. The modifications made to outbound resource to enable it to operate in a system having an architecture as described herein are as follows.

These changes will be described with reference to the message structure of received messages.

Message Structure

Each field has a value following an '=' sign and is terminated by a newline character. The exception to this is the "Message" field where a newline immediately follows the '=' sign and the actual message follows on the next line.

The fields of a message are as follows:

Password=
MessageID=
MessageStatus=
MessageSentTimeStamp=
MessageDuration=
MessageLength=
MessageRemoteCSID=
MessageSourceCSID=
MessageAttachStatus=
MessageDestination=
ResourceID=
ResourceStatus=
ResourceLastCommTimeStamp=
ResourceExpiryDuration=
ResourceQueueInStatus=
ResourceQueueOutStatus=
ResourceChannelMax=
ResourceChannelStatus=
MessageBoundary=
Message=

8

In the following explanation of the above fields, the text in brackets at the end indicates the entity providing the value for the field in the forward/reverse direction (i.e., from router/filter 23 (RF) to outbound resource 31 (RESOURCE), and from RESOURCE to RF, respectively). "NA" indicates that no value is applicable, and the text "NA" is used to populate the field. "Same" indicates that the same value is used in the reverse direction, i.e, the RESOURCE does not modify the value; it only echoes the value it receives in that field.

Password—There is a fixed password pair for each RESOURCE and RF combination. RESOURCE stores the RF password in a flat text password file in a directory (jfaxom), and RF stores the RESOURCE password in the database. (RF/RESOURCE).

MessageID—Unique ID, per message, generated by RESOURCE. (RESOURCE/Same).

MessageStatus—Code indicating current status of the message. See Status codes below. (RF/RESOURCE)

MessageSentTimeStamp—Time stamp indicating date/time the message was delivered to the final destination by RESOURCE. (NA/RESOURCE)

MessageDuration—Time (in seconds) to transmit message from RESOURCE. (NA/RESOURCE)

Messagelength—Number of pages transmitted by RESOURCE. (NA/RESOURCE)

MessageRemoteCSID—called subscriber identification (CSID) of fax machine to which message was transmitted. (NA/RESOURCE)

MessageSourceCSID—Source CSID. This may be customized per customer. (RF/Same)

MessageAttachStatus—Value of "A" indicates a message is attached for delivery. (RF/RESOURCE)

MessageDestination—Destination phone number. (RF/Same)

ResourceID—Unique ID, per resource, stored in the database. (RF/Same)

ResourceStatus—Code indicating the current status of the resource, i.e., whether it is active or not. RF uses this to determine whether further messages should be sent to RESOURCE for delivery. See Status codes below. (NA/RESOURCE)

ResourceLastCommTimeStamp—Date/time of last communication between RF and RESOURCE. (RF/RESOURCE)

ResourceExpiryDuration—Life of message (in minutes) on RESOURCE. If a message has not been delivered to the final destination by RESOURCE within this amount of time, the message is considered "expired" and is discarded.

ResourceQueueInStatus—Number of messages waiting to be processed in an Inbox directory on RESOURCE. (NA/RESOURCE)

ResourceQueueOutStatus—Number of messages waiting to be processed in an Outbox directory on RESOURCE. (NA/RESOURCE)

ResourceChannelMax—Number of channels available for use on RESOURCE. (NA/RESOURCE)

ResourceChannelStatus—Channel activity status, e.g., 0000000111000001, where 0's indicate an idle channel and 1's indicate a busy channel. (NA/RESOURCE)

MessageBoundary—Text for MIME boundary. (RF/NA)

Message—Actual MIME message sent by RF. If MessageAttachStatus=NA, no message follows this tag. All fields are NA if not used.

Date fields are expressed in MMDDYYhhmmss format.

Exhibit 1 Page -55-

US 6,597,688 B2

9

Resource Status Codes are:

A—Active

I—Inactive

Message Status Codes are:

P—Pending

H—On Hold

D—Deferred

R—Ready for sending to RESOURCE

X—Exchanged, i.e., sent to RESOURCE but not acknowledged by it.

A—Sent to RESOURCE and acknowledged by it.

S—Sent (i.e., receipt for final delivery received from RESOURCE)

Normal sequence for Message delivery by RESOURCE is:

RF receives a request in its queue (message queue 21).

RF sends the message to RESOURCE.

RESOURCE gets message, authenticates password, and creates a new message in the Inbox directory.

RESOURCE acknowledges receipt of message.

RESOURCE processes the message in Inbox (MessageStatus=A, MessageAttachStatus=A).

RESOURCE moves message to a Process directory for further processing.

RESOURCE finishes processing message and delivers it to final destination.

RESOURCE removes the message from the Process directory.

RESOURCE creates a message in Outbox directory. (MessageStatus=S). If a "reply message" is to be delivered to the original sender, MessageAttachStatus=A, else MessageAttachStatus=NA. MessageID remains the same in either case.

RESOURCE delivers receipt (with "reply message," if applicable) to RF.

RF receives the message and puts it in the Queue for database processing.

Processing server 19 with the above described functionality may be implemented using readily available systems such as a Windows NT server or a UNIX server. Database 27 may be implemented as a database server using readily available systems such as a Windows NT server or a UNIX server running, for example a SQL database.

What follows is a detailed description of FIGS. 5–7 which set forth a method and apparatus for allowing the receipt and transmission of audio and fax information between a circuit switched network and a packet switched network, as described in U.S. Pat. No. 6,208,638. For purposes of explanation, specific embodiments are set forth to provide a thorough understanding of the present invention. However, it will be understood by one skilled in the art, from reading this disclosure, that the invention may be practiced without these details. Further, although the system is described through the use of circuit switched and packet switched networks, most, if not all, aspects apply to all networks in general.

FIG. 5 contains a block diagram illustrating an embodiment of a system comprising a communications server 550 connected to a circuit switched network 530 and a wide area network (WAN) 580. In an embodiment, the circuit switched network 530 is a circuit switched network such as the PSTN

10

while WAN 580 is a packet switched network such as the Internet. It is to be noted that circuit switched network 530 can also be a network such as the generalized switched telephone network (GSTN), which encompasses PSTN networks, cellular telephone networks, and the other networks with which they are in communication.

Communications server 550 is connected to circuit switched network 530 via a switch 540 and to WAN 580 through the use of a router 585. As described in further detail below, in an embodiment, switch 540 and router 585 are interfaced to communications server 550 using two separate hardware interfaces. In an alternate embodiment, switch 540 and router 585 can be interfaced to communications server 550 through the use of one hardware unit.

Connected to circuit switched network 530 is both a telephone unit 510 and a facsimile unit 520. Telephone unit 510 is a standard telephone capable of converting audio signals into electrical signals suitable for transmission over circuit switched network 530. Similarly, facsimile unit 520 is a standard facsimile machine capable of transmitting and receiving facsimile messages over circuit switched network 530. Each of these devices can be connected to circuit switched network 530 using either wired or wireless technology.

Connected to WAN 580 is a database server 595, a system management unit 597, a mail server 560, and a client 590. Each of these systems communicate with each other and with communications server 550 via WAN 580 using such protocols such as simple network management protocol (SNMP) and hyper-text transport protocol (HTTP)—packetized using a protocol such as the transmission control protocol/internet protocol (TCP/IP).

In an embodiment, each one of database server 595, system management unit 597, mail server 560, and client 590, are stand-alone computers or workstations containing the hardware and software resources to enable operation. In alternate embodiments, the functions provided by each one of database server 595, system management unit 597, mail server 560, and client 590, are provided by any number of computer systems.

In an embodiment, mail server 560 is a server providing e-mail receipt and transmission using a protocol such as the simple mail transfer protocol (SMTP) and post office protocol (POP). Moreover, client 590 is configured to be able to communicate over WAN 580 using SMTP or POP in order to retrieve e-mail from mail server 560 or another suitably configured server.

System management unit 597 communicates with communications server 550 to monitor: (1) the processes on communications server 550; (2) the status of the trunk line connected to communications server 550; and (3) the connection between the various servers connected to WAN 580. As described below, if any processes on communications server 550 or connection to the circuit switched network 530 is interrupted, system management unit 597 can allocate resources, or cause the re-routing of a call or message via one or more redundant resources or connections, ensuring that the call or message is routed to the final destination.

Communications server 550 contains user data needed to receive and route incoming messages received from circuit switched network 530. The same information is also stored

Exhibit 1 Page -56-

US 6,597,688 B2

11

on database server 595. In an embodiment, communications server 550 stores an inbound address, a set of final destination addresses; and an account status for each user. The inbound address corresponds to the telephone number assigned to the user. As further discussed below, the inbound address is the number that a message sender dials on telephone unit 510 or facsimile unit 520 to leave a message for the user. The set of final destination address contain one or more e-mail addresses where the user account status information indicates whether the inbound address is either active or inactive—i.e, whether the user is able to receive messages using the system.

Database server 595 stores a duplicate copy of the inbound address, the set of final destination addresses; and the account status for each user. Database server 595 also stores additional information for each user such as mailing address and billing information which are not used in the operation of the present invention but are note herein for completeness only. Thus, the information that is stored on communications server 550 is a subset of the information that is stored on database server 595, and if communications server 550 were to become inoperable or otherwise unable to handle incoming messages, database server 595 can configure another communications server to accept those calls.

In an embodiment, system management unit 597 is responsible for monitoring the status of communications server 550 and re-assigning the users being handled by communications server 550 if communications server malfunctions or becomes overloaded with incoming calls. In the former case, system management unit 597 would re-assign all users being handled by communications server 550 to another communications server. In the latter case, system management unit 597 would only off-load the only those incoming calls for which communications server 550 does not have the available resources to process.

FIG. 6 is a block diagram of communications server 550 configured in accordance with an embodiment containing a processor 651 coupled to a memory subsystem 653 through the use of a system bus 655. Also coupled to system bus 655 is a network interface 656; a trunk interface 652; and a set of fax/voice processing resources 654. Set of fax/voice processing resources 654 and trunk interface 652 are also coupled to a bus 657.

Bus 657 is a bus that supports time division multiplex access (TDMA) protocols to optimize the flow of real time traffic between set of fax/voice processing resources 654 and trunk interface 652.

Memory subsystem 653 is used to store information and programs needed by communications server 550. The functioning of memory subsystems in computer design are well known to those of ordinary skill in the art and thus will not be further discussed herein.

In an embodiment, trunk interface 652 is a trunk line interface, such as a T-1 or E-1 line, to switch 540 and can handle up to 24 channels of communications. Trunk line signaling is well known to those of ordinary skill in the art of telecommunication and thus will not be further discussed herein except as necessary for describing the invention.

Set of fax/voice processing resources 654 are made up of multiple fax/voice processing cards. Each of these process-

12

ing cards contain processing units which are capable of receiving and transmitting facsimiles according to established protocols, and which are capable of digitizing voice or other audio data, also according to established protocols. In an embodiment, there are three fax/voice processing cards in set of fax/voice processing resources 654, each fax/voice processing card containing eight processing units capable of handling a channel from trunk interface 652. Thus, communications server 550 can communicate on twenty-four channels concurrently.

The storage of destination addresses on both circuit switched network 530 and WAN 580 is controlled by a database located either on communications server 550 or on database server 595. Keeping this information separate from communications server 550 allows communications server 550 to be a resource that can be allocated on demand. Hence, a number of communications servers could be used, along with one or more database servers, to allow a fully redundant and scalable system. In addition, system management unit 597 monitors the status and connection of all the communication and database servers.

FIG. 7 is a flow diagram illustrating the operations of an embodiment of the present invention when a call originating from a source on the circuit switched network 530. For example, either telephone unit 510 or facsimile unit 520 can initiate the call.

In block 700, an incoming call signal is received by communications server 550 from switch 540. The incoming call signal is initiated by telephone unit 510 or facsimile unit 520 over circuit switched network 530 and is routed to communications server 550 via switch 540. Communications server 550 detects the incoming call signal using trunk interface 652. Operation would continue with block 702.

Continuing with block 702, trunk line interface unit 652, in addition to receiving signals to indicate that there is an incoming call from switch 540, also receives signals indicating the circuit destination address of the incoming call. The destination address is captured by trunk interface 652 and is determined by trunk line signaling using mechanisms such as direct-inward-dial, or dual tone multifrequency (DTMF) tones.

Continuing with block 704, to determine whether or not to process the incoming call, processor 651 searches the list of inbound addresses contained in memory subsystem 653 for the destination address. If processor 651 finds the destination address in the inbound address list, processor 651 will then look up the account status for the user who owns the inbound address to determine if the account of that user is a valid user account. In an alternate embodiment, the validation is performed through the use of a database maintained by a separate entity such as database server 595. If the account is found to be inactive, communications server 651 will play a prepared message indicating that the number to which the incoming message was sent is an invalid account.

In block 706, once the validity of the user account has been established, processor 651 will attempt to allocate one fax/voice processing resource from set of fax/voice processing resources 654 and also determine the availability of other resources required for the receipt and processing of the incoming call. These other resources include the processing

Exhibit 1 Page -57-

US 6,597,688 B2

13

capacity of processor 651, the storage capacity of memory subsystem 653.

If it is determined that the appropriate resources are not available, then the call will be routed to a different communications server that is capable of allocating the necessary resources. The routing of calls is accomplished by trunk line signaling via switch 540 and is managed by system management unit 597.

Also, it should be noted that the call will only come from switch 540 to communications server 550 if there are no problems with the line. Otherwise the call will get routed to a different communications server. In an embodiment, fault detection and correction happens in one of two ways. First, on the telephone network side, switch 540 can be set up to independently route a call to another line if it is determined that one of the lines is bad. Second, if communications server 550 detects that the trunk line coming into trunk interface 652 is down, communications server 550 will notify system management unit 597 to reallocate the users for whom communications server 550 is responsible onto another communications server. Thus, system management unit 597 will transfer the duplicate user information contained in database server 595 into a different communications server.

In block 708, communications server 550 "answers" the incoming call by having trunk interface 652 go "off-hook" on the trunk line.

In block 710, if the fax/voice processing resource of set of fax/voice processing resources 654 which is processing the call determines that the incoming call is a fax transmission, then operation will continue with block 712. Otherwise, operation will continue with block 714. For example, if the call is a fax, a fax protocol is initiated, and the fax is received by one of the fax/voice processing resources of set of fax/voice processing resources 654. If the call is a voice call, the voice is recorded by one of the fax/voice processing resources of set of fax/voice processing resources 654.

In block 712, the fax/voice processing resource of set fax/voice processing resources 654 responsible for processing the incoming call will perform the fax transfer and store the incoming message as a temporary file in memory subsystem 653. In an embodiment, the incoming fax is saved into a file which follows the group 3 facsimile file format. Operation will then continue with block 716.

In block 714, where it is determined that the incoming message is an audio message, the fax/voice processing resource of set of fax/voice processing resources 654 allocated to process the call will initiate an audio recording of the incoming voice message. In an embodiment, the audio message is digitized and stored in memory subsystem 653 as a temporary file in a pulse code modulated format. After the incoming call has been digitized and stored, operation will then continue with block 716.

In block 716, trunk interface 652 will terminate the call. Operation will then continue with block 718.

In block 718, the incoming message, which has been stored as a temporary file in memory subsystem 653, is processed by processor 651. In an embodiment, the temporary file is processed according to the type of the incoming call. If the incoming call was a fax transmission, then the temporary file, which has been stored as a group 3 facsimile

14

file, will be converted into a file which follows the tagged image file format (TIFF), or a format that is suitable for transmission over WAN 580. Optionally, the temporary fax file can also be compressed at this stage. If the incoming call was an audio message, then the temporary file would be compressed using a compression scheme such as the scheme defined in the global system for mobile-communications (GSM) standard. In alternate operations, compressing and other processing of the incoming message is performed as the same time the incoming message is being received and being placed in memory subsystem 653.

In block 720, communications server 550 uses the inbound address to determine the set of final destination addresses, which are destinations on WAN 580 (i.e., the packet switched network), to send the processed incoming message. Communications server 550 then sends an electronic mail (e-mail) with the processed incoming message as an attachment to all the destinations in the set of final destination addresses.

For example, the e-mail containing the attachment is transferred to, and stored in, a server such as mail server 560, The e-mail is then retrieved by client 590 whenever the user wishes. In an alternate embodiment, client 590 can retrieve the e-mail directly from communications server 550, without the storing operation of mail server 560.

While the present invention has been particularly described with reference to the various figures, it should be understood that the figures are for illustration only and should not be taken as limiting the scope of the invention. Many changes and modifications may be made to the invention, by one having ordinary skill in the art, without departing from the spirit and scope of the invention.

What is claimed is:

1. A system for supporting a message delivery service, comprising:

a plurality of processing servers each being coupled to communicate with a plurality of first outbound resources and a database server, over an internal packet-switched data network, the database server containing account information on customers of the message delivery service, each processing server implements a router-filter and a message queue,

the message queue to store request messages that are received from a customer of the message delivery service over an external packet-switched data network,

the router-filter to obtain a request message from the queue while polling the queue for pending requests, validate a customer associated with said request message after accessing the account information in the database server, and determine to which of the plurality of first outbound resources to assign said request message,

each of the first resources being capable of converting an input request message into a format capable of being received by a fax machine over a telephone network.

2. The system of claim 1 wherein the internal data network is a private data network.

3. The system of claim 2 wherein the external data network is the Internet.

4. The system of claim 3 wherein the request messages are received from the customers via one of a mail transport protocol server and a hypertext transport protocol server on the Internet.

Exhibit 1 Page -58-

US 6,597,688 B2

15

5. The system of claim 1 wherein the router-filter is to prioritize a plurality of request messages that have been obtained from the queue and that are assigned to an outbound resource.

6. The system of claim 1 wherein the router-filter is to determine which of the plurality of first outbound resources to assign said request message to, based on which resource offers the least cost of delivering said request message.

7. The system of claim 1 wherein the router-filter is to generate an error message that indicates an error in delivering said request message as reported by the outbound resource to which said request message was assigned.

8. The system of claim 1 further comprising:

a plurality of second outbound resources each being capable of converting an input request message into a format capable of being played back to a telephone over a telephone network, wherein the router-filter is to determine to which of the first and second resources said request message is to be assigned, based on a message type of said request matching a capability of one of a first resource and a second resource.

9. The system of claim 1 further comprising:

a plurality of second outbound resources each being capable of converting an input request message into a format capable of being transmitted to a paging terminal over one of (1) a telephone network and (2) a paging gateway over an external packet-switched network, wherein the route-filter is to determine to which of the first and second resources said request message is to be assigned, based on a message type of said request matching a capability of one of a first resource and second resource.

10. An article of manufacture for supporting a message delivery system, comprising:

a machine accessible medium containing data that, when accessed by a machine, cause a plurality of processing servers to communicate with a plurality of first outbound resources and a database server all as part of an internal packet-switched data network, each processing server implements a router-filter and a message queue, the message queue to store request messages that are received from a customer of the message delivery service over an external packet switched data network, the router-filter to obtain a request message from the queue, validate a customer associated with said request message after accessing account information in the database server, and determine which of the plurality of first outbound resources to assign said request message, each of the first resources being capable of converting an input request message into a format capable of being received via a fax machine over a telephone network.

11. The article of manufacture of claim 10 wherein the medium includes further data which, when executed by the machine, cause the internal network to perform as a private data network.

12. The article of manufacture of claim 10 wherein the medium includes further data which allow the request messages to be received from a customer over the Internet.

13. The article of manufacture of claim 12 wherein the medium includes further data which allow the request messages to be received from the customer via one of a mail transport protocol server and a hypertext transport protocol server on the Internet.

14. The article of manufacture of claim 10 wherein the medium includes further data which, when executed by the

16

machine, cause the router-filter to prioritize a plurality of request messages that have been obtained from the queue and that are assigned to an outbound resource.

15. The article of manufacture of claim 10 wherein the medium includes further data which, when executed by the machine, cause the router-filter to determine which of the plurality of first outbound resources to assign said request message to, based on which resource offers the least cost of delivering said request message.

16. The article of manufacture of claim 10 wherein the medium includes further data which, when executed by the machine, cause the router-filter to generate an error message that indicates an error in delivering said request message as reported by the outbound resource to which said request message was assigned.

17. The article of manufacture of claim 10 wherein the medium includes further data which, when executed by the machine, cause one of the plurality of processing servers to be capable of (1) communicating with a plurality of second outbound resources each being capable of converting an input request message into a format capable of being played back to a telephone over the telephone network and (2) determining which of the first and second outbound resources to assign said request message based on a message type of said request message matching the capability of an outbound resource.

18. The article of manufacture of claim 10, wherein the medium includes further data which, when executed by the machine, cause one of the plurality of processing servers to be capable of (1) communicating with a plurality of second outbound resources each being capable of converting an input request message into a format capable of being transmitted to one of (1) a paging terminal over a telephone network and (2) a paging gateway over an external packet-switched network, and (2) determining which of the first and second outbound resources to assign said request message based on a message type of said request message matching the capability of an outbound resource.

19. A method for supporting a message delivery service, comprising:

communicating with a plurality of first outbound resources and a data base server over an internal packet-switched data network, each of the plurality of first outbound resources being capable of converting a request message into a format capable of being received by a fax machine over a telephone network, the database server containing account information on customers of the message delivery service;

obtaining a request message from a message queue, the queue storing a plurality of request messages that are received from customers of the message delivery service and that were sent from an external packet-switched data network;

validating a customer associated with said obtained request message after accessing the account information in the database server; and

determining to which of the plurality of first outbound resources said obtained request message should be assigned.

20. The method of claim 19 wherein the internal data network is a private data network.

21. The method of claim 19 wherein the external data network is the Internet.

Exhibit 1 Page -59-

US 6,597,688 B2

**17**

22. The method of claim 21 wherein the request messages are received from the customers via one of a mail transport protocol server and a hypertext transport protocol server on the Internet.

23. The method of claim 19 further comprising:

prioritizing the delivery of a plurality of request messages that have been obtained from the queue and that are assigned to an outbound resource.

24. The method of claim 19 further comprising:

determining which of the plurality of first outbound resources to assign said obtained request message to, based on which resource offers the least cost of delivering said obtained request message.

25. The method of claim 19 further comprising:

generating an error message that indicates an error in delivering said obtained request message as reported by the outbound resource to which said obtained request message was assigned.

26. The method of claim 19 further comprising communicating with a plurality of second outbound resources each being capable of converting a request message into a format

**18**

being capable of being played back to a telephone over a telephone network; and

determining to which of the plurality of first and second outbound resources said obtained message should be assigned, based on a message type of said request message matching a capability of an outbound resource.

27. The method of claim 19, further comprising:

communicating with a plurality of second outbound resources each being capable of converting an input request message into a format capable of being transmitted to one of (1) a paging terminal over a telephone network and (2) a paging gateway over an external packet-switched network; and

determining to which of the plurality of first and second outbound resources said obtained message should be assigned, based on a message type of said request message matching a capability of an outbound resource.

\*    \*    \*    \*    \*

Exhibit 1 Page -60-

US006597688C1

(12) **EX PARTE REEXAMINATION CERTIFICATE** (6151st)

# United States Patent
Narasimhan et al.

(10) **Number:** US 6,597,688 C1
(45) **Certificate Issued:** Mar. 11, 2008

(54) **SCALABLE ARCHITECTURE FOR TRANSMISSION OF MESSAGES OVER A NETWORK**

(75) Inventors: **Anand Narasimhan**, Beverly Hills, CA (US); **Yaacov Shemesh**, Los Angeles, CA (US); **Amit Kumar**, Los Angeles, CA (US)

(73) Assignee: **J2 Global Communications, Inc.**, Hollywood, CA (US)

**Reexamination Request:**
No. 90/007,472, Mar. 21, 2005

**Reexamination Certificate for:**
Patent No.: 6,597,688
Issued: Jul. 22, 2003
Appl. No.: 09/097,307
Filed: Jun. 12, 1998

(51) **Int. Cl.**
*H04L 12/64* (2006.01)

(52) **U.S. Cl.** ...................... 370/353; 370/465; 370/355; 370/356; 379/220.01

(58) **Field of Classification Search** ....................... None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 4,941,170 A | 7/1990 | Herbst |
| 5,113,496 A | 5/1992 | McCalley et al. |
| 5,193,110 A | 3/1993 | Jones et al. |
| 5,299,255 A | 3/1994 | Iwaki et al. |
| 5,333,266 A | 7/1994 | Boaz et al. |
| 5,339,156 A | 8/1994 | Ishii |
| 5,406,557 A | 4/1995 | Baudoin |
| 5,479,411 A | 12/1995 | Klein |
| 5,487,100 A | 1/1996 | Kane |
| 5,513,126 A | 4/1996 | Harkins |
| 5,557,659 A | 9/1996 | Hyde-Thomson |

| | | |
|---|---|---|
| 5,561,703 A | 10/1996 | Arledge et al. |
| 5,568,536 A | 10/1996 | Tiller et al. |
| 5,568,540 A | 10/1996 | Greco et al. |
| 5,579,472 A | 11/1996 | Keyworth, II et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0554456 A1 | 8/1993 |
| EP | 0835021 A1 | 4/1998 |
| JP | 09-135266 | 5/1947 |
| JP | 04-256273 | 9/1992 |
| JP | 04-290033 | 10/1992 |

(Continued)

OTHER PUBLICATIONS

*j2 Global Communications, Inc. v. Venali, Inc.*, United States District Court Central District of California, Case No. CV04–01172 DDP (AJWx), litigation cover page.

(Continued)

Primary Examiner—Roland G. Foster

(57) **ABSTRACT**

A system for supporting a message delivery service, a method for supporting such a service and a machine accessible medium containing program data for implementing such a system. A number of processing servers are coupled to communicate with a number of outbound resources and a database server over an internal packet-switched data network. The database server contains account information on customers of the service. Request messages received from a customer over an external packet-switched data network are stored in a queue of a processing server. A router filter obtains a request message from the queue and validates a customer associated with the request message, after accessing the database server. A determination is made as to which of the multiple outbound resources to assign the request message. Each of these resources is capable of converting an input request message into a format capable of being received by a fax machine over a telephone network.



**Exhibit 1 Page -61-**

US 6,597,688 C1

Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,604,788 | A | 2/1997 | Tett |
| 5,608,786 | A | 3/1997 | Gordon |
| 5,621,727 | A | 4/1997 | Vaudreuil |
| 5,630,060 | A | 5/1997 | Tang et al. |
| 5,633,916 | A | 5/1997 | Goldhagen et al. |
| 5,675,507 | A | 10/1997 | Bobo, II |
| 5,712,907 | A | 1/1998 | Wegner et al. |
| 5,717,742 | A | 2/1998 | Hyde-Thomson |
| 5,737,395 | A | 4/1998 | Irribarren |
| 5,740,231 | A | 4/1998 | Cohn et al. |
| 5,742,668 | A | 4/1998 | Pepe et al. |
| 5,742,905 | A | 4/1998 | Pepe et al. |
| 5,751,791 | A | 5/1998 | Chen et al. |
| 5,758,088 | A | 5/1998 | Bezaire et al. |
| 5,761,201 | A | 6/1998 | Vaudreuil |
| 5,761,396 | A | 6/1998 | Austin et al. |
| 5,765,033 | A | 6/1998 | Miloslavsky |
| 5,774,668 | A | 6/1998 | Choquier et al. |
| 5,781,614 | A | 7/1998 | Brunson |
| 5,870,454 | A | 2/1999 | Dahlen |
| 5,872,845 | A | 2/1999 | Feder |
| 5,933,412 | A | 8/1999 | Choudhury et al. |
| 5,933,490 | A | 8/1999 | White et al. |
| 5,937,161 | A | 8/1999 | Mulligan et al. |
| 5,940,476 | A | 8/1999 | Morganstein et al. |
| 5,987,508 | A | 11/1999 | Agraharam et al. |
| 5,991,292 | A | 11/1999 | Focsaneanu et al. |
| 5,999,525 | A | 12/1999 | Krishnaswamy et al. |
| 5,999,594 | A | 12/1999 | Mizoguchi et al. |
| 6,020,980 | A | 2/2000 | Freeman |
| 6,023,345 | A | 2/2000 | Bloomfield |
| 6,025,931 | A | 2/2000 | Bloomfield |
| 6,028,679 | A | 2/2000 | Murphy |
| 6,052,442 | A | 4/2000 | Cooper et al. |
| 6,064,723 | A | 5/2000 | Cohn et al. |
| 6,069,890 | A | 5/2000 | White et al. |
| 6,072,862 | A | 6/2000 | Srinivasan |
| 6,073,165 | A | * 6/2000 | Narasimhan et al. ....... 709/206 |
| 6,084,892 | A | 7/2000 | Benash et al. |
| 6,084,952 | A | 7/2000 | Beerman, Jr. et al. |
| 6,185,603 | B1 | 2/2001 | Henderson et al. |
| 6,208,638 | B1 | * 3/2001 | Rieley et al. ............... 370/354 |
| 6,212,550 | B1 | 4/2001 | Segur |
| 6,215,550 | B1 | 4/2001 | Baer et al. |
| 6,215,858 | B1 | 4/2001 | Bartholomew et al. |
| 6,216,173 | B1 | 4/2001 | Jones et al. |
| 6,233,318 | B1 | 5/2001 | Picard et al. |
| 6,246,983 | B1 | 6/2001 | Zou et al. |
| 6,259,533 | B1 | 7/2001 | Toyoda et al. |
| 6,263,064 | B1 | 7/2001 | O'Neal et al. |
| 6,285,777 | B2 | 9/2001 | Kanevsky et al. |
| 6,301,245 | B1 | 10/2001 | Luzeski et al. |
| 6,301,339 | B1 | 10/2001 | Staples et al. |
| 6,304,636 | B1 | 10/2001 | Goldberg et al. |
| 6,330,079 | B1 | 12/2001 | Dugan et al. |
| 6,339,591 | B1 | 1/2002 | Migimatsu |
| 6,341,160 | B2 | 1/2002 | Tverskoy et al. |
| 6,350,066 | B1 | 2/2002 | Bobo, II |
| 6,356,356 | B1 | 3/2002 | Miller, Jr. et al. |
| 6,359,881 | B1 | 3/2002 | Gerszberg et al. |
| 6,360,256 | B1 | 3/2002 | Lim |
| 6,411,696 | B1 | 6/2002 | Iverson et al. |
| 6,564,321 | B2 | 5/2003 | Bobo, II |

## FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| JP | | 04-291858 | 10/1992 |
| JP | | 05-233488 | 9/1993 |
| JP | | 05-235997 | 9/1993 |
| JP | | 05-284326 | 10/1993 |
| JP | | 05-316309 | 11/1993 |
| JP | | 06-069956 | 3/1994 |
| JP | | 06-217069 | 8/1994 |
| JP | | 07-038689 | 2/1995 |
| JP | | 07-212393 | 8/1995 |
| JP | | 07-250094 | 9/1995 |
| JP | | 08-009092 | 1/1996 |
| JP | | 09-023273 | 1/1997 |
| WO | | WO 97/23082 A1 | 6/1997 |
| WO | | WO 98/017041 A2 | 4/1998 |
| WO | | WO 98/23058 A2 | 5/1998 |

## OTHER PUBLICATIONS

Guo Zhen Sheng, et al., "Intranet–Based Mail Fax Gateway Technology", 1997 IEEE International Conference on Intelligent Processing Systems, Oct. 28–31, Beijing, China, 97TH8335 vol. 2 of 2, pp. 1607–1611.

L. Orozco–Barbosa, et al. "Design and Performance Evaluation of Intelligent Multimedia Services", Computer Communications 20 (1997) pp. 219–232.

Guide to Intelligent Least Cost Routing, Right Fax, Inc. (1997).

Guide to Internet Faxing, Right Fax, Inc. (1997).

Rightfax Ships Internet Connectivity Module for Lan Fax Software; Rightfax News Release; (Feb. 10, 1997).

Rightfax Poised for Internet Faxing; Rightfax News Release (May 27, 1997).

Mendel, Brett; Net Faxing Awaits Its Day; Lan Times, Dec. 9, 1996, v13 n27, p. 25(2).

Kinnucan, Paul; What's New in the Fax World; Systems Integration; Feb. 1990, v23 n2 p. 50(7).

Deixler, Lyle; Fax Forges Ahead; Teleconnect; Nov. 1996, v14 n11 p. 52(12).

Fax Solutions; Lan Times Sep. 23, 1996, v13 n21 p. 123(5).

Rightfax Introduces New Fax Server Designed for the Enterprise; Rightfax News Release (May 27, 1997).

* cited by examiner

**Exhibit 1 Page -62-**

US 6,597,688 C1

1

# EX PARTE
# REEXAMINATION CERTIFICATE
# ISSUED UNDER 35 U.S.C. 307

NO AMENDMENTS HAVE BEEN MADE TO
THE PATENT

2

AS A RESULT OF REEXAMINATION, IT HAS BEEN
DETERMINED THAT:

The patentability of claims 1–27 is confirmed.

\* \* \* \* \*

Exhibit 1 Page -63-

# Exhibit B

Exhibit 1 Page -64-

US007020132B1

(12) **United States Patent**
    Narasimhan et al.

(10) Patent No.:     **US 7,020,132 B1**
(45) Date of Patent:          **Mar. 28, 2006**

(54) **SCALABLE ARCHITECTURE FOR TRANSMISSION OF MESSAGES OVER A NETWORK**

(75) Inventors: **Anand Narasimhan**, Beverly Hills, CA (US); **Yaacov Shemesh**, Los Angeles, CA (US); **Amit Kumar**, Los Angeles, CA (US)

(73) Assignee: **j2 Global Communications, Inc.**, Hollywood, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **10/393,227**

(22) Filed: **Mar. 20, 2003**

**Related U.S. Application Data**

(63) Continuation of application No. 09/097,307, filed on Jun. 12, 1998, now Pat. No. 6,597,688.

(51) Int. Cl.
    *H04L 12/66*        (2006.01)

(52) U.S. Cl. ...................................... **370/355; 370/357**

(58) Field of Classification Search ................ 370/237, 370/242, 252, 352–353, 360, 389, 401, 465; 379/112–114, 200, 220; 709/206, 228
    See application file for complete search history.

(56)        **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 4,941,170 A | 7/1990 | Herbst |
| 5,115,326 A | 5/1992 | Burgess et al. |
| 5,193,110 A | 3/1993 | Jones et al. |
| 5,333,266 A | 7/1994 | Boaz et al. |
| 5,339,156 A | 8/1994 | Ishii |
| 5,406,557 A | 4/1995 | Baudoin |
| 5,479,411 A | 12/1995 | Klein |

| | | |
|---|---|---|
| 5,487,100 A | 1/1996 | Kane |
| 5,513,126 A | 4/1996 | Harkins et al. |
| 5,561,703 A | 10/1996 | Arledge et al. |
| 5,568,536 A | 10/1996 | Tiller et al. |
| 5,568,540 A | 10/1996 | Greco et al. |
| 5,579,472 A | 11/1996 | Keyworth, II et al. |
| 5,604,788 A | 2/1997 | Tett |
| 5,608,786 A | 3/1997 | Gordon |
| 5,621,727 A | 4/1997 | Vaudreuil |
| 5,675,507 A | 10/1997 | Bobo, II |
| 5,712,907 A | 1/1998 | Wegner et al. |
| 5,740,231 A | 4/1998 | Cohn et al. |
| 5,742,668 A | 4/1998 | Pepe et al. |
| 5,742,905 A | 4/1998 | Pepe et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| GB | 2 024 561 A | 1/1980 |

(Continued)

OTHER PUBLICATIONS

jFax Personal telecom™, http://www.jfax.net/, Dec. 4, 1994 4:57 p.m. (pp.1-2); and www.jfax.net/software.htm, Dec. 4, 1996 5:22 p.m. (pp.1-2).

(Continued)

*Primary Examiner*—Chi Pham
*Assistant Examiner*—Thai Hoang
(74) *Attorney, Agent, or Firm*—Blakely, Sokoloff, Taylor & Zafman LLP

(57)        **ABSTRACT**

A method and apparatus is disclosed for delivering messages that utilizes a message queue and a router/filter within a private data network. The private network is connected to an external data network such as the Internet, and has separate outbound resource servers to provide a high degree of scalability for handling a variety of message types.

**20 Claims, 8 Drawing Sheets**



Exhibit 1 Page -65-

## US 7,020,132 B1

Page 2

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,758,088 | A | 5/1998 | Bezaire et al. |
| 5,761,201 | A | 6/1998 | Vaudreuil |
| 5,761,396 | A | 6/1998 | Austin et al. |
| 5,765,033 | A | 6/1998 | Miloslavsky |
| 5,812,786 | A | 9/1998 | Seazholtz et al. |
| 5,870,454 | A | 2/1999 | Dahlen |
| 5,937,161 | A | 8/1999 | Mulligan et al. |
| 5,940,476 | A | 8/1999 | Morganstein et al. |
| 5,991,292 | A * | 11/1999 | Focsaneanu et al. ........ 370/352 |
| 5,999,525 | A | 12/1999 | Krishnaswamy et al. |
| 5,999,594 | A | 12/1999 | Mizoguchi et al. |
| 5,999,965 | A * | 12/1999 | Kelly ........................ 709/202 |
| 6,020,980 | A | 2/2000 | Freeman |
| 6,025,931 | A | 2/2000 | Bloomfield |
| 6,073,165 | A * | 6/2000 | Narasimhan et al. ........ 709/206 |
| 6,185,603 | B1 | 2/2001 | Henderson et al. |
| 6,208,638 | B1 * | 3/2001 | Rieley et al. ............... 370/354 |
| 6,212,550 | B1 | 4/2001 | Segur |
| 6,215,858 | B1 | 4/2001 | Bartholomew et al. |
| 6,216,173 | B1 | 4/2001 | Jones et al. |
| 6,246,983 | B1 | 6/2001 | Zou et al. |
| 6,259,533 | B1 | 7/2001 | Toyoda et al. |
| 6,263,064 | B1 | 7/2001 | O'Neal et al. |
| 6,330,079 | B1 | 12/2001 | Dugan et al. |
| 6,339,591 | B1 | 1/2002 | Migimatsu |
| 6,341,160 | B1 | 1/2002 | Tverskoy et al. |
| 6,350,066 | B1 | 2/2002 | Bobo, II |
| 6,356,356 | B1 | 3/2002 | Miller, Jr. et al. |
| 6,359,881 | B1 * | 3/2002 | Gerszberg et al. ......... 370/354 |
| 6,510,438 | B1 | 1/2003 | Hasegawa |
| 6,564,321 | B1 | 5/2003 | Bobo, II |
| 6,597,688 | B1 | 7/2003 | Narasimhan et al. |

### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| GB | 2 157 117 A | 10/1985 |
| JP | 406164645 | 6/1994 |

### OTHER PUBLICATIONS

Oracle & NT Software Library, Faxmail Networks for Windows v5.13 Fax over a network; Search results of online search, Dec. 5, 1996 12:03 p.m. (pp. 1-3).

Alta Vista Search, SHAREWARE.COM: Search results, Dec. 5, 1995 11:41 a.m. (pp. 1-2).

Yahoo[TM] Internet Life, vol. 3, No. 1, Jan. 1997 "Cooltools" (p. 73).

NetScan KOFAX, http://www.netscan.kofax.com/, Dec. 13, 1006 4:09 p.m. (pp. 103); http://www.netscan.kofax.com/brochure.html, Dec. 13, 1996 4:13 p.m. (pp. 1-4); and http://www.netscan.kofax.com/brochure2.html, Dec. 13, 1996 4:23 p.m. (pp. 1-3).

Electronics, Jan. 18 1979 (379-100), S9054 0063 (pp. 69-70).

"Unified Messaging Solutions On the Road", Mar. 7, 1995, Computer Telephony Expo, Dallas Texas.

j2 Global Communications, Inc. v. Venali, Inc. United States District Court Central District of California, Case No. CV04-01172 DDP (AjWx), Defendant Venali, Inc.'s Objections and Responses to Plaintiff j2 Global Communications, Inc.'s First Set of Interrogatories (Nos. 1-7) (19 pages).

"Guide to Intelligent Least Cost Routing", RightFAX, Inc. Tucson, Arizona, USA (1997) (pp. 1-17).

"Guide to Internet Faxing", RightFAX, Inc., Tucson, Arizona, USA (1997) (pp. 1-16).

"Rightfax Ships Internet Connectivity Module for Lan Fax Software", RightFAX News Research, RightFAX, Inc., Tucson, Arizona, USA, Feb. 10, 1997 (2 pages).

"RightFAX Poised for Internet Faxing", Right FAX News Release, RightFAX, Inc., Tucson, Arizona, USA, May 27, 1997 (2 pages).

"RightFAX Introduces New Fax Server Designed for the Enterprise", RightFAX News Research, RightFAX, Inc., Tucson, Arizona, USA, May 27, 1997 (3 pages).

Brett Mendel, "Net Faxing Awaits Its Day", LAN Times, Dec. 9, 1996, v13 n27 p. 25 (2 pages).

Paul Kinnucan, "What's New in the Fax World", Systems Integration, Feb. 1990, v23 n2 p. 50(7) (4 pages).

Lyle Deixler, "Fax Forges Ahead", Teleconnect, Nov. 1996, v14 n11 p. 52(12) (5 pages).

Fax Solutions, LAN Times, Sep. 23, 1996, v13 n21 p. 123(5) (10 pages).

Tomaru, "Electronic Mails Systems", 1983, Japan Annual Review in Electronics, Computers and Telecommunications, vol. 9, Telecommination Technology, pp. 283-290.

* cited by examiner

Exhibit 1 Page -66-



# FIG. 1
## (PRIOR ART)

**Exhibit 1 Page -67-**

U.S. Patent        Mar. 28, 2006        Sheet 2 of 8        US 7,020,132 B1



FIG. 2

Exhibit 1 Page -68-



FIG. 3

Exhibit 1 Page -69-

**U.S. Patent**      Mar. 28, 2006      Sheet 4 of 8      US 7,020,132 B1



FIG. 4A

Exhibit 1 Page -70-

U.S. Patent        Mar. 28, 2006        Sheet 5 of 8        US 7,020,132 B1



FIG. 4B

Exhibit 1 Page -71-



**FIG. 5**

Exhibit 1 Page -72-



FIG. 6

Exhibit 1 Page -73-



**FIG. 7**

Exhibit 1 Page -74-

US 7,020,132 B1

1

## SCALABLE ARCHITECTURE FOR TRANSMISSION OF MESSAGES OVER A NETWORK

This is a continuation of Ser. No. 09/097,307, now U.S. Pat. No. 6,597,688 filed on Jun. 12, 1998.

### BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention relates to the field of message receipt/transmission and delivery using computer, phone, wireless and other communications networks. Specifically, the present invention relates to the transmission of e-mail messages which may be text only, text plus an audio file, text plus a video file, text plus a fax file or any combination thereof to a phone, pager or fax machine or other receiving device suitable for the message content, over appropriate communications networks using an architecture which enables easy expansion to handle additional message traffic as well as to connect to additional communications networks, including networks which do not presently exist which may become available in the future.

2. Description of Related Art

Voice and data communications systems such as the public switched telephone network (PSTN) are currently used to transfer image and text data transmitted by facsimile ("fax") machines in addition to the normally carried voice traffic. These faxed images are usually transmitted through the PSTN and received for printout or storage of the image on a destination fax machine or computer for the use by the recipient.

In U.S. Pat. No. 6,208,638 entitled Method and Apparatus for Transmission and Retrieval of Facsimile and Audio Messages Over a Circuit or Packet Switched Network, it is disclosed that to provide for the receipt and transmission of audio and fax information by a first user over a circuit switched network such as the public switched telephone network (PSTN) to a second user over a packet switched network such as the Internet, a communications server is connected both to the circuit switched network and a packet switched network.

The communications server contains resources to receive and process incoming audio and facsimile calls from the circuit switched network into a format suitable for transmission over the packet switched network to the second user's address. In addition, a link is first determined between the second user's address on the circuit switched network and the second user's address on the packet switched network, and then an appropriate route to the second user's address on the packet network is determined. With the system being maintained in a distributed and redundant fashion, reliable receipt and transfer of all messages is ensured. A copy of the specification and drawings of U.S. Pat. No. 6,208,638 is attached hereto.

However, the architecture utilized as described in U.S. Pat. No. 6,208,638 is not easily scalable to handle increasingly higher levels of message traffic or to easily connect to networks in addition to the PSTN and the Internet. FIG. 1 shows the essence of the architecture of U.S. Pat. No. 6,208,638. An e-mail message is passed to an outbound resource 11 (communications server 550 in U.S. Pat. No. 6,208,638) which converts the e-mail message to a fax format or to audio for transmission to a fax machine or telephone connected to the PSTN. A database 13 stores customer information necessary for processing of messages (an unnumbered part of communications server 550 in U.S.

2

Pat. No. 6,208,638 which is also contained in database server 595 in U.S. Pat. No. 6,208,638). After processing of an e-mail message by outbound resource 11, a fax or voice mail message is sent over the PSTN or more generally, a generalized switched telephone network (GSTN) which includes cellular telephone networks as well as the PSTN. Optionally, a pager message may also be sent informing a user of the fax which has been sent or availability of a voice mail message as described in U.S. Pat. No. 6,073,165 entitled Processing and Forwarding Messages From a Computer Network to a Forwarding Service.

### SUMMARY OF THE INVENTION

A method and apparatus is disclosed for delivering messages that utilizes a message queue and a router/filter within a private data network. The private network is connected to an external data network such as the Internet, and has separate outbound resource servers to provide a high degree of scalability for handling a variety of message types.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a block diagram of a prior art architecture which performs the functions, but not the scalability of the architecture of the present invention.

FIG. 2 is a block diagram illustrating the architecture of the present invention.

FIG. 3 is a block diagram showing the data/control flow through message queue 21, router/filter 23 and database 27.

FIG. 4 (4a and 4b) is a flow diagram of the processing performed by router/filter 23.

FIG. 5 is a system diagram of a network containing a message server.

FIG. 6 is a block diagram illustrating the message server.

FIG. 7 is a flow diagram illustrating some operations.

### DETAILED DESCRIPTION OF THE INVENTION

The present invention provides a method and apparatus for allowing the receipt and transmission of audio, video and fax information between a circuit switched network and a packet switched network. For purposes of explanation, specific embodiments are set forth to provide a thorough understanding of the present invention. However, it will be understood by one skilled in the art, that the invention may be practiced without these details. Further, although the present invention is described through the use of circuit switched and packet switched networks, most, if not all, aspects of the invention apply to all networks in general. Moreover, well-known elements, devices, process steps and the like are not set forth in detail in order to avoid obscuring the present invention.

Referring now to FIG. 2, e-mail messages for a customer are sent to/through an external data network 15 (e.g., the Internet) and routed to an appropriate SMTP/HTTP (or SHTTP) server 17 as determined by a domain name server (DNS) 18 according to well known techniques. The e-mail message may be a text message or it may include a file, the content of which may be audio, video or bitmapped (e.g., a fax) or other data. Again, the techniques for creating and sending e-mail messages with these characteristics are well known.

A processing server 19, which includes a message queue 21 and a router/filter 23 first verifies that the message is from or is to a customer using information in database 27. After

Exhibit 1 Page -75-

US 7,020,132 B1

3

successful verification, the message is broken into fragments (in the case of files with multiple attachments) and written to message queue 21. Router/filter 23 obtains messages from the message queue and handles least call routing/billing/prioritization/filtering of messages. Filtering is primarily for notification messages for pager delivery. After billing verification and determination of a least cost route, the message is assigned to one or more outbound resources 31 for delivery to the intended recipient by a method or methods selected by the customer as previously recorded in database 27.

In the case of faxes, the outbound resource is a server which dials the destination fax number and sends the fax.

In the case of voice messages, the outbound resource is a server which dials the destination telephone number and plays the voice message.

In the case of notification messages, the outbound resource is a server which interfaces with the paging terminal or delivers the notification message through any appropriate paging gateway.

After the message (in whatever form) has been delivered, a receipt with details and an error log (if any) is sent back via a secure protocol to the message queue 21.

The receipt/error log messages are then processed by the router/filter which interfaces with a billing system (not shown) for customer account update.

FIG. 3 is a block diagram showing the data/control flow through message queue 21, router/filter 23 and database 27 using information contained in the following tables as explained with reference to FIGS. 4a and 4b.

### TABLE 1

| Message Queue Table | |
| --- | --- |
| MESSAGE_ID | This is a unique number assigned to each message that arrives in the system. |
| RESOURCE_ID | Unique number assigned to each Outbound Resource |
| RESOURCE_TYPE | Each Resource is identified by the type of messages it can deliver (e.g., FAX, VOICE, NOTIFY, etc.) |
| RESOURCE_ADDRESS | Location of the Resource (such as IP address) |
| MESSAGE_TO_EMAIL_ADDRESS | To: address of the message |
| MESSAGE_FROM_EMAIL_ADDRESS | From: address of the message |
| MESSAGE_LOCATION | Location of actual message on the Message Queue 21 |
| MESSAGE_SIZE | Size of the message in bytes |
| MESSAGE_PRIORITY | Priority of the message (e.g., low, medium, high) |
| MESSAGE_CREATION_DATE | Timestamp identifying the date/time that the message was received by the system |
| MESSAGE_EXPIRY_DURATION | Amount of time after which the message becomes stale |
| MESSAGE_SCHEDULED_DATE | Scheduled delivery timestamp for the message |
| MESSAGE_STATUS | Current status of the message (Active, Pending, Sent, etc.) |
| MESSAGE_ESTIMATED_COST | Estimated cost for the delivery of the message |
| CUSTOMER_KEY | Unique number identifying the customer in the database |
| MESSAGE_PART_OF_BROADCAST | Flag identifying if the message is part of a larger broadcast list waiting to be delivered |

4

### TABLE 1-continued

| Message Queue Table | |
| --- | --- |
| BROADCAST_ID | Unique number identifying a broadcast list |
| COVERPAGE_ID | Unique number identifying a coverpage (if any) for a fax |
| MESSAGE_SUBJECT | Subject line of the message to be delivered |
| MESSAGE_DURATION | Duration of the message (delivery time of fax, or delivery time for a voice message, etc.) |
| MESSAGE_RATE | Rate for message delivery (dollars per second, etc.) |
| MESSAGE_SEND_DATE | Actual timestamp identifying when the message was delivered |
| MESSAGE_REMOTE_CSID | Identifier of the fax machine to which a FAX message was delivered |
| MESSAGE_TYPE | Type of message (e.g., FAX, VOICE, NOTIFICATION, etc.) |
| RESOURCE_COMMUNICATION_TYPE | Protocol used to communicate with the resource (HTTP, SHTTP, etc.) |
| MESSAGE_LANGUAGE_CODE | Language used for delivery of a receipt or response, based on settings in the customer table |
| MESSAGE_PAGES | Number of pages of a message (used primarily for a fax) |

### TABLE 2

| File Type Table | |
| --- | --- |
| FILETYPE_MESSAGE_TYPE | Identifier of a message type (FAX, VOICE, etc.) |
| FILETYPE_RESOURCE_TYPE | Identifier to determine a resource that can handle a particular file type |
| FILETYPE_EXTENSION | The filename extension that identifies a file type (e.g., WAV, TIF, JFX, AU, GSM, etc.) |

### TABLE 3

| Customer Table | |
| --- | --- |
| CUSTOMER_KEY | Unique number identifying a customer in the database |
| FIRSTNAME | First name of customer |
| LASTNAME | Last name of customer |
| COMPANY | Company name of customer |
| ADDRESSLINE1 | Company address |
| ADDRESSLINE2 | Company address |
| CITY | Company city |
| MAILREGION | Company state or equivalent |
| MAILCODE | Zipcode or equivalent |
| COUNTRY | Company country |
| WORKNUMBER | Customer work phone number |
| HOMENUMBER | Customer home phone number |
| EMAILADDRESS | Email address of customer |
| COLLECTIONMETHOD | Collection method such as Credit card, Debit, etc. |
| BILLTYPE | e.g., Customer, Demo, free, corporate, etc. |
| STATUS | Status of customer, Active, Inactive, etc. |
| LANGUAGECODE | Language of customer, English, German, etc. |
| CURRENCYCODE | Currency for billing the customer, US Dollars, Pound Sterling, etc. |

Exhibit 1 Page -76-

US 7,020,132 B1

5

## TABLE 4

Currency Table

| FORMAT | Currency label |
|---|---|
| CURRENCY_SYMBOL | Symbol for currency |

## TABLE 5

Notification Table

| CUSTOMERKEY | Unique number identifying a customer in the database |
|---|---|
| PAGERTYPECODE | Code to determine the kind of pager service |
| BBSNUMBER | Modem number for pager notification delivery, based on the pager type |
| PAGERNUMBER | Identifier number of the pager unit |
| PIN | PIN code for the pager unit |
| DISPLAYTYPE | Display type of the pager (numeric, alphanumeric, etc.) |

## TABLE 6

Response_email Table

| RESPONSE_ID | Unique ID for a response/receipt message to be sent to a customer |
|---|---|
| RESPONSE_SUBJECT | Subject line of the response message |
| RESPONSE_FROM_EMAIL | From: line of the response message |
| RESPONSE_BODY | Actual text of the response message |

## TABLE 7

Resource Table

| RESOURCE_ID | Unique identifier for the resource |
|---|---|
| RESOURCE_TYPE | Type of resource (FAX, VOICE, etc.) |
| RESOURCE_STATUS | Status of resource (Active, Inactive, etc.) |
| RESOURCE_QUEUE_STATUS | Status of the Queue, number of messages in queue |
| RESOURCE_TIME_ZONE | Time zone for the resource |
| RESOURCE_QUEUE_MAX | Maximum size of the resource queue |
| RESOURCE_ADDRESS | Address of the resource (IP address, etc.) |
| RESOURCE_NAME | Name of the resource |
| RESOURCE_EXPIRY_DURATION | Expiry duration for any message sent to the specified resource |
| RESOURCE_QUEUE_IN_STATUS | Number of messages waiting to be delivered by the resource |
| RESOURCE_COMMUNICATION_TYPE | Method used to communicate with resource (HTTP, SHTTP, etc.) |

## TABLE 8

Resource Rates Table

| RESOURCE_ID | Unique identifier for the resource |
|---|---|
| RESOURCE_PREFIX | Any digits to be dialed before an actual number |
| RESOURCE_CITY_NAME | Name of destination city for the message to be delivered |
| RESOURCE_PROVIDER_RATE | Rate for a particular city (dollars per second, etc.) |
| RESOURCE_MAX_DIGITS | Max number of digits allowed to be dialed |
| RESOURCE_AREA_CODE | Area code for the particular city |

6

FIGS. 4a and 4b are a flow diagram of the processing performed by router/filter 23 using Tables 1–8. When a message is received it is placed into message queue 21 which is simply a storage area, the specifics of which, including the mechanism for placing the message into the queue are well known. Certain details concerning the message are also stored in a message queue table (Table 1). In step 41, router/filter, which is a computer program running on processing server 19, polls the message queue table for pending requests as determined by the existence of an active message in the message status field. If no message is found, after a system defined delay, the message queue table is again polled (step 43). Once a message has been found in the table, processing continues with step 45 by determining the message type using the message_type field in Table 1 and the file type information in Table 2. The customer is then validated using information in Table 3 in step 47. In step 49, currency information for the customer is obtained from Table 4. The message is then filtered for possible pager notification using the information in Table 5 in step 51. In step 53, Table 7 is used to check for available resources to deliver the message. In step 55, the rates of available resources are checked to determine the least cost resource using Table 8. Then in step 59, the message is delivered using the determined least cost resource. After the message has been delivered, or after an error in the delivery has occurred, in step 59, a response/receipt is composed using Table 6. In step 61, the response or receipt is delivered to the sender. The system then begins the process over again at step 41.

As noted above outbound resource 31 is equivalent to communications server 550 as described in U.S. Pat. No. 6,208,638. The modifications made to outbound resource to enable it to operate in a system having an architecture as described herein are as follows.

These changes will be described with reference to the message structure of received messages.

Message Structure

Each field has a value following an '=' sign and is terminated by a newline character. The exception to this is the "Message" field where a newline immediately follows the "=" sign and the actual message follows on the next line.

The fields of a message are as follows:
Password=
MessageID=
MessageStatus=
MessageSentTimeStamp=
Message Duration=
MessageLength=
Message RemoteCSID=
MessageSourceCSID=
MessageAttachStatus=
MessageDestination=
ResourceID=
ResourceStatus=
ResourceLastCommTimeStamp=
ResourceExpiryDuration=
ResourceQueueInStatus=
ResourceQueueOutStatus=
ResourceChannelMax=
ResourceChannelStatus=
MessageBoundary=
Message=

In the following explanation of the above fields, the text in brackets at the end indicates the entity providing the value for the field in the forward/reverse direction (i.e., from

Exhibit 1 Page -77-

US 7,020,132 B1

7

router/filter 23 (RF) to outbound resource 31 (RESOURCE), and from RESOURCE to RF, respectively. "NA" indicates that no value is applicable, and the text "NA" is used to populate the field. "Same" indicates that the same value is used in the reverse direction, i.e, the RESOURCE does not modify the value; it only echoes the value it receives in that field.

Password—There is a fixed password pair for each RESOURCE and RF combination. RESOURCE stores the RF password in a flat text password file in a directory (jfaxom), and RF stores the RESOURCE password in the database. (RF/RESOURCE).

MessageID—Unique ID, per message, generated by RESOURCE. (RESOURCE/Same).

MessageStatus—Code indicating current status of the message. See Status codes below. (RF/RESOURCE)

MessageSentTimeStamp—Time stamp indicating date/time the message was delivered to the final destination by RESOURCE. (NA/RESOURCE)

MessageDuration—Time (in seconds) to transmit message from RESOURCE. (NA/RESOURCE)

Messagelength—Number of pages transmitted by RESOURCE. (NA/RESOURCE)

MessageRemoteCSID—called subscriber identification (CSID) of fax machine to which message was transmitted. (NA/RESOURCE)

MessageSourceCSID—Source CSID. This may be customized per customer. (RF/Same)

MessageAttachStatus—Value of "A" indicates a message is attached for delivery. (RF/RESOURCE)

MessageDestination—Destination phone number. (RF/Same)

ResourceID—Unique ID, per resource, stored in the database. (RF/Same)

ResourceStatus—Code indicating the current status of the resource, i.e., whether it is active or not. RF uses this to determine whether further messages should be sent to RESOURCE for delivery. See Status codes below. (NA/RESOURCE)

ResourceLastCommTimeStamp—Date/time of last communication between RF and RESOURCE. (RF/RESOURCE)

ResourceExpiryDuration—Life of message (in minutes) on RESOURCE. If a message has not been delivered to the final destination by RESOURCE within this amount of time, the message is considered "expired" and is discarded.

ResourceQueueInStatus—Number of messages waiting to be processed in an Inbox directory on RESOURCE. (NA/RESOURCE)

ResourceQueueOutStatus—Number of messages waiting to be processed in an Outbox directory on RESOURCE. (NA/RESOURCE)

ResourceChannelMax—Number of channels available for use on RESOURCE. (NA/RESOURCE)

ResourceChannelStatus—Channel activity status, e.g., 0000000011000001, where 0's indicate an idle channel and 1's indicate a busy channel. (NA/RESOURCE)

MessageBoundary—Text for MIME boundary. (RF/NA)

Message—Actual MIME message sent by RF. If MessageAttachStatus=NA, no message follows this tag. All fields are NA if not used.

Date fields are expressed in MMDDYYhhmmss format.
Resource Status Codes are:
A—Active
I—Inactive

8

Message Status Codes are:
P—Pending
H—On Hold
D—Deferred
R—Ready for sending to RESOURCE
X—Exchanged, i.e., sent to RESOURCE but not acknowledged by it.
A—Sent to RESOURCE and acknowledged by it.
S—Sent (i.e., receipt for final delivery received from RESOURCE)
Normal sequence for Message delivery by RESOURCE is:
RF receives a request in its queue (message queue 21).
RF sends the message to RESOURCE.
RESOURCE gets message, authenticates password, and creates a new message in the Inbox directory.
RESOURCE acknowledges receipt of message.
RESOURCE processes the message in Inbox (MessageStatus=A, MessageAttachStatus=A).
RESOURCE moves message to a Process directory for further processing.
RESOURCE finishes processing message and delivers it to final destination.
RESOURCE removes the message from the Process directory.
RESOURCE creates a message in Outbox directory. (MessageStatus=S). If a "reply message" is to be delivered to the original sender, MessageAttachStatus=A, else MessageAttachStatus=NA. MessageID remains the same in either case.
RESOURCE delivers receipt (with "reply message," if applicable) to RF.
RF receives the message and puts it in the Queue for database processing.
Processing server 19 with the above described functionality may be implemented using readily available systems such as a Windows NT server or a UNIX server. Database 27 may be implemented as a database server using readily available systems such as a Windows NT server or a UNIX server running, for example a SQL database.
What follows is a detailed description of FIGS. 5–7 which set forth a method and apparatus for allowing the receipt and transmission of audio and fax information between a circuit switched network and a packet switched network, as described in U.S. Pat. No. 6,208,638. For purposes of explanation, specific embodiments are set forth to provide a thorough understanding of the present invention. However, it will be understood by one skilled in the art, from reading this disclosure, that the invention may be practiced without these details. Further, although the system is described through the use of circuit switched and packet switched networks, most, if not all, aspects apply to all networks in general.
FIG. 5 contains a block diagram illustrating an embodiment of a system containing a communications server 550 connected to a circuit switched network 530 and a wide area network (WAN) 580. In an embodiment, the circuit switched network 530 is a circuit switched network such as the PSTN while WAN 580 is a packet switched network such as the Internet. It is to be noted that circuit switched network 530 can also be a network such as the generalized switched telephone network (GSTN), which encompasses PSTN networks, cellular telephone networks, and the other networks with which they are in communication.
Communications server 550 is connected to circuit switched network 530 via a switch 540 and to WAN 580 through the use of a router 585. As described in further detail

Exhibit 1 Page -78-

US 7,020,132 B1

9

below, in an embodiment, switch 540 and router 585 are interfaced to communications server 550 using two separate hardware interfaces. In an alternate embodiment, switch 540 and router 585 can be interfaced to communications server 550 through the use of one hardware unit.

Connected to circuit switched network 530 is both a telephone unit 510 and a facsimile unit 520. Telephone unit 510 is a standard telephone capable of converting audio signals into electrical signals suitable for transmission over circuit switched network 530. Similarly, facsimile unit 520 is a standard facsimile machine capable of transmitting and receiving facsimile messages over circuit switched network 530. Each of these devices can be connected to circuit switched network 530 using either wired or wireless technology.

Connected to WAN 580 is a database server 595, a system management unit 597, a mail server 560, and a client 590. Each of these systems communicate with each other and with communications server 550 via WAN 580 using such protocols such as simple network management protocol (SNMP) and hyper-text transport protocol (HTTP)—packetized using a protocol such as the transmission control protocol/internet protocol (TCP/IP).

In an embodiment, each one of database server 595, system management unit 597, mail server 560, and client 590, are stand-alone computers or workstations containing the hardware and software resources to enable operation. In alternate embodiments, the functions provided by each one of database server 595, system management unit 597, mail server 560, and client 590, are provided by any number of computer systems.

In an embodiment, mail server 560 is a server providing e-mail receipt and transmission using a protocol such as the simple mail transfer protocol (SMTP) and post office protocol (POP). Moreover, client 590 is configured to be able to communicate over WAN 580 using SMTP or POP in order to retrieve e-mail from mail server 560 or another suitably configured server.

System management unit 597 communicates with communications server 550 to monitor: (1) the processes on communications server 550; (2) the status of the trunk line connected to communications server 550; and (3) the connection between the various servers connected to WAN 580. As described below, if any processes on communications server 550 or connection to the circuit switched network 530 is interrupted, system management unit 597 can allocate resources, or cause the re-routing of a call or message via one or more redundant resources or connections, ensuring that the call or message is routed to the final destination.

Communications server 550 contains user data needed to receive and route incoming messages received from circuit switched network 530. The same information is also stored on database server 595. In an embodiment, communications server 550 stores an inbound address, a set of final destination addresses; and an account status for each user. The inbound address corresponds to the telephone number assigned to the user. As further discussed below, the inbound address is the number that a message sender dials on telephone unit 510 or facsimile unit 520 to leave a message for the user. The set of final destination address contain one or more e-mail addresses where the user account status information indicates whether the inbound address is either active and or inactive—i.e, whether the user is able to receive messages using the system.

Database server 595 stores a duplicate copy of the inbound address, the set of final destination addresses; and the account status for each user. Database server 595 also

10

stores additional information for each user such as mailing address and billing information which are not used in the operation of the present invention but are note herein for completeness only. Thus, the information that is stored on communications server 550 is a subset of the information that is stored on database server 595, and if communications server 550 were to become inoperable or otherwise unable to handle incoming messages, database server 595 can configure another communications server to accept those calls.

In an embodiment, system management unit 597 is responsible for monitoring the status of communications server 550 and re-assigning the users being handled by communications server 550 if communications server malfunctions or becomes overloaded with incoming calls. In the former case, system management unit 597 would re-assign all users being handled by communications server 550 to another communications server. In the latter case, system management unit 597 would only off-load the only those incoming calls for which communications server 550 does not have the available resources to process.

FIG. 6 is a block diagram of communications server 550 configured in accordance with an embodiment containing a processor 651 for monitoring to a memory subsystem 653 through the use of a system bus 655. Also coupled to system bus 655 is a network interface 656; a trunk interface 652; and a set of fax/voice processing resources 654. Set of fax/voice processing resources 654 and trunk interface 652 are also coupled to a bus 657.

Bus 657 is a bus that supports time division multiplex access (TDMA) protocols to optimize the flow of real time traffic between set of fax/voice processing resources 654 and trunk interface 652.

Memory subsystem 653 is used to store information and programs needed by communications server 550. The functioning of memory subsystems in computer design are well known to those of ordinary skill in the art and thus will not be further discussed herein.

In an embodiment, trunk interface 652 is a trunk line interface, such as a T-1 or E-1 line, to switch 540 and can handle up to 24 channels of communications. Trunk line signaling is well known to those of ordinary skill in the art of telecommunication and thus will not be further discussed herein except as necessary for describing the invention.

Set of fax/voice processing resources 654 are made up of multiple fax/voice processing cards. Each of these processing cards contain processing units which are capable of receiving and transmitting facsimiles according to established protocols, and which are capable of digitizing voice or other audio data, also according to established protocols. In an embodiment, there are three fax/voice processing cards in set of fax/voice processing resources 654, each fax/voice processing card containing eight processing units capable of handling a channel from trunk interface 652. Thus, communications server 550 can communicate on twenty-four channels concurrently.

The storage of destination addresses on both circuit switched network 530 and WAN 580 is controlled by a database located either on communications server 550 or on database server 595. Keeping this information separate from communications server 550 allows communications server 550 to be a resource that can be allocated on demand. Hence, a number of communications servers could be used, along with one or more database servers, to allow a fully redundant and scalable system. In addition, system management unit 597 monitors the status and connection of all the communication and database servers.

Exhibit 1 Page -79-

US 7,020,132 B1

11

FIG. 7 is a flow diagram illustrating the operations of an embodiment of the present invention when a call originating from a source on the circuit switched network 530. For example, either telephone unit 510 or facsimile unit 520 can initiate the call.

In block 700, an incoming call signal is received by communications server 550 from switch 540. The incoming call signal is initiated by telephone unit 510 or facsimile unit 520 over circuit switched network 530 and is routed to communications server 550 via switch 540. Communications server 550 detects the incoming call signal using trunk interface 652. Operation would continue with block 702.

Continuing with block 702, trunk line interface unit 652, in addition to receiving signals to indicate that there is an incoming call from switch 540, also receives signals indicating the circuit destination address of the incoming call. The destination address is captured by trunk interface 652 and is determined by trunk line signaling using mechanisms such as direct-inward-dial, or dual tone multifrequency (DTMF) tones.

Continuing with block 704, to determine whether or not to process the incoming call, processor 651 searches the list of inbound addresses contained in memory subsystem 653 for the destination address. If processor 651 finds the destination address in the inbound address list, processor 651 will then look up the account status for the user who owns the inbound address to determine if the account of that user is a valid user account. In an alternate embodiment, the validation is performed through the use of a database maintained by a separate entity such as database server 595. If the account is found to be inactive, communications server 651 will play a prepared message indicating that the number to which the incoming message was sent is an invalid account.

In block 706, once the validity of the user account has been established, processor 651 will attempt to allocate one fax/voice processing resource from set of fax/voice processing resources 654 and also determine the availability of other resources required for the receipt and processing of the incoming call. These other resources include the processing capacity of processor 651, the storage capacity of memory subsystem 653.

If it is determined that the appropriate resources are not available, then the call will be routed to a different communications server that is capable of allocating the necessary resources. The routing of calls is accomplished by trunk line signaling via switch 540 and is managed by system management unit 597.

Also, it should be noted that the call will only come from switch 540 to communications server 550 if there are no problems with the line. Otherwise the call will get routed to a different communications server. In an embodiment, fault detection and correction happens in one of two ways. First, on the telephone network side, switch 540 can be set up to independently route a call to another line if it is determined that one of the lines is bad. Second, if communications server 550 detects that the trunk line coming into trunk interface 652 is down, communications server 550 will notify system management unit 597 to reallocate the users for whom communications server 550 is responsible onto another communications server. Thus, system management unit 597 will transfer the duplicate user information contained in database server 595 into a different communications server.

In block 708, communications server 550 "answers" the incoming call by having trunk interface 652 go "off-hook" on the trunk line.

12

In block 710, if the fax/voice processing resource of set of fax/voice processing resources 654 which is processing the call determines that the incoming call is a fax transmission, then operation will continue with block 712. Otherwise, operation will continue with block 714. For example, if the call is a fax, a fax protocol is initiated, and the fax is received by one of the fax/voice processing resources of set of fax/voice processing resources 654. If the call is a voice call, the voice is recorded by one of the fax/voice processing resources of set of fax/voice processing resources 654.

In block 712, the fax/voice processing resource of set fax/voice processing resources 654 responsible for processing the incoming call will perform the fax transfer and store the incoming message as a temporary file in memory subsystem 653. In an embodiment, the incoming fax is saved into a file which follows the group 3 facsimile file format. Operation will then continue with block 716.

In block 714, where it is determined that the incoming message is an audio message, the fax/voice processing resource of set of fax/voice processing resources 654 allocated to process the call will initiate an audio recording of the incoming voice message. In an embodiment, the audio message is digitized and stored in memory subsystem 653 as a temporary file in a pulse code modulated format. After the incoming call has been digitized and stored, operation will then continue with block 716.

In block 716, trunk interface 652 will terminate the call. Operation will then continue with block 718.

In block 718, the incoming message, which has been stored as a temporary file in memory subsystem 653, is processed by processor 651. In an embodiment, the temporary file is processed according to the type of the incoming call. If the incoming call was a fax transmission, then the temporary file, which has been stored as a group 3 facsimile file, will be converted into a file which follows the tagged image file format (TIFF), or a format that is suitable for transmission over WAN 580. Optionally, the temporary fax file can also be compressed at this stage. If the incoming call was an audio message, then the temporary file would be compressed using a compression scheme such as the scheme defined in the global system for mobile-communications (GSM) standard. In alternate operations, compressing and other processing of the incoming message is performed as the same time the incoming message is being received and being placed in memory subsystem 653.

In block 720, communications server 550 uses the inbound address to determine the set of final destination addresses, which are destinations on WAN 580 (i.e., the packet switched network), to send the processed incoming message. Communications server 550 then sends an electronic mail (e-mail) with the processed incoming message as an attachment to all the destinations in the set of final destination addresses.

For example, the e-mail containing the attachment is transferred to, and stored in, a server such as mail server 560. The e-mail is then retrieved by client 590 whenever the user wishes. In an alternate embodiment, client 590 can retrieve the e-mail directly from communications server 550, without the storing operation of mail server 560.

While the present invention has been particularly described with reference to the various figures, it should be understood that the figures are for illustration only and should not be taken as limiting the scope of the invention. Many changes and modifications may be made to the invention, by one having ordinary skill in the art, without departing from the spirit and scope of the invention.

Exhibit 1 Page -80-

US 7,020,132 B1

13

What is claimed is:

1. A system for supporting a message delivery service, comprising:

a server coupled to communicate with a plurality of first outbound resources and a database server, over an internal packet-switched data network, the database server containing account information on customers of the message delivery service, the server implements a router-filter and a message queue,

the message queue to store a request message received from a customer of the message delivery service over an external packet-switched data network,

the router-filter to obtain a request message from the queue, validate said request message by accessing the account information in the database server, and determine to which of the plurality of first outbound resources to assign said request message,

each of the first resources being capable of converting an input request message into a format capable of being received by a fax machine over a circuit switched network.

2. The system of claim 1 wherein the internal data network is a private data network.

3. The system of claim 2 wherein the external data network is the Internet.

4. The system of claim 3 wherein the request message is received from the customer via one of a mail transport protocol server and a hypertext transport protocol server on the Internet.

5. The system of claim 1 wherein the router-filter is to prioritize a plurality of request messages that have been obtained from the queue and that are assigned to an outbound resource.

6. The system of claim 1 wherein the router-filter is to determine which of the plurality of first outbound resources to assign said request message to, based on which resource offers the least cost of delivering said request message.

7. The system of claim 1 wherein the router-filter is to generate an error message that indicates an error in delivering said request message as reported by the outbound resource to which said request message was assigned.

8. The system of claim 1 further comprising:

a plurality of second outbound resources each being capable of converting an input request message into a format capable of being played back to a telephone over a circuit switched network, wherein the router-filter is to determine to which of the first and second resources said request message is to be assigned, based on a message type of said request matching a capability of one of a first resource and a second resource.

9. The system of claim 1 further comprising:

a plurality of second outbound resources each being capable of converting an input request message into a format capable of being transmitted to a paging terminal over one of (1) a circuit switched network and (2) a paging gateway over an external packet-switched network, wherein the route-filter is to determine to which of the first and second resources said request message is to be assigned, based on a message type of said request matching a capability of one of a first resource and second resource.

10. The system of claim 1 wherein a location of each outbound resource is given by an Internet Protocol address.

11. The system of claim 1 wherein the message is received from the customer via one of a mail transport protocol server and a hypertext transport protocol server on the Internet.

14

12. The system of claim 1 wherein a protocol used by the router-filter to communicate with the plurality of outbound resources is one of HTTP and SHTTP.

13. The system of claim 1 wherein the router-filter is to send a MIME message.

14. An article of manufacture for supporting a message delivery system, comprising:

a machine accessible medium containing data that, when accessed by a machine, cause a server to communicate with an outbound resource and a database all as part of an internal packet-switched data network, the server to store a request message received from a customer of the message delivery service over an external packet switched data network, verify that the request message is from the customer using information in the database, and assign said request message to the resource which converts data associated with said request message into a format capable of being received by a fax machine over a circuit switched network.

15. The article of manufacture of claim 14 wherein the medium includes further data which allows the request message to be received from a customer over the Internet.

16. The article of manufacture of claim 14 wherein the medium includes further data which, when executed by the machine, cause the server to determine which of a plurality of first outbound resources to assign said request message to, based on which resource offers the least cost of delivering said request message.

17. A method comprising:

receiving an email message from an external packet data network;

performing a database lookup in an internal packet data network to correlate the email message with a user account;

verifying within the internal network the email message is associated with a valid user account;

performing within the internal network one of a least cost routing calculation, a billing calculation, a prioritization calculation, and a message filtering operation;

converting within the internal network the email message into a fax format for transmission to a machine; and

transmitting the converted email message into a public switched telephone network to a destination telephone number.

18. A method comprising:

receiving an email message from the Internet;

performing within an internal packet data network a database lookup to correlate the email message with a user account;

determining within the internal packet data network if the email message passes a filter screening criterion;

converting the email message into a fax format for transmission to a fax machine; and

transmitting the converted email message into a public switched telephone network to a destination telephone number.

19. A method comprising:

receiving an email message from the Internet;

performing a database lookup within an internal packet data network to correlate the email message with a user account;

queuing the email message within the internal packet data network;

reading the queued message based on a prioritized ordering rule within the internal packet data network;

converting the read message into a fax format for transmission; and

Exhibit 1 Page -81-

US 7,020,132 B1

15

transmitting the converted message into a public switched telephone network to a destination telephone number associated with the user account.

20. A method comprising:

receiving in an internal packet data network an email message from the Internet;

correlating the email message with a user account in the internal packet data network;

16

queuing email the message in the internal packet data network;

performing a routing operation to determine a destination to forward the email message;

converting the routed message into a fax format; and

transmitting the converted message into a public switched telephone network to a destination telephone number associated with the user account and determined in said routing.

* * * * *

Exhibit 1 Page -82-